# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CLOUDING IP, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 12-675-LPS |
| | § | |
| RACKSPACE HOSTING, INC., | § | **JURY TRIAL DEMANDED** |
| RACKSPACE US, INC., and JUNGLE | § | |
| DISK, LLC | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS INDIRECT INFRINGEMENT CLAIMS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

*Pro Hac Vice:*

R. Laurence Macon
Kirt S. O'Neill
Melanie G. Cowart
AKIN GUMP STRAUSS HAUER & FELD
LLP
300 Convent Street, Suite 1600
San Antonio, Texas 78205-3732
(210) 281-7000
lmacon@akingump.com
koneill@akingump.com
mcowart@akingump.com

Kenneth L. Dorsney (#3726)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com

**ATTORNEYS FOR DEFENDANTS**
**RACKSPACE HOSTING, INC.,**
**RACKSPACE US, INC., and JUNGLE DISK, LLC**

Dated: July 12, 2013

# TABLE OF CONTENTS

**Page**

I.      NATURE AND STAGE OF PROCEEDINGS ....................................................................1

II.     SUMMARY OF THE ARGUMENT ...............................................................................1

III.    STATEMENT OF RELEVANT FACTS..........................................................................2

IV.     LEGAL STANDARD ...................................................................................................3

V.      ARGUMENT ...............................................................................................................4

        A.      Clouding's First Amended Complaint fails to state a claim for indirect
                infringement........................................................................................................4

                1.      Clouding's Second Amended Complaint fails to plead sufficient
                        facts to demonstrate specific intent...............................................................4

                2.      Even if Clouding pled sufficient facts to support specific intent,
                        those facts are contradicted by the public record and should
                        be disregarded . ........................................................................................7

VI.     CONCLUSION..............................................................................................................8

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apeldyn Corp. v. Sony Corp.*,
852 F. Supp. 2d 568 (D. Del. 2012)............................................................................6

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009).....................................................................................................4

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007).....................................................................................................4

*Bolick v. Pennsylvania*,
No. 10-1461, 2011 U.S. Dist. LEXIS 27513 (E.D. Pa. Mar. 15, 2011).......................3

*Commil USA, LLC v. Cisco Sys.*,
No. 2012-1042, 2013 U.S. App. LEXIS 12943 (Fed. Cir. June 25, 2013)..................7

*Common Cause of Pa. v. Pennsylvania*,
558 F.3d 249 (3d Cir. 2009).........................................................................................3

*DSU Medical Corp. v. JMS Co., Ltd.*,
471 F.3d 1293 (Fed. Cir. 2006)...............................................................................5, 6

*E.I. Du Pont De Nemours & Co. v. Heraeus Holding GMBH*,
No. 11-773, 2012 U.S. Dist. LEXIS 140037 (D. Del. Sept. 28, 2012)........................6

*Fowler v. UPMC Shadyside*,
578 F. 3d 203 (3d Cir. 2009).....................................................................................3, 4

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011).................................................................................................4

*Hand Held Products, Inc. v. Amazon.com, Inc.*,
No. C.A. 12-768, 2013 U.S. Dist. LEXIS 16328 (D. Del. Feb. 6, 2013) ..................6

*Mack v. South Bay Beer Distributors, Inc.*,
798 F.2d at 1281 (9th Circuit 1986)............................................................................7

*Mayer v. Belichick*,
605 F.3d 223 (3d Cir. 2010).........................................................................................7

*Monec Holding AG v. Motorola Mobility*,
897 F. Supp. 2d 225 (D. Del. 2012).....................................................................1, 5, 6

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997)..................................................................................3

*Mumma v. High-spec, Inc.*,
   No. 1:09-CV-1447, 2009 U.S. Dist. LEXIS 111866 (M.D. Pa. Dec. 2, 2009).........................3

*Nami v. Fauver*,
   82 F.3d 63 (3d Cir. 1996).......................................................................................3

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993)..................................................................................7

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
   412 F. 3d 1284 (Fed. Cir. 2005).............................................................................7

*Schuylkill Energy Rees., Inc. v. Pennsylvania Power & Light Co.*,
   113 F.3d 405 (3d Cir. 1997)...................................................................................3

*Walker Digital v. Facebook*,
   852 F. Supp. 2d 559 (D. Del. 2012)........................................................................6

*Xpoint Tech. v. Microsoft Corp.*,
   730 F. Supp. 2d 349 (D. Del. 2010).......................................................................4


**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(6) .................................................................1, 7

## APPENDIX

Exhibit A:     Collectively, the Patent Trial and Appeal Board of the United States Patent and Trademark Office's April 24, 2013 and May 1, 3, 7, 16, and 23, 2013 Decisions.

Exhibit B:     *Monec Holding AG v. Motorola Mobility*, C.A. No. 11-798-LPS, Monec's First Amended Complaint (D.I. 34).

Exhibit C:     *Clouding IP, LLC v. Amazon.com, Inc*., C.A. No. 12-641-LPS, Clouding's Second Amended Complaint (D.I. 67).

Exhibit D:     *Clouding IP, LLC v. Oracle Corp.*, C.A. No. 12-642-LPS, Clouding's Second Amended Complaint (D.I. 87).

I.      NATURE AND STAGE OF PROCEEDINGS

On September 9, 2012, Defendants Rackspace Hosting, Inc., Rackspace US, Inc. and Jungle Disk, LLC (collectively, "Rackspace") moved to dismiss Plaintiff Clouding IP, LLC's claims for induced and willful infringement for failure to state a claim upon which relief can be granted (D.I. 16).  On May 24, 2013, the Court granted Rackspace's motion with respect to indirect infringement, but also granted Clouding leave to amend its complaint (D.I. 62). Consequently, on June 22, Clouding filed its Second Amended Complaint for Patent Infringement (D.I. 87).[1]  But the second amended complaint still fails to allege sufficient facts to support Plaintiff's induced infringement claims.  Thus, Defendants again move under Federal Rule of Civil Procedure 12(b)(6) to dismiss those claims.

II.     SUMMARY OF THE ARGUMENT

Plaintiff again fails to meet the threshold requirements for asserting post-litigation induced infringement.  Plaintiff merely adds more boilerplate language to support its claim that Defendants specifically intended or encouraged others to infringe.[2]  But those nonspecific statements are insufficient to state a claim for induced infringement.  Consequently, Plaintiff's failure to plead any facts from which the Court can infer intent is again fatal to its induced infringement claims.[3]

What is more, Clouding's boilerplate allegations ignore public records that contradict its claims that Rackspace intends to induce infringement.  Specifically, recent decisions from the

---

[1] Clouding alleges induced infringement of the U.S. Patent Nos. 7,596,784, 7,065,637, 6,738,799, 6,925,481, 6,631,449, and 6,918,014.  Thus, for purposes of this Motion, the term "patents at issue" will refer only to those six patents.

[2] *See, e.g.,* Second Amended Complaint (D.I. 71) at ¶¶ 16-17.

[3] *See, e.g. Monec Holding AG v. Motorola Mobility*, 897 F. Supp. 2d 225, 234-235 (D. Del. 2012).

Patent Trial and Appeal Board of the United States Patent and Trademark Office ("PTAB") show findings of a reasonable likelihood of unpatentability for at least one claim of each of the six patents Rackspace is accused of indirectly infringing.  In other words, those public records establish a reasonable belief that Clouding's patents are invalid—thereby negating any intent allegations.

In sum, Clouding's Second Amended Complaint fails to plead sufficient facts to support an inference that Rackspace specifically intended or encouraged others to infringe.  And even if the Complaint does sufficiently allege intent, those allegations are negated by public records.  Accordingly, Clouding's induced infringement claims should be dismissed for failure to state a claim.

## III.    STATEMENT OF RELEVANT FACTS

On May 24, 2013, the Court dismissed Clouding's induced infringement claims because Clouding "failed to plead facts from which the Court [could] infer intent."[4]  The Court however, granted Clouding leave to amend its complaint to correct that deficiency.

Accordingly, on June 22, 2013, Plaintiff filed its Second Amended Complaint again alleging, *inter alia,* induced infringement of the patents at issue.  But yet again, Clouding's copy-and-paste allegations of intent fail to identify specific examples of Rackspace's intent to induce infringement.[5]  Instead, Clouding simply alleges that Rackspace "markets and promotes," "sells," and "makes" its products, and "instructs its customers and end-users how to use such

---

[4] May 24, 2013 Memorandum Opinion (D.I. 61) at 6.
[5] *See, e.g.,* (D.I. 71) at ¶¶ 12-18, 25-30, 37-42, 56-61, 82-88, and 95-101.

products and services in a manner that infringes" the patents.[6]   That is, Clouding again fails to plead sufficient facts from which the Court can infer intent.

Moreover, since Plaintiff filed it first amended complaint, PTAB granted all eleven of Oracle's *inter partes* review ("IPR") petitions, six of which cover the patents at issue. Specifically, PTAB concluded that a reasonable likelihood exists that Oracle would prevail on showing that some claims in the patents are unpatentable.[7]   Consequently, any alleged fact Plaintiff pled that could lead to an inference of intent is negated by the PTAB decisions.

## IV.   LEGAL STANDARD

When considering a motion to dismiss, the Court should engage in a two-part analysis.[8] First, the Court should accept as true all well-pled allegations and construe the complaint in the light most favorable to the plaintiff.[9]   That said, the Court need not accept as true "bald assertions,"[10] "unsupported conclusions and unwarranted inferences,"[11] or allegations that are "self-evidently false."[12]   Similarly, courts can refuse to consider factual allegations that are plainly contradicted by matters of public record.[13]   Second, excluding any "self-evidently false"

---

[6] *See, e.g.,*(D.I. 71) at ¶¶ 16, 28, 40, 59, 86, and 99.

[7] *See* Ex. A (collectively, PTAB's 4/24/13, 5/1/13, 5/3/13, 5/7/13, 5/16/13, and 5/23/13 Decisions).

[8] *Fowler v. UPMC Shadyside*, 578 F. 3d 203, 210 (3d Cir. 2009).

[9] *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 253 (3d Cir. 2009); *Fowler*, 578 F.3d at 210.

[10] *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997),

[11] *Schuylkill Energy Rees., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997),

[12] *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

[13] *See, e.g.*, *Bolick v. Pennsylvania*, No. 10-1461, 2011 U.S. Dist. LEXIS 27513, at *17 (E.D. Pa. Mar. 15, 2011) ("[W]e cannot accept as true an allegation that is plainly contradicted by a matter of public record."); *Mumma v. High-spec, Inc.*, No. 1:09-CV-1447, 2009 U.S. Dist. LEXIS 111866, at *2 (M.D. Pa. Dec. 2, 2009) (refusing to consider factual allegations "that are directly contradicted by documents that are matters of public record").

allegations, the Court should next determine whether the remaining well-pled facts state a plausible claim to relief.[14]   Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[15]   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the conduct alleged."[16]

## V.   ARGUMENT

### A.   Clouding's Second Amended Complaint fails to state a claim for indirect infringement.

#### 1.   *Clouding's Second Amended Complaint fails to plead sufficient facts to demonstrate specific intent.*

Plaintiff's Second Amended Complaint fails to state a claim for induced infringement because it fails to demonstrate that Defendants had the requisite intent to induce infringement. Without such intent, Plaintiff's claims for induced infringement must again be dismissed.

Induced infringement must be predicated on "purposeful, culpable expression and conduct."[17]   "To demonstrate inducement of infringement, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."[18]   That is, an inducement claim must show specific intent or encouragement of others to directly infringe—not

---

[14] *Fowler*, 578 F.3d at 211 (citing *Iqbal*, 556 U.S. at 679).

[15] *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

[16] *Id.* at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 556 (2007)).

[17] *Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060, 2066-67 (2011).

[18] *Xpoint Tech. v. Microsoft Corp.,* 730 F. Supp. 2d 349, 356 (D. Del. 2010) (internal citations omitted).

merely intent to cause acts that produce direct infringement.[19]   Here, Clouding again fails to make a plausible showing that Rackspace has specific intent to induce infringement.

More specifically, even though Clouding's Second Amended Complaint identifies an example of an accused product, and includes broad and generic allegations that Rackspace "markets and promotes," "sells," and "makes" its products and "instructs its customers and end-users how to use such products and services in a manner that infringes" the patents, the complaint fails to allege any specific acts that permit the Court to infer intent to induce infringement.[20]   And when plaintiff a merely identifies accused products and makes general allegations that an accused infringer advertised its products and instructed its end users on infringing use, the motion to dismiss should be granted.[21]

For example, in *Monec*, the plaintiff identified specific accused products and made generic allegations that (i) the defendants advertised infringing products for sale in the United States, (ii) supplied infringing products to customers, and (iii) instructed their customers on uses of infringing products.[22]   But Monec failed to plead any specific acts to plausibly show the defendants' specific intent.   That is, Monec's "allegations of marketing activities of the

---

[19] *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) ("It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement.")

[20] *See, e.g.,* (D.I. 71) at ¶¶ 16, 28, 40, 59, 86, and 99.

[21] *See, e.g.*, *Monec*, 897 F. Supp. 2d at 234-235.

It is impossible for Clouding to argue that it identified *specific* facts from which the Court can infer *Rackspace's* intent because Clouding copy-and-pasted substantially the *same* formulaic allegations in its complaints against Amazon and Oracle.  *See, e.g.,* Exhibit C (*Clouding IP, LLC v. Amazon.com, Inc*., C.A. No. 12-641-LPS, Clouding's Second Amended Complaint (D.I. 67) and Exhibit D (*Clouding IP, LLC v. Oracle Corp.*, C.A. No. 12-642-LPS, Clouding's Second Amended Complaint (D.I. 87).  Clouding's complaint is contains only general allegations which are void of Rackspace specific facts.

[22] *See*  Exhibit B  (*Monec Holding AG v. Motorola Mobility*, C.A. No. 11-798-LPS, Monec's First Amended Complaint (D.I. 34)) at ¶¶ 29-33, 54-58, 84-88.

Defendants [did] not, on their own, demonstrate that Defendants knew such actions were infringing or that Defendants possessed specific intent to encourage another's infringement."[23] Thus, the Court dismissed Monec's induced infringement claims.[24]  The same should occur here.

Clouding's allegations simply fail to include the requisite factual allegations to survive a motion to dismiss.  Specifically, Clouding's induced infringement claim is void of factual allegations such as: (i) "the nature of the relationship between Defendants and their customers," or (ii) "how the sale of Defendants' products relates to the patented [claims]."[25]  Clouding also fails to include any number of other allegations that may have passed muster—such as pleading specific acts to show *how* Rackspace allegedly advertised or provided instruction on the use of the accused features that allegedly practice the asserted patents.[26]

Consequently, Clouding *again* fails to plead sufficient facts to support an allegation of specific intent.  Without such facts, Clouding cannot rely on allegations of continued infringement by Rackspace to support its induced infringement claims.[27]  As such, Clouding's claims for induced infringement in counts I, II, III, V, VIII, and IX should be dismissed.

---

[23] *Monec*, 897 F. Supp. 2d at 234.

[24]*Id.* at 237.

[25] *E.I. Du Pont De Nemours & Co. v. Heraeus Holding GMBH,* No. 11-773, 2012 U.S. Dist. LEXIS140037, at *22-23 (D. Del. Sept. 28, 2012).

[26] *See, e.g.*, *Hand Held Products, Inc. v. Amazon.com, Inc.*, No. C.A. 12-768, 2013 U.S. Dist. LEXIS 16328, at *15-19 (D. Del. Feb. 6, 2013) (finding pleading that included specific allegations of how defendants encouraged or instructed their customers to scan barcodes and check retail prices to be sufficient); *Apeldyn Corp. v. Sony Corp.*, 852 F. Supp. 2d 568, 573 (D. Del. 2012) (finding pleading that included allegations that defendant Sony worked "directly with American customers to develop infringing LCD televisions for sale by its customers to end consumers" sufficient); *Walker Digital v. Facebook*, 852 F. Supp. 2d 559, 563-64 (D. Del. 2012) (finding pleading that included specific examples and screen-shot exhibits showing how defendants encouraged their customers to use the accused apparatuses for cross-benefits as allegedly claimed in the patent-in-suit to be sufficient).

[27] *DSU*, 471 F. 3d at 1306.

> ### 2. Even if Clouding pled sufficient facts to support specific intent, those facts are contradicted by the public record and should be disregarded.

Although the Court is required to take all factual allegations in a complaint as true, it is not obligated to do so if those allegations, such as the one here, are plainly contradicted by matters of public record.[28]   For example, Clouding claims that Rackspace "has not produced an opinion of counsel . . .  evaluation, analysis, or investigation relating to invalidity," and that Rackspace is "unaware of any legal or factual basis that its actions, solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement."[29]   But these allegations disregard and contradict public records.   That is, Clouding's blanket and unsupported allegations of specific intent ignore the fact that eleven of eleven IPRs, covering all six patents at issue, have been instituted with findings of a reasonable likelihood of unpatentability.[30]   And because it is axiomatic that one cannot infringe an invalid patent,[31]  and because "a good-faith belief of invalidity may negate the requisite intent for induced infringement,"[32] the IPR decisions directly contradict Clouding's allegations that Rackspace has no legal basis to support invalidity or noninfringement arguments.

---

[28] In deciding a 12(b)(6) motion, courts may consider matters of public record.  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *Pension Benefit*, 998 F.2d at 1196.  Public records include decisions or reports issued by administrative bodies.  *See, e.g., Id.* at 1197 (citing *Mack*, 798 F.2d at 1281  (abrogated on other grounds) (holding that ALJ decisions at California Unemployment Insurance Appeals Board constitute public records that can be considered in 12(b)(6) motions without converting to summary judgment)).

[29] *See, e.g.*, D.I. 71 at ¶¶ 17, 29, 41, 60, 87, and 100.

[30] Ex. A.

[31] *See, e.g.*, *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 412 F. 3d 1284, 1291 (Fed. Cir. 2005).

[32] *Commil USA, LLC v. Cisco Sys.*, No. 2012-1042, 2013 U.S. App. LEXIS 12943,*15 (Fed. Cir. June 25, 2013).

Simply put, Clouding's bare allegations that Rackspace's post-filing conduct demonstrates the requisite specific intent are clearly deficient, particularly given substantial portions of those allegations are contradicted by the public record.

## VI.   CONCLUSION

Not only does Clouding again fail to plead the requisite specific intent, but the public record also demonstrates that Clouding will not be able to plead such requisite specific intent because Rackspace holds a reasonable belief that the patents are invalid.   Under these circumstances, the Court should dismiss Clouding's induced infringement claims, as set forth in paragraphs 12-18, 25-30, 37-42, 56-61, 82-88, and 95-101, and the Prayer for Relief in Plaintiff's Second Amended Complaint, for failure to state a claim.   Additionally, those claims should be dismissed with prejudice because there is no indication that Clouding will be able to cure the defects that plagued the First and Second Amend Complaints.

Dated:  July 12, 2013

*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
**MORRIS JAMES LLP**
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801
(302) 888-6800
kdorsney@morrisjames.com


− and −

*Pro Hac Vice:*

R. Laurence Macon
Kirt S. O'Neill
Melanie G. Cowart
**AKIN GUMP STRAUSS HAUER & FELD LLP**
300 Convent Street, Suite 1600
San Antonio, Texas 78205-3732
(210) 281-7000
lmacon@akingump.com
koneill@akingump.com
mcowart@akingump.com

**ATTORNEYS FOR DEFENDANTS
RACKSPACE HOSTING, INC., RACKSPACE
US, INC., and JUNGLE DISK, LLC**

# Exhibit "A"

## To

# DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS INDIRECT INFRINGEMENT CLAIMS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

Trials@uspto.gov                                          Paper 8
571-272-7822                              Entered:  April 24, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**ORACLE** CORPORATION
Petitioners,

v.

**CLOUDING** IP, LLC
Patent Owner.

_____

Case IPR2013-00073 (JL)
Patent 6,738,799

_____

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL W. KIM,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00073
Patent 6,738,799

# I.   INTRODUCTION

On December 8, 2012, Oracle Corporation ("Oracle") filed a petition requesting an *inter partes* review of claims 1, 5-10, 23, 24, and 37 of U.S. Patent 6,738,799 (Ex. 1001, "the '799 patent").  (Paper 1, "Pet.")  In response, Clouding IP, LLC ("Clouding") filed a patent owner preliminary response on March 12, 2013.  (Paper 7, "Prel. Resp.")  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition and patent owner preliminary response, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Oracle would prevail with respect to claims 1, 5-10, 23, 24, and 37 of the '799 patent.  Accordingly, pursuant to 35 U.S.C. § 314, we authorize an *inter partes* review to be instituted as to claims 1, 5-10, 23, 24, and 37 of the '799 patent.

## A.  Related Proceedings

Oracle indicates that the '799 patent is involved in co-pending litigation captioned *Clouding IP, LLC v. Oracle Corp.*, Case No. 1:12-cv-00642 (D.Del.). (Pet. 3.)

Case IPR2013-00073
Patent 6,738,799

## B. The '799 Patent

The '799 patent is related to a method for file synchronization using a signature list.  (Ex. 1001, Title.)  In particular, the '799 patent discloses a method for synchronizing the local copies of files on client computers to the current versions of the files on a network drive.  (Ex. 1001, 1:24-27.)  According to the '799 patent, an object of the method is to provide a mechanism by which a user can be automatically provided with a current version of a subscription file in an efficient manner.  (Ex. 1001, 3:36-41.)  This is accomplished by having a server computer monitor network files for changes, and then send users email notifications and updates when there is a change to the files.  (Ex. 1001, 3:41-44.)

## C. Exemplary Claims

Of the challenged claims, claims 1, 23, and 37 are independent claims. Independent claims 1 and 23 recite similar limitations, but independent claim 37 is broader than those claims.  As to the dependent claims, claims 5-10 directly or indirectly depend from claim 1, and claim 24 depends from claim 23.  Claims 1 and 37 are exemplary of the claimed subject matter of the '799 patent, and are reproduced as follows (emphasis added):

> 1. A method for a first computer to generate an update for transmission to a second computer that permits the second computer to generate a copy of a current version of a file comprised of a first plurality of file segments from a copy of an earlier version of the file comprised of a second plurality of file segments, such that each file segment corresponds to a portion of its respective file, the method comprising the steps of:
>
> for each segment of the current version of the file,

3

(a) searching an earlier version of a signature list corresponding to an earlier version of the file for an old segment signature which matches a new segment signature corresponding to the segment;

(b) if step (a) results in a match, writing *a command* in the update for the second computer *to copy* an old segment of the second computer's copy of the earlier version of the file into the second computer's copy of the current version of the file, wherein the old segment corresponds to the segment for which a match was detected in step (a); and

(c) if step (a) results in no match, writing *a command* in the update for the second computer *to insert* a new segment of the current version of the file into the second computer's copy of the current version of the file;

wherein the new segment of the current version of the file is written into the update and the unchanged segment is excluded from the update; and

wherein steps (a) through (c) are performed by the first computer, without interaction with the second computer, in response to the first computer detecting a change between the current version of the file and the earlier version of the file.

37. A method for a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files, the method comprising the steps of:

(a) determining whether the second computer has *a latest version* of a file, wherein said determining is performed by the first computer without interaction with the second computer;

(b) generating an update, if the second computer does not have a latest version of the file, wherein said generating is performed by the first computer without interaction with the second computer; and

(c) transmitting the update from the first computer to the second computer.

4

Case IPR2013-00073
Patent 6,738,799

## D. Prior Art Relied Upon

Oracle relies upon the following prior art references:

| Miller | U.S. Patent 5,832,520 | Nov. 3, 1998 | (Ex. 1004) |
| Freivald | U.S. Patent 5,898,836 | Apr. 27, 1999 | (Ex. 1005) |
| Williams | U.S. Patent 5,990,810 | Nov. 23, 1999 | (Ex. 1006) |
| Balcha | U.S. Patent 6,233,589 | May 15, 2001 | (Ex. 1003) |

## E. The Asserted Grounds

Oracle alleges that the challenged claims are unpatentable based on the following grounds:

1. Claims 1, 23, 24, and 37 are unpatentable under 35 U.S.C. § 102(e) as anticipated by William;

2. Claims 5-10 are unpatentable under 35 U.S.C. § 103(a) over William and Miller;

3. Claim 37 is unpatentable under 35 U.S.C. § 102(e) as anticipated by Balcha;

4. Claims 1, 5, 9, 10, 23, and 24 are unpatentable under 35 U.S.C. § 103(a) over Balcha and Miller;

5. Claims 6-8 are unpatentable under 35 U.S.C. § 103(a) over Balcha, Miller, and Freivald;

6. Claim 37 is unpatentable under 35 U.S.C. § 102(e) as anticipated by Freivald; and

7. Claims 1, 5-10, 23, 24, and 37 are unpatentable under 35 U.S.C. § 103(a) over Miller and Freivald.

5

Case IPR2013-00073
Patent 6,738,799

## II.   ANALYSIS

### A.  Claim Construction

As a first step in our analysis for determining whether to institute a review, we determine the meaning of the claims.  In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b).  Under the broadest reasonable construction standard, claim terms are presumed to be given their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  Here, the parties have not alleged that the inventor of the '799 patent acted as his own lexicographer and gave any claim term a special definition different from its recognized meaning to one with ordinary skill.  Therefore, the words of the claim will be given their plain meaning unless the plain meaning is inconsistent with the specification.  *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989).  In this regard, we must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Oracle provides its interpretations for two claim terms, "signature list" and "without interaction."  (Pet. 15-16.)  Clouding also submits its proposed interpretation for the claim term "signature list," and identifies four additional

Case IPR2013-00073
Patent 6,738,799

claim terms or phrases for which claim construction is sought: "update," "a command to copy," "determining whether the second computer has a latest version of a file," and "generating an update, if the second computer does not have a latest version of the file." Further, we find it necessary to construe the claim term "a command to insert," and the preamble of each independent claim being challenged. For this decision, we will construe each of these claim terms and phrases in turn.

  1. *"Signature list" (Claims 1 and 23)*

Oracle asserts that the term "signature list" should be interpreted as "a table or listing of unique identifiers *determined using any 'hashing method or signature algorithm'* including, but not limited to, Cyclic redundancy Checks (CRCs), Checksums, and any variety of hash functions." (Pet. 15, citing to Ex. 1001, 8:18-28, emphasis added.) Clouding counters that "a signature list is a collection (*e.g.*, a table) of representations of variable length segments of a subject file, which representations serve to identify the segments from which they are determined" (*e.g.*, a table of hashes). (Prel. Resp. 8, citing to Ex. 1001, 8:18-20, 29-54; fig. 5.)

To resolve the differences between the parties' proposed interpretations, we begin our analysis by reviewing the pertinent portions of the specification of the '799 patent. *See Phillips*, 415 F.3d at 1317 (The specification is the single best guide to the meaning of a claim term.).

Figure 3 of the '799 patent, reproduced below, depicts a subscription file and the signatures corresponding to the segments of the file.

7

Case IPR2013-00073
Patent 6,738,799



FIG. 3

Figure 3 of the '799 patent illustrates an earlier version of a subscription file that has been divided into six segments (A1-A6), and the signatures (SIG(A1)-(A6), 311-316) corresponding to the six segments. (Ex. 1001, 8:7-10.) Segments (A1-A6) represent variable length portions of the subscription file. (Ex. 1001, 8:10-12.) Signatures (311-316) are fixed length values *derived from the variable length segments* (A1-A6). (Ex. 1001, 8:18-28, emphasis added.) As explained in the '799 patent, the signatures *may*, but are not required to, be determined by a hashing method or signature algorithm (*e.g.*, the cyclic redundancy check (CRC) and MD5). (*Id.,* emphasis added.)

Figure 4 of the '799 patent, reproduced below, depicts a *signature list* that is corresponding to a subscription file.



As shown in Figure 4 of the '799 patent, for each segment, the signature list includes: (1) the segment/starting location (401-406); (2) the size (411-416); and

8

Case IPR2013-00073
Patent 6,738,799

(3) the signature (311-316).  (Ex. 1001, 8:29-54.)  The segment location and size allow the addresses of all of the data within the segment to be computed.  (*Id*.)

Applying the broadest reasonable interpretation standard, we agree with Clouding that the claim term "signature list" does not require the unique identifiers to be determined using a hashing method or signature algorithm.  The specification does not set forth any specific definition that requires such determination.  In fact, the specification merely suggests the usage of a hashing method, signature algorithm, or cyclic redundancy check in a preferred embodiment.  (*See e.g.*, Ex. 1001, 8:20-28 "The signatures 311 through 316 *may* be determined by any one of a variety of hashing methods or signature algorithms.  In the presently *preferred embodiment*, the signatures A1 through A6 are computed using the cyclic redundancy check (CRC)."  Emphasis added.)  Therefore, we decline to adopt Oracle's narrow interpretation of the claim term "signature list."

Because Clouding's construction is consistent with the specification, on this record, we adopt its construction of the claim term "signature list" to mean a signature list is a collection (*e.g.*, table) of representations of variable length segments of a subject file, which representations serve to identify the segments from which they are determined (*e.g.*, a table of hashes).

2.  *"Update" (Claims 1, 23 and 37)*

Clouding urges the Board to construe the claim term "update" as "an item that allows a second computer to build a current version of a file from a local copy of that file."  (Prel. Resp. 9-11, citing to Ex. 1001, 1:24-27; 10:15-22; 11:60-12:13.)  Oracle did not submit any interpretation as to this claim term.

9

Case IPR2013-00073
Patent 6,738,799

The claim term "update" has the following dictionary definition:  "current information for updating something or *an up-to-date version*, account, or report."[1] (Emphasis added.)  In the context of file synchronization, we therefore construe the claim term "update" broadly, but reasonably, as information for updating a file or an up-to-date version of a file.

We do not adopt Clouding's narrow interpretation, as Clouding does not direct our attention to any special definition provided in the specification that would exclude an up-to-date version of a file from the meaning of the claim term "update."  While the specification provides examples where the second computer already maintains a version of the file which may suggest that the claim term "update" means "information for updating a file," nonetheless it would be improper to import such a limitation from the specification into the claims.  *See Phillips*, 415 F.3d at 1323 (Although the specification often describes very specific embodiments of the invention, our reviewing court has repeatedly warned against confining the claims to those embodiments.).  Furthermore, the term "an item" as proposed by Clouding in its construction is vague in the context of the claimed subject matter.

3.  *"Command to copy" (Claims 1 and 23)*

Each of claims 1 and 23 recites the following claim phrase:  "writing *a command* in the update for the second computer *to copy* an old segment of the second computer's copy of the earlier version of the file into the second

---

[1] MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/update (last visited Apr. 10, 2013).

Case IPR2013-00073
Patent 6,738,799

computer's copy of the current version of the file."  (Emphasis added.)

Clouding urges the Board to construe that claim phrase to require "*a copy command*" be written in the update.  (Prel. Resp. 4-6.)  Clouding asserts that the examples provided in the specification of the '799 patent indicate that "it is *a copy command* that is being referenced in the claims."  (*Id.*, citing to Ex. 1001, 11:19-23; 11:57-12:13; figs. 10 and 11.)  Clouding through its arguments related to prior art grounds of unpatentability, which we address *infra*, implies that a copy command must be written in a specific format or form to include the word "copy" (*e.g.*, Prel. Resp. 36-38).

Turning first to the claim language, it does not limit the claimed "command" to any specific format or form written in the update file for instructing the second computer to perform the function "to copy."  As ordinarily understood, "command" means "an instruction to a computer program that when issued by the user, causes an action to be carried out"; and "copy" means "to duplicate information and reproduce it in another part of a document, in a different file or memory location, or in a different medium."[2]  With the context of the claimed subject matter and the specification of the '799 patent in mind, we construe the claim phrase "a command to copy" to mean an instruction that causes the computer to duplicate information or data.

We further disagree with Clouding that the specification of the '799 patent supports its narrow interpretation.  Clouding fails to point out a special definition in the specification.  Clouding's argument also seems to be relying upon a

---

[2] Microsoft Computer Dictionary, Microsoft Press, 5th edition, 2002.

11

Case IPR2013-00073
Patent 6,738,799

preferred embodiment disclosed in the '799 patent.  (Prel. Resp. 5-6, citing to Ex. 1001, 11:57-12:13; fig. 11).  Specifically, Clouding relies upon Figure 11 of the '799 patent, reproduced below, that illustrates an updated file that contains *a copy command* (*id.*).



FIG. 11

However, other portions of the specification of the '799 patent do not limit the word "command" to any specific format or form.  (*See e.g.*, Ex. 1001, 11:19-23.)  For example, Figure 10 of the '799 patent depicts a flowchart for generating an update file, and is reproduced as follows:



FIG. 10

As illustrated by Figure 10 of the '799 patent, the new segment signature is

12

Case IPR2013-00073
Patent 6,738,799

compared to the old segment signature (Step 1002).  (Ex. 1001, 11:3-4.)  If there is a match, the method 1000 "writes *a command* in the update file *to copy* the old segment into the client computer's copy of the current version of the subscription file at step 1003."  (Ex. 1001, 11:19-23, emphasis added.)  Therefore, construing the claim phrase to require "a copy command" or limiting the claimed "command" to a specific format or form, as proposed by Clouding, would be importing the limitation from the specification into the claim improperly.  *In re Zletz*, 893 F.2d at 321 ("[L]imitations are not to be read into the claims from the specification.").

### 4.  *"Command to insert"* (Claims 1 and 23)

Each of claims 1 and 23 recites the following claim phrase:  "writing *a command* in the update for the second computer *to insert* a new segment of the current version of the file into the second computer's copy of the current version of the file."  (Emphasis added.)

Similar to the claim phrase "a command to copy," the claim language of the phrase "a command to insert" does not limit the claimed "command" to any specific format or form written in the update file for instructing the second computer to perform the function "to insert."  The claim term "insert" ordinarily is understood as "to put or introduce into the body of something."[3]

In the context of the specification of the '799 patent and the claimed subject matter, we therefore interpret the claim phrase "a command to insert" to mean an instruction that causes the computer to put or introduce certain information or data

---

[3] MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/insert (last visited Apr. 10, 2013).

Case IPR2013-00073
Patent 6,738,799

into another file.

5. *"Determining whether the second computer has a latest version of a file"* *and "Generating an update, if the second computer does not have a latest* *version of the file" (Claim 37)*

Clouding urges the Board to construe these claim phrases cited in claim 37 to require "that the second computer must currently possess some version of the file." (Prel. Resp. 6-7.) In Clouding's view, "[b]y articulating a process that requires a first computer to determine whether a second computer *has* a copy of a file (i.e., a latest version of that file), claim 37 necessarily implies that the second computer must already possess some version of the file." (*Id*.) To support its contention, Clouding directs our attention to the specification of the '799 patent (Ex. 1001, 1:24-27 "the present invention involves the synchronization of the local copies of files on user's [sic] client computer hard disk to the current version of the files on a network drive"), and to its discussion regarding the "copy command." (Prel. Resp. 4-6.)

We decline to adopt Clouding's proposed construction that requires the second computer to possess some version of the file prior to "transmitting the update from the first computer to the second computer." With respect to the determining step, Clouding improperly substitute the claim phrase "a *latest* version of a file" with its proposed language "a copy of a file." Also, the generating step does not require the second computer to possess a version of the file. As discussed previously, the claim term "update" is interpreted as information for updating a file or *an up-to-date version of a file*.

14

Case IPR2013-00073
Patent 6,738,799

Moreover, Clouding's discussion regarding the "copy command" is inapposite for the interpretation of claim limitations in claim 37, as claim 37 does not recite a "copy" limitation. The "copy command" discussion is directed to claims 1 and 23, rather than claim 37.

The portion of the specification cited by Clouding does not provide a special definition that supports Clouding's proposed construction to require the additional limitation. Requiring the second computer to have a copy of the file would be importing a limitation from the specification into the claim, which we decline to do. *In re Zletz*, 893 at 321.

6. *"Without interaction" (Claims 1, 23, and 37)*

Oracle asserts that the term "without interaction" should be interpreted as limiting the interaction between first and second computers only for the purposes specifically recited in the claims. (Pet. 15.) In particular, Oracle argues that the claims do not require the computer systems to operate with complete independence from one another, but only "without interaction" for the purposes specified in the claims. Clouding did not submit any interpretation as to this claim term.

We agree with Oracle's interpretation as it is consistent with other claim language. For instance, the limitation "determining whether the second computer has a latest version of a file, wherein said determining is performed by the first computer *without interaction* with the second computer" recited in claim 37 merely limits the first computer's interaction with the second computer in the context of determining whether the second computer has a latest version of a file. By comparison, step (c) of claim 37 does not recite "without interaction," and thus the

15

Case IPR2013-00073
Patent 6,738,799

first computer may interact with the second computer when transmitting the update to the second computer (*see* step (c) of claim 37).

   7.   *The Preambles (Claims 1, 23, and 37)*

      The preamble of claim 37 provides that "[a] method for a first computer to provide updates for transmission to a second computer that permits the second computer to obtain most recent versions of files."  And each preamble of claims 1 and 23 recites the following:

> A method for a first computer to generate an update for transmission to a second computer that permits the second computer to generate a copy of a current version of a file comprised of a first plurality of file segments from a copy of an earlier version of the file comprised of a second plurality of file segments, such that each file segment corresponds to a portion of its respective file,

      The language in each preamble provides antecedent basis for many of the important terms in the respective claim body (*e.g.*, "a first computer," "an update," "second computer," "a copy of a current version of a file," and "file segments"). Further, the language in each preamble expressly states that the transmission of the update permits the second computer to obtain the most recent version of a file, while the respective claim body may have set forth such a limitation implicitly.

      Because the bodies of independent claims 1, 23, and 37 depend on their preambles for completeness, we determine that the preambles of those claims are entitled to patentable weight.  *Catalina Marketing Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999) (A preamble limits the invention if it

recites essential structure or steps, or if it is "necessary to give life, meaning, and vitality" to the claim.).

### B.  Claims 1, 23, 24, and 37 – Anticipated by Williams

Oracle asserts that claims 1, 23, 24, and 37 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Williams.  (Pet. 46-54.)  In support of this asserted ground of unpatentability, Oracle provides detailed explanations as to how each claim limitation is met by Williams, and a declaration of Dr. Andrew Grimshaw ("Dr. Grimshaw").  (Pet. 46-54, citing to Ex. 1007, ¶¶ 24, 35, 36, 46.)  Upon review of Oracle's analysis and supporting evidence, we determine that Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claims 1, 23, 24, and 37 on the ground that these claims are anticipated by Williams.

In its patent owner's preliminary response, Clouding argues that Oracle fails to establish a reasonable likelihood that claims 1, 23, and 24 are anticipated by Williams.  (Prel. Resp. 35-40.)  In particular, Clouding asserts that Williams does not describe "a command to copy" or "a command to insert" as recited in the claims.  (*Id.*)

We are not persuaded by Clouding's arguments as they are based on narrow interpretations of the disputed claim phrases, which we decline to adopt (*see supra*).  Furthermore, Clouding fails to consider Williams from the perspective of a person of ordinary skill in the art.  *In re Graves*, 69 F.3d 1147, 1152 (Fed. Cir. 1995); *In re LeGrice*, 301 F.2d 929, 936 (CCPA 1962) (A reference anticipates a claim if it discloses the claimed invention such that a skilled artisan could take its

Case IPR2013-00073
Patent 6,738,799

teachings in combination with his own knowledge of the particular art and be in possession of the invention.).

Williams

Williams describes a fine-grained incremental backup system and the process thereof.  (Ex. 1006, 19:26-22:14.)  Figure 25 of Williams, reproduced below, illustrates the backup process for two network computers.



As shown in Figure 25 of Williams, each of the network computers (E1 & E2) has a version of the same file (X and Y).  When file X on computer E1 is modified, computer E2 will reconstruct a duplicate version of file X using file Y and the incremental backup file D sent from computer E1 to computer E2, rather than importing the entire file X from computer E1.  (Ex. 1006, 19:29-34; 19:63-20:2.)

For further improvement, Williams indicates that copies of the previous versions of the file system should be retained.  (Ex. 1006, 21:62-65.)  This means that computer E2 should maintain both file Y (the previous version) and a duplicate version of file X.

18

Case IPR2013-00073
Patent 6,738,799

As explained in Williams, computer E1 compares the hash of file Y against the hash of file X to determine whether file X has changed.  (Ex. 1006, 19:44-46.) If file X has changed, computer E1 partitions file X into subblocks, and compares the hashes of these subblocks with the hashes of file Y that are stored in shadow file S of computer E1, to find all identical hashes.  (Ex. 1006, 19:48-51.)  Identical hashes identify identical subblocks in file Y that can be transmitted by reference. (Ex. 1006, 19:51-52.)  Computer E1 then transmits the incremental backup file D as a mixture of raw subblocks and references to subblocks whose hashes appear in the shadow file S and which are known to appear as subblocks in file Y.  (Ex. 1006, 19:52-55.)

To reconstruct a duplicate version of file X from file Y and incremental backup file D, computer E2 partitions file Y into subblocks and calculates the hashes of subblocks.  (Ex. 1006, 19:66-20:2.)  It then processes the incremental backup information, copying subblocks that were transmitted raw and looking up the references in file Y.  (Ex. 1006, 20:2-5.)

Whether Williams describes the disputed claim limitations

With respect to Clouding's argument that Williams does not describe "a command to copy," this argument is based on Clouding's narrow claim interpretation, which we decline to adopt.  As discussed previously, we construe the claim phrase "a command to copy" as *an instruction that causes the computer to duplicate information or data*.  Under the proper construction, the claim language does not limit the claimed "command" to a specific format or form.

19

Case IPR2013-00073
Patent 6,738,799

Clouding fails to recognize that, as explained in Williams, the subblocks of file Y are *duplicated* in computer E2, and that is caused by the instructions in the incremental backup file D.  In that regard, Williams describes that the incremental backup file D contains instructions that cause the computer E2 to *duplicate* certain subblocks of file Y, so that a duplicate version of file X is reconstructed from file Y and the incremental backup file D, and computer E2 may maintain both file Y (the previous version) and the duplicate version of file X.  (Ex. 1006, 19:26-22:14.)

Additionally, Clouding's arguments focus narrowly on limited portions of Williams that merely contain the word "copy," without considering the entire disclosure of Williams' fine-grained incremental backup process relied upon by Oracle.  (*See e.g.*, Prel. Resp. 36-37, citing to Ex. 1006, 19:29-34; 22:1-6.)  Those arguments are misplaced because the reference need not satisfy an *ipsissimis verbis* test to anticipate.  *In re Gleave,* 560 F.3d 1331, 1334 (Fed. Cir. 2009).

<u>Expert testimony</u>

Clouding further contends that the testimony of Dr. Grimshaw does not support Oracle's asserted ground of unpatentability, because Dr. Grimshaw's testimony makes a reference to Miller and contains a drawing that is not part of Williams's actual disclosure.  (Prel. Resp. 36, citing to Ex. 1007, ¶ 35-36, the drawing on p. 26.)  We are not persuaded by that argument.

At the time of his declaration, Dr. Grimshaw was employed as a Professor of Computer Science at the University of Virginia School of Engineering and Applied Science and Chief Architect for the NCSA-led eXtrem Science and Engineering Discovery Environment project.  (Ex. 1007, ¶ 1.)  Dr. Grimshaw holds a Ph.D. in

20

computer science and has more than 25 years of teaching and research experience in distributed systems including client-server and peer-2-peer interaction, grid computing, high-performance parallel computing, compilers for parallel systems, and operating systems.  (Ex. 1007, ¶¶ 2-10.)  Therefore, we conclude that Dr. Grimshaw is qualified to testify as to the understanding of a person of ordinary skill in the art at the time of the invention.

Based on Figure 25 of Williams and the relevant portions of Williams, Dr. Grimshaw testifies (Ex. 1007, ¶ 36):

> First, using traditional methods for determining if a file has changed, such as, for example, periodic modification date or back up date comparisons, the system of Miller determines whether to initiate a backup procedure.   [Williams, Ex. 1006, 22:10-14.]   Second, computer E1 compares the signature list (*i.e.*, "hashes of subblocks") for old file Y with the signature list for new file X.   From the comparison, incremental backup file D is generated.   After D is transmitted to computer E2, E2 uses its copy of old file Y and the instructions accompanying file D (*e.g.*, insert and copy commands) to generate and save a copy of new file X at E2. As shown below, file D provides the following instructions to E2:



Following these instructions results in a copy of X being created at E2.



21

Case IPR2013-00073
Patent 6,738,799

Contrary to Clouding's assertion that the testimony of Dr. Grimshaw does not support Oracle's asserted ground of unpatentability, we determine that Dr. Grimshaw's testimony is credible and supports Oracle's contention that Williams describes the disputed claim limitations.

Dr. Grimshaw's testimony does not rely on Miller to describe "a command to copy," but merely points to Miller as an example of using a traditional method for determining whether a file has changed.  (Ex. 1007, ¶ 36.)  Clouding does not dispute that Williams describes the determining step as recited in the challenged claims.  Indeed, Williams contains such a disclosure for determining whether a file has changed.  (Ex. 1006, 19:44-50 "E1 compares the hash of Y (stored in S) against the hash of X to see if X has changed" and 22:10-14 "the traditional methods for determining if a file has changed since the last backup (modification date, backup date and so on) can be used.")

As to Clouding's objection to Dr. Grimshaw's drawing, it is clear from the testimony that Dr. Grimshaw did not present the drawing as Williams' actual disclosure, but merely as an explanation to Figure 25 of Williams.  Therefore, Clouding's objection is without merit.

Other considerations – Claim 37

Clouding asserts that the petition fails to establish a reasonable likelihood that claim 37 is anticipated by Williams.  In particular, Clouding urges the Board not to institute an *inter partes* review based on Williams pursuant to 35 U.S.C. § 325(d).  (Prel. Resp. 45.)  According to Clouding, Oracle has not raised any issues that were not previously considered because the Office considered U.S.

22

Case IPR2013-00073
Patent 6,738,799

Patent 6,101,507 to Crane during the original prosecution of the '799 patent, and Crane describes substantively the same process as Williams.  (Prel. Resp. 43-44.)

The statutory provision does not require the Director, in deciding whether to institute *inter partes* review, to defer to a prior determination in the Office, even one which considered the same prior art and arguments.  The statute gives the Director the authority not to institute a review on the basis that the same or substantially the same prior art or arguments were presented previously to the Office, but does not require that result.

Here, unlike the case in *ex parte* prosecution of the application that issued as the '799 patent, Oracle is a party to the proceeding.  Oracle presents different arguments and new supporting evidence that were not before the examiner, shedding a different light on Williams.  As such, we decline to deny this ground of unpatentability based on Williams under 35 U.S.C. § 325(d).

### C. Claims 5-10 – Unpatentable Over Williams and Miller

Oracle asserts that claims 5-10, which depend from claim 1 are unpatentable under 35 U.S.C. § 103(a) over Williams and Miller.  (Pet. 54-59.)  In particular, Oracle alleges that the combination of the cited prior art reference describes all of the claim limitations and provides a rationale for combining the references.  (*Id.*)

Clouding counters that the combination of Williams and Miller fails to provide a difference file having a command to copy.  (Prel. Resp. 40-43.)  We are not persuaded by Clouding's arguments.  Rather, we determine that Williams describes "a command to copy" as recited in claim 1 for the reasons set forth above.

23

Case IPR2013-00073
Patent 6,738,799

We have reviewed Oracle's analysis and supporting evidence, and determine that Oracle's assertion has merit.  On this record, Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claims 5-10 based on the ground that these claims are unpatentable over Williams and Miller.

### D. Claim 37 – Anticipated by Balcha

Oracle asserts that claim 37 is unpatentable under 35 U.S.C. § 102(e) as anticipated by Balcha.  (Pet. 25-27.)  Oracle also provides detailed explanations as to how each claim limitation is met by Balcha and directs our attention to Dr. Grimshaw's testimony.  (*Id.*, citing to Ex. 1007 ¶¶ 23, 25, 44.)  Based on our review of the petition, we determine that Oracle's analysis and supporting evidence have merit.

Clouding responds that Oracle fails to establish a reasonable likelihood that claim 37 is anticipated by Balcha.  (Prel. Resp. 24-26.)  Specifically, Clouding alleges that Balcha does not describe "determining whether a second computer has a latest version of a file" as recited in claim 37.  (*Id.*)  We do not agree.

Balcha discloses a method for synchronization of files.  (Ex. 1003, 1:5-7.) In particular, a synchronized file exists on two different servers, and changes made to one file must be reflected in the other file.  (Ex. 1003, 1:42-44.)  Figure 1 of Balcha, reproduced below, illustrates a computer network with two servers using file synchronization.

24

Case IPR2013-00073
Patent 6,738,799



FIG. 1

As shown in figure 1 of Balcha, servers (22 & 24) are interconnected via a network 26, and each server (22 & 24) maintains a copy of a base file (21 & 27) and a base signature file (20 & 28). (Ex. 1003, 4:51-53.) The base files (21 & 27) should be identical, but either base file can be modified at either server. (Ex. 1003, 4:53-61.) *Upon detection of a modification to the file*, the detecting server (*e.g.*, server 22), uses the respective base signature file (*e.g.*, base signature file 20) to generate a new delta file, and communicates the delta file over network 26 to server 24. (Ex. 1003, 4:61-66, emphasis added.) Server 24 uses the delta file to update the base file 27, and recalculates the base signature file 28. (Ex. 1003, 4:66-67.) As a consequence, the base files on the servers will stay in synchronization with minimal transfer of data over network 26. (Ex. 1003, 5:1-3.)

Figure 3 of Balcha, reproduced below, illustrates the relationship of the files.



FIG. 3

25

Case IPR2013-00073
Patent 6,738,799

Referring to Figure 3 of Balcha, the base signature file (42) contains a
plurality of cyclic redundancy check (CRC) values derived from the data contained
in the base file (38). (Ex. 1003, 3:1-3; 3:21-28; 7:46-49.) When a revised version
of the base file (44) is created, a revised signature file (48), including a plurality of
revised bit patterns, is generated from the revised file (44). (Ex. 1003, 3:4-6;
7:49-53.) *Each revised bit pattern is compared to the base bit patterns in base
signature file 42.* (Ex. 1003, 7:57-59, emphasis added.) For each revised bit
pattern that matches a base bit pattern in base signature file 42, it is stored in
revised signature file 48, along with an offset indicating the location in revised file
44 of the beginning of the block of data represented by the revised bit pattern.
(Ex. 1003, 7:59-63.)

As explained in Balcha, based on the differences between the base signature
file and the revised signature file, a delta file reflecting the differences between the
base file and the revised file is generated. (Ex. 1003, 3:7-10; 3:50-54.) The delta
file contains primitives, such as insert, modify, and delete primitives, which are
commands that can be applied to a previous version of the file to generate the
revised file. (Ex. 1003, 54-58.)

Given those disclosures of Balcha, we determine that Balcha appears to
describe "determining whether a second computer has a latest version of a file"
as recited in claim 37. As explained by Oracle, Balcha's detecting server
determines whether a monitored file has been revised, and a revision to file 21
stored on server 22, for example, indicates that file 27 stored on server 24 is out of
date. (Pet. 26-27, citing to Ex. 1003, 4:52-67). Clouding does not provide
sufficient explanation or credible evidence as to why the detection of a file revision

26

Case IPR2013-00073
Patent 6,738,799

does not meet the claim limitation "determining whether a second computer has a latest version of a file."

Clouding's argument that Dr. Grimshaw's testimony relies upon the combination of Balcha and Miller is misplaced.  (Prel. Resp. 25, referring to Ex. 1007, ¶ 22.)  Oracle did not rely upon that portion of the testimony for this asserted ground of unpatentability.  (Pet. 25-27, citing to Ex. 1007, ¶¶ 23, 25, 44.)

For the foregoing reasons, we determine that Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claim 37 based on the ground that Balcha anticipates the claim.

### E.  Claims 1, 5, 9, 10, 23, and 24 – Obvious over Balcha and Miller; and Claims 6-8 – Obvious over Balcha, Miller, and Freivald

Oracle asserts that claims 1, 5, 9, 10, 23, and 24 are unpatentable under 35 U.S.C. § 103(a) over Balcha and Miller, and that claims 6-8 are unpatentable over Balcha, Miller, and Freivald.  (Pet. 16-25, 27-29.)  In that regard, Oracle contends that the combination of cited prior art references describes all of the claim limitations and provides rationales for combining the references.  (*Id.*)

Clouding opposes and argues that the Oracle fails to establish a reasonable likelihood that at least one challenged claim is unpatentable.  (Prel. Resp. 12-23, citing to Ex. 1004, 2:21-33; 8:27-29.)  In particular, Clouding contends that a person of ordinary skill in the art would not have combined Balcha and Miller in view of Miller's stated objective that the DIFF file must be smallest as possible. (Prel. Resp. 16-23, citing to Ex. 1004, 2:21-33.)  According to Clouding, one of ordinary skill in the art would have avoided the usage of a copy command in the

27

Case IPR2013-00073
Patent 6,738,799

DIFF file to reduce the number of bytes needed in the DIFF file.  (Prel. Resp.
19-20.)

    We are not persuaded by Clouding's arguments.  Clouding's contentions
take Miller's stated objective out of context.  Miller's stated objective for its own
invention cannot be read to eliminate a key element of its invention that is used for
achieving the very same objective.

    In the background section, Miller discusses the problem associated with
large computer files.  (Ex. 1004, 1:47-57.)  Specifically, Miller highlights the
following (*id*., emphasis added):

> One obstacle to the frequent revision of large computer files by a
> manufacturer is the cost of delivering the updated file to the user.  *If
> an entire new revised file must be delivered, the amount of data can
> be substantial.*  Large files typically are as large as ten million
> characters (10 Megabytes) or larger.  Distribution of such files on
> floppy disk can require a relatively large amount of disk space.
> *Distribution of such large files over a medium such as the Internet can
> take an undesirably long time from the point of view of the customer
> and can consume a large amount of server resources from the point of
> view of the file provider*.

    To solve the problem of distributing large revised files to customers, Miller
provides a method and file structure for generating a DIFF file from an old file and
a new file so that the DIFF file can be transmitted to a second computer, rather
than the entire revised file.  (Ex. 1004, 2:38-46.)  An important feature of Miller's
invention that minimizes the number of bytes being transmitted is the usage of a
copy command in the DIFF file.  (Ex. 1004, 2:51-60.)  The second computer uses
the DIFF file and the old file to create a duplicate version of the new file.  (*Id*.)

28

Case IPR2013-00073
Patent 6,738,799

As a result, transmitting the entire revised file to the second computer is avoided by using the copy command. Accordingly, contrary to Clouding's contentions, a person of ordinary skill in the art would not have eliminated the usage of a copy command.

Clouding also alleges that the petition lacks any showing that a person of ordinary skill in the art at the time of the invention would have selected and combined those prior art elements to arrive at the claimed invention. (Prel. Resp. 17.) We disagree. In its petition, Oracle provides a rationale with sufficient technical reasoning to combine the disclosures of Balcha and Miller. (Pet. 17.) Moreover, one of ordinary skill in the art would have used a copy command in Balcha's delta file in light of Miller to minimize the need to transmit the entire revised file, and to maintain both the previous version and a duplicate version of the revised file on the second computer.

As acknowledged by Clouding, Balcha describes converting the old file to the revised file directly through execution of the insert and delete instructions included in the delta file. (Prel. Resp. 19, citing to Ex. 1003 at 13:64-65.) In such a situation, the revised file would replace the old file and, therefore, the second computer would not have a version of the old file (*i.e.*, the previous version).

Miller describes a DIFF file that includes *a copy command*. (Ex. 1004, 8:27-29; Fig. 5A.) Using such a copy command in Balcha's delta file, the second computer would create a duplicated version of the revised file without eliminating the previous version. A person of ordinary skill in the art would have readily appreciated the benefits of maintaining both the previous version and a duplicated version of the revised file on the second computer, *e.g.*, to ensure that the

29

Case IPR2013-00073
Patent 6,738,799

conversion is successful or other user applications are compatible with the revised file before deleting the previous version.  Accordingly, Clouding's argument that one of ordinary skill in the art would not have use Miller's copy command in the combination of Balcha and Miller is without merit.

For the foregoing reasons, we determine that Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claims 1, 5-10, 23, and 24 based on the grounds that these claims are obvious over Balcha and Miller, or over Balcha, Miller, and Freivald.

### F.  Other Asserted Grounds

Oracle also asserts that claim 37 is anticipated by Freivald, and claims 1, 5-10, 23, 24, and 37 are unpatentable over Miller and Freivald.  (Pet. 30-45.)  Those asserted grounds are denied as redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds of unpatentability on which we institute an *inter partes* review.  *See* 37 C.F.R. § 42.108(a).

### III.  CONCLUSION

For the forgoing reasons, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Oracle would prevail with respect to claims 1, 5-10, 23, 24, and 37 of the patent '799.

Case IPR2013-00073
Patent 6,738,799

## IV.  ORDER

Accordingly, it is

**ORDERED** that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claims 1, 5-10, 23, 24, and 37 of the '799 patent for the following grounds:

1. Claims 1, 23, 24, and 37 unpatentable under 35 U.S.C. § 102(e) as anticipated William;

2. Claims 5-10 are unpatentable under 35 U.S.C. § 103(a) over William and Miller;

3. Claim 37 is unpatentable under 35 U.S.C. § 102(e) as anticipated by Balcha;

4. Claims 1, 5, 9, 10, 23, and 24 are unpatentable under 35 U.S.C. § 103(a) over Balcha and Miller; and

5. Claims 6-8 are unpatentable under 35 U.S.C. § 103(a) over Balcha, Miller, and Freivald;

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial is commencing on the entry date of this decision; and

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 3:00 PM Eastern Time on May 8, 2013; the parties are directed to the Office Trial Practice Guide[4] for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling

---

[4] *Office Patent Trial Practice Guide*, 77 *Fed. Reg*. 48756, 48765-66 (Aug. 14, 2012).

Case IPR2013-00073
Patent 6,738,799

Order entered herewith and any motions the parties anticipate filing during the
trial.

For PETITIONER:

Greg Gardella
Scott A. McKeown
OBLON SPIVAK
cpdocketgardella@oblon.com
cpdocketmckeown@oblon.com

For PATENT OWNER

Tarek N. Fahmi
Amy J. Embert
Fahmi, Sellers & Embert
tarek.fahmi@fseip.com
amy.embert@fseip.com

Trials@uspto.gov                                                              Paper 10
571-272-7822                                                    Entered:  May 1, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

**ORACLE** CORPORATION
Petitioners,

v.

**CLOUDING** IP, LLC
Patent Owner.

_____

Case IPR2013-00099 (JL)
Patent 7,065,637

_____

Before JAMESON LEE, JONI Y. CHANG, and MICHAEL W. KIM,
*Administrative Patent Judges*.

CHANG, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00099
Patent 7,065,637

## I.   INTRODUCTION

Oracle Corporation ("Oracle") filed a petition requesting an *inter partes* review of claims 1-4 and 6 of U.S. Patent 7,065,637 (Ex. 1001, "the '637 patent"). (Paper 5, "Pet.")  In response, Clouding IP, LLC ("Clouding") filed a patent owner preliminary response.  (Paper 9, "Prel. Resp.")  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition and patent owner preliminary response, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Oracle would prevail with respect to claims 1-4 and 6 of the '637 patent.  Accordingly, pursuant to 35 U.S.C. § 314, we authorize an *inter partes* review to be instituted as to claims 1-4 and 6 of the '637 patent.

### A.  Related Proceedings

Oracle indicates that the '637 patent is involved in co-pending litigation captioned *Clouding IP, LLC v. Oracle Corp.*, Case No. 1:12-cv-00642 (D.Del.). (Pet. 3.)  Additionally, Clouding informs the Board that U.S. Patent Application 12/946,448 is a pending continuation of the application which issued as the '637 patent.  (Prel. Resp. 5.)

2

*B. The '637 Patent*

The '637 patent relates to an interactive system for computer system architects to design and create a computing environment dynamically.  (Ex. 1001, Abs., 1:17-23, 2:66-3:1.)  In particular, the '637 patent discloses an interactive system that permits computer system architects to design a computing environment by allocating resources (*e.g.*, hardware, software, or communication components) and specifying how the resources are to be used.  (Ex. 1001, Abs., 4:17-19.)

Figure 1 of the '637 patent depicts a block diagram of a system for configuring a computing environment, and is reproduced as follows:



Figure 1 of the '637 patent illustrates a block diagram of
a system for configuring a computing environment.

As shown above, a customer (*e.g.*, a computer system architect) 101 uses the web-based visual interface 102 and the Internet 108 to interact with server system 103 for allocating resources.  (Ex. 1001, 5:13-35.)  In response to the customer's request, the server 103 allocates resources based on the customer's requirements

3

Case IPR2013-00099
Patent 7,065,637

and the availability of resources in the inventory 105.  (*Id*.)  The access level

security layer 106 and isolation level security layer 107 ensure that customer 101

can access the server and resources, without any other customer being aware of the

information passed between the interface 102 and the server 103, such as the

specific configuration or computing environment used by customer 101.  (*Id*.)

### C. Illustrative Claim

Of the challenged claims, claim 1 is the sole independent claim.  Claims 2-4

and 6 directly or indirectly depend from claim 1.  For purposes of this decision,

Claim 1 is illustrative of the claimed subject matter of the '637 patent, and is

reproduced as follows (emphasis added):

> 1. A system for providing configurable resources to create a
> computing environment, the system comprising[:]
>
>> a configurable communication link;
>>
>> a plurality of hardware devices coupled to the communication
> link;
>
>> a plurality of software programs executable by the hardware
> devices, the software programs comprising at least one of operating
> system software and application software, wherein the computing
> environment comprises the communication link, at least one of the
> hardware devices and at least one of the software programs; and
>
>> a visual construction of the computing environment via a user
> interface, the user interface coupled to a display screen and to an input
> device for generating signals in response to interactions of a user,
> wherein
>
>> the user interface is configured to accept a signal which enables
> the user to ***request a copy [of] a device configuration***,
>
>> the system is configured to ***make the copy of the device***

4

Case IPR2013-00099
Patent 7,065,637

*configuration* and ***save the copy of the device configuration in storage***,

the user interface is further configured to accept a signal which enables the user to instantiate a device from a stored configuration, and

the system is further configured to instantiate the device from the stored configuration.

### D. Prior Art Relied Upon

Oracle relies upon the following prior art references:

| | | | |
|---|---|---|---|
| Verissimo | U.S. Patent 5,841,654 | Nov. 24, 1998 | (Ex. 1006) |
| Aziz | U.S. Patent 6,779,016 | Aug. 17, 2004 | (Ex. 1005) |
| Patterson | U.S. Patent 7,093,005 | Aug. 15, 2006 | (Ex. 1003) |

"Cluster X Getting Started Guide Version 2.0 The First True Cluster Application and Configuration Management Solution for Microsoft Windows NT" Copyright 1998-19999 NuView, Inc. ("ClusterX," Ex. 1007)

### E. The Asserted Grounds

Oracle alleges that the challenged claims are unpatentable based on the following grounds:

1. Claims 1-4 and 6 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Patterson;

2. Claims 1-4 and 6 are unpatentable under 35 U.S.C. § 103(a) over Aziz and Verissimo; and

3. Claims 1-4 and 6 are unpatentable under 35 U.S.C. § 103(a) over Aziz and ClusterX.

## II.   ANALYSIS

### A.  Claim Construction

As a first step in our analysis for determining whether to institute a review, we determine the meaning of the claims.  In an *inter partes* review, claim terms in an unexpired patent are given their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b).  In that regard, we determine the scope of the claims not solely on the basis of the claim language, but also by giving claims their broadest reasonable interpretation consistent with the specification and in light of the specification as it would be understood by one of ordinary skill in the art.  *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).  Further, an inventor is entitled to be his or her own lexicographer of patent claim terms by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

We find it necessary to construe the claim term "resources."  Further, the parties identify the claim terms "visual construction" and "configuration" for which claim construction is sought.  (Pet. 18-20; Prel. Resp. 4-5.)  For this decision, we will construe each of these claim terms in turn.

### 1.  "Resources" (Claim 1)

The claim term "resources" appears in the preamble of claim 1, which recites "[a] system for providing configurable *resources* to create a computing environment."

We begin our analysis by reviewing the specification of the '637 patent.

6

Case IPR2013-00099
Patent 7,065,637

*See Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (en banc) (The

specification is the single best guide to the meaning of a claim term.).  Notably, the

specification provides the following (Ex. 1001, 4:15-30, emphasis added):

> The present invention allows fast, efficient selection and configuration
> of processing networks.  The processing network is referred to as a
> system including "resources."  *A system resource is any hardware,
> software or communication components in the system.*  For example,
> discrete *hardware devices* include processing platforms such as
> computers or processors, mobile/laptop computers, embedded
> computing devices, hand-held computers, personal digital assistants,
> point-of-sale terminals, smart-card devices, storage devices, data
> transmission and routing hardware etc., without limitation.  *Software*,
> or any other form of instruction, is executed by processors in the
> system and is a type of resource.  Finally, *communication resources*
> are also part of the system such as a digital network's hardware, the
> network configuration and topology, and network control as provided
> by software or hardware.

We recognize that the specification of the '637 patent defines the claim term

"resources" as "any hardware, software or communication components in the

system" with reasonable clarity.  *Paulsen*, 30 F.3d at 1480.  That definition is also

consistent with the other claim language, such as "wherein the computing

environment comprises the communication link, at least one of the hardware

devices and at least one of the software programs" as recited in claim 1.  We

therefore adopt that definition as our claim construction for the claim term

"resources."

7

   2. *"Visual Construction" (Claim 1)*

Claim 1 recites "a *visual construction* of the computing environment via a user interface."  Essentially, the claim term "visual construction" is referring to a visual representation of a computing environment being created by a user.

Oracle asserts that the term "visual construction" should be interpreted as including "both textual <u>and</u> graphical representations of the network" (emphasis added).  (Pet. 18, citing Ex. 1001, 7:29-31, Fig. 11; Ex. 1009, ¶ 35.)  According to Clouding, however, the claim term "visual construction" should be interpreted as including "textual <u>and/or</u> graphical representation of a network" (emphasis in the original).  (Prel. Resp. 4, citing Ex. 1001, Figs 5, 7, and 11.)  The parties' proposed interpretations and contentions provide an illuminating context as to how one of ordinary skill in the art would have understood the claim term in light of the specification.

We discern no special definition in the specification of the '637 patent for this claim term.  In fact, the specification does not use the claim term "visual construction" or "construction" anywhere.  Nevertheless, the parties direct our attention to certain figures of the '637 patent that are said to be examples of a visual construction.  More precisely, the parties agree that Figure 11 of the '637 patent depicts a visual construction that includes both textual and graphical representations of a network.  (Pet. 18; Prel. Resp. 4.)  Figure 11 of the '637 patent is reproduced as follows (emphasis added):

Case IPR2013-00099
Patent 7,065,637



Figure 11 of the '637 patent illustrates a web-page user interface that provides
a visual representation of a computing environment.

As depicted in the above figure, the web-page user interface displays a list of
resources (*e.g.*, "95 Windows"), and icons representing the computing environment
(highlighted with a green oval), including the resources that have been allocated by
the user. (Ex. 1001, 6:49-7:32.) Although that example in Figure 11 of the '637
patent shows both textual representations (*e.g.*, "NT Windows winnt4-185") and
graphical representations (*e.g.*, the communication connections), the claim
language is not so limiting.

As ordinarily understood, the word "visual" means "producing mental
images" and the word "construction" means the process of making or forming

9

something by combining or arranging of parts or elements.[1]  We observe that either

a textual representation or a graphical representation could produce a mental image

of a computing environment.  As such, limiting the claim to require both textual

and graphical representations would be importing the limitation from the

specification into the claim improperly.  *In re Zletz*, 893 F.2d 319, 321 (Fed.Cir.

1989).  (Limitations are not to be read into the claims from the specification.).

In light of the specification of the '637 patent and the claimed subject

matter, we construe the claim term "visual construction" to mean "a representation

of the combination of hardware, software, and communication components," and

the representation may include at least one of the following:  (1) a textual

representation; and (2) a graphical representation.

### 3.  *"Configuration" (Claims 1 and 4)*

Clouding agrees with Oracle that the claim term "configuration" should be

construed as including "any software or hardware related settings."  (Pet. 19, citing

Ex. 1001, 5:1-12 & Ex. 1009, ¶ 35; Prel. Resp. 4.)  However, a review of the

specification reflects that the claim term "configuration" is not limited to software

and hardware components, but also includes communication components.  (*See

e.g.*, Ex. 1001, 4:15-30, reproduced above.)

We further determine that the phrase "related settings" in the parties'

proposed interpretation is vague.  The claim term "configuration" ordinarily means

---

[1] *See e.g.*, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-
webster.com/dictionary/ (last visited Apr. 22, 2013).

Case IPR2013-00099
Patent 7,065,637

"relative arrangement of parts or elements."[2]  In the context of the claimed subject matter and the specification of the '637 patent, we construe the claim term "configuration" to mean "an arrangement of software, hardware, and communication components."

### B. Claims 1-4 and 6 – Anticipated by Patterson

Oracle asserts that claims 1-4 and 6 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Patterson.  (Pet. 21-29.)  To support its assertion, Oracle provides detailed explanations as to how each claim limitation is met by Patterson, including claim charts and a declaration of Dr. Benjamin B. Bederson[3] ("Dr. Bederson").  (Pet. 21-29; Ex. 1009.)  In its preliminary response, Clouding presents no argument as to this ground of unpatentability.

Patterson discloses a system that enables a user to create and deploy a networked computer system by creating a graphical representation of the logical configuration of the networked computer system.  (Ex. 1003, Abs.; 6:43-55.)  The networked computer system is created based on a user selection of graphic icons that represent computing elements, network elements, and interconnections.  (Id.)

---

[2] *See e.g.*, MERRIAM-WEBSTER DICTIONARY, http://www.merriam-webster.com/dictionary/ (last visited Apr. 22, 2013).

[3] Dr. Bederson holds a Ph.D. in computer science from New York University and has more than 25 years of experience in the computer science and human-computer interaction field.  (Ex. 1009, ¶¶ 1-11.)  At the time of his declaration, Dr. Bederson was employed by the University of Maryland as a Professor in the Computer Science Department and the Institute of Advanced Computer Studies.  (Id.)  We conclude that Dr. Bederson is qualified to testify as to the understanding of one skill in the art.

11

Case IPR2013-00099
Patent 7,065,637

Figures 1A and 1D of Patterson depict a method and system for creating a networked computer system, and are reproduced as follows:



Figures 1A and 1D of Patterson illustrate a method and system for designing and creating a networked computer system.

As shown in Figure 1A of Patterson, a graphical representation of a logical configuration of a computer system is created and stored (101). (Ex. 1003, 7:41-43.) A textual representation of the logical configuration of the computer system is generated based on the graphical representation (102). (Ex. 1003, 7:51-56.) Finally, commands are generated based on the textual representation and executed so that the networked computer system is created and activated by interconnecting computing elements logically (104). (Ex. 1003, 7:56-64.)

12

Case IPR2013-00099
Patent 7,065,637

As represented in Figure 1 D of Patterson, the system for creating a
networked computer system includes a client 120 that executes a browser 122 and
communicates with service provider 126 through a network 124.  (Ex. 1001,
9:19-26.)  The service provider 126 has a computing grid 132 that has a large
plurality of processor and storage elements.  (Ex. 1001, 9:28-42.)  With the
appropriate instructions, service provider 126 can create and deploy one or more
data centers 134 using elements of the computing grid 132.  (*Id.*)  The service
provider 126 also offers a graphical user interface editor server 28, and an
administration management server 130, which interact with browser 122 to provide
data center definition, management, reconfiguration.  (*Id.*)

Figure 3A of Patterson depicts a user interface, and is reproduced as follows:



Figure 3A of Patterson illustrates a user interface that shows
graphical representation of the networked computer system.

13

Case IPR2013-00099
Patent 7,065,637

As depicted in Figure 3A, Patterson's software editor application provides a user interface that has icons representing elements or nodes of a computer system so that a user can drop the icons into a workspace, connect the icons with lines representing network connections, configure one or more parameter values associated with the nodes, and submit the completed logical representation to a service provider for review and validation.  (Ex. 1003, 7:43-50; 21:37-43.)

Although Patterson's actual filing date is later than the actual filing date of the '637 patent, Patterson qualifies as prior art under 35 U.S.C. § 102(e) based on its effective filing date.  Patterson claims the benefit under 35 U.S.C. § 119(e) to U.S. Patent Provisional Application No. 60/212,925 ("the '925 provisional application," Ex. 1004) filed on June 20, 2000, which is prior to the effective filing date of the '637 patent (August 24, 2000).  In its petition, Oracle provides detailed explanations as to how each claim limitation is met by each of Patterson and the '925 provisional application.  (Pet. 22-29.)

Upon review of Oracle's analysis and supporting evidence, we determine that Oracle assertion regarding the anticipatory ground of unpatentability has merit.  On this record, Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claims 1-4 and 6 on the ground that these claims are anticipated by Patterson.

### C. Claims 1-4 and 6 – Unpatentable Over Aziz in view of Verissimo

Oracle asserts that claims 1-4 and 6 are unpatentable under 35 U.S.C. § 103(a) over Aziz in view of Verissimo.  (Pet. 30-41.)  In particular, Oracle

14

Case IPR2013-00099
Patent 7,065,637

alleges that the combination of the cited prior art references describes all of the claim limitations and provides a rationale for combining the references.  (*Id.*)

Clouding opposes and argues that the combination of Aziz and Verissimo fails to describe the claim limitation "the user interface is configured to accept a signal which enables the user to *request a copy [of] a device configuration*, the system is configured to *make the copy of the device configuration* and *save the copy of the device configuration in storage*" as recited in claim 1 (with emphasis added).  (Prel. Resp. 6.)  We do not agree.

Oracle relies upon Aziz for disclosing all of the claim limitations of claim 1, except the disputed claim limitation.  (Pet. 30-41.)  As noted by Clouding, Oracle cites Verissimo for the disputed claim limitation.  (Prel. Resp. 6; Pet. 35.)  Verissimo discloses a system for configuring a process control system.  (Ex. 1006, Abs.)  As described by Verissimo, the configuration process includes a design phase and a downloading phase.  (Ex. 1006, 7:33-34.)  Using a user interface, a user may design a software representation of the process control system by selecting representations of the various field mounted devices to be included in the actual control system.  (Ex. 1006, Abs., 8:16-20; Figure 6A.)

Figure 5B of Verissimo, reproduced below, depicts a flow diagram of a file command subroutine for configuring a system.

15

Case IPR2013-00099
Patent 7,065,637



FIG. 5B

Figure 5B of Verissimo illustrates a flow diagram
for configuring a system.

As shown above, a user may select to create a new configuration file (2006)
or to open an existing configuration file (2008).  (Ex. 1006, 9:3-14.)  If the *user
chooses to open an existing configuration file*, the selected file is retrieved from
memory.  (*Id*., emphasis added.)  Once the user has completed the process of
selecting and identifying the field mounted devices and the function blocks to be
included in the system, the user may *select to save the completed configuration file
in memory* (2020).  (Ex. 1006, 8:46-50; 9:30-32; 11:62-12:2, emphasis added.)
And when the design phase is completed, the user can initiate the *downloading of
the configuration and link files to the Fieldbus system from the master computer*

16

Case IPR2013-00099
Patent 7,065,637

through the interface device, using the Download command from the File

command menu.  (Ex. 1006, 14:65-15:6, emphasis added.)

Given those disclosures of Verissimo, we are not persuaded by Clouding's

arguments.  Rather, we determine that Oracle has made a threshold showing that

Verissimo describes the disputed claim limitation as recited in claim 1.

Moreover, Clouding fails to provide adequate explanation or credible

evidence as to why Verissimo does not meet that limitation.  Clouding's contention

regarding Oracle's reliance on Dr. Bederson's testimony to "fill in the gaps" is

inapposite because Verissimo describes the disputed claim limitation as discussed

above.  (Prel. Resp. 6-9.)  As stated previously, we conclude that Dr. Bederson is

qualified to testify as to the understanding of one skill in the art.  Contrary to

Clouding's contention, Dr. Bederson's testimony provides a credible rationale for

combining Aziz and Verissimo.  (Prel. Resp. 7, citing to Pet. 35 and Ex. 1009,

¶ 23.)  For instance, Dr. Bederson testifies (Ex. 1009, ¶¶ 23-24, emphasis added):

> Once the user has completed the process of selecting and
> identifying the field mounted devices and function blocks to be
> included in the Fieldbus system to be configured, the Fieldbus
> Network can be viewed via the window 10 and the user can save the
> completed configuration file by selecting the Save command from the
> File command menu.  [Ex. 1006, 11:62-12:2]  Of course, as would be
> obvious to one of ordinary skill in the art at the time of the invention,
> a configuration file could be saved under a new filename thereby
> creating a copy of the configuration file.

> I believe that *it is reasonable and entirely expected for a person of*
> *ordinary skill in this area to combine the above-noted system*
> *configurator of Verissimo with the virtual provisioning console and*
> *VSF creation techniques of Aziz.*  When combined in this manner, the
> virtual provisioning console could provide a VSF system configurator

17

> GUI enabling the visual creation of the VSF.  Accordingly, the system configurator GUI could be used to specify the number of tiers, the number and types of computing elements in a particular tier, the hardware and software platform used for each element, and things such as what kind of Web server, application server, or database server software should be preconfigured on these computing elements. *The configured VSF configuration could then be viewed or saved for later use and/or modification by the customer.* I believe that *it would be reasonable and expected for a person of ordinary skill to combine these references for a variety of reasons*.

On this record, we determine Dr. Bederson's testimony to be credible that it articulates an adequate rationale with technical reasoning as to why a person of ordinary skill in the art would have combined the teachings of Aziz and Verissimo to reach the subject matter of claim 1.

We have reviewed Oracle's analysis and supporting evidence, and determine that Oracle's assertion as to the unpatentability of the challenged claims based on Aziz and Verissimo is persuasive.  Accordingly, Oracle has demonstrated that there is a reasonable likelihood that it would prevail with respect to claims 1-4 and 6 based on the ground that these claims are unpatentable over Aziz and Verissimo.

### D.  Other Asserted Grounds

Oracle also asserts that claims 1-4 and 6 are unpatentable under 35 U.S.C. § 103(a) over Aziz and ClusterX.  (Pet. 42-55.)  That asserted ground is denied as redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds of unpatentability on which we institute an *inter partes* review.  *See* 37 C.F.R. § 42.108(a).

Case IPR2013-00099
Patent 7,065,637

## III.  CONCLUSION

For the forgoing reasons, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Oracle would prevail with respect to claims 1-4 and 6 of the '637 patent.

## IV.  ORDER

Accordingly, it is

**ORDERED** that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claims 1-4 and 6 of the '637 patent for the following grounds:

1. Claims 1-4 and 6 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Patterson; and

2. Claims 1-4 and 6 are unpatentable under 35 U.S.C. § 103(a) over Aziz and Verissimo;

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial is commencing on the entry date of this decision; and

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on May 16, 2013; the parties are directed to the Office Trial Practice Guide[4] for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling

---

[4] *Office Patent Trial Practice Guide*, 77 *Fed. Reg*. 48756, 48765-66 (Aug. 14, 2012).

19

Case IPR2013-00099
Patent 7,065,637

Order entered herewith and any motions the parties anticipate filing during the trial.

For PETITIONER:

Greg Gardella
Scott A. McKeown
OBLON SPIVAK
cpdocketgardella@oblon.com
cpdocketmckeown@oblon.com

For PATENT OWNER

Tarek N. Fahmi
Amy J. Embert
Fahmi, Sellers & Embert
tarek.fahmi@fseip.com
amy.embert@fseip.com

Trials@uspto.gov                                                              Paper 8
571-272-7822                                                   Date:  May 3, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**ORACLE CORPORATION**
Petitioner

v.

Patent of **CLOUDING IP, LLC**
Patent Owner

_____

Case IPR2013-00075
Patent 6,925,481

_____

Before JAMESON LEE, MICHAEL W. KIM, and RAMA G. ELLURU,
*Administrative Patent Judges.*

KIM, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2013-00075
Patent 6,925,481

I.    INTRODUCTION

Background

Oracle Corporation ("Oracle") petitioned for *inter partes* review of claims 1, 2, 25, 28, 32, and 50-57 of US Patent 6,925,481 (" '481 Patent") (Ex. 1001) pursuant to 35 U.S.C. §§ 311 et seq.  The patent owner, Clouding IP, LLC ("Clouding IP"), filed a preliminary response on March 13, 2013.  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

The petition is granted in part and we institute an *inter partes* review of claims 1, 2, 25, 28, 32, and 50-57.

Summary of the Invention

The '481 Patent sets forth (Ex. 1001, 1:7-13):

> The present invention relates to pervasive computing, and more particularly to methods, systems, and computer program instructions for enabling users of **pervasive devices** (such as limited-function mobile devices, smart appliances, etc.) to remotely access and manipulate information in ways that might otherwise be impossible or impractical because of inherent limitations of the device.

(Emphasis added.)

As explained in the '481 Patent, pervasive devices have become popular in recent years as people increasingly seek "anywhere, anytime" access to services

2

IPR2013-00075
Patent 6,925,481

such as voice and data communications.  (Ex. 1001, 1:17-20.)  However, pervasive devices have inherent drawbacks.  (Ex. 1001, 1:46-47.)  They typically do not have sufficient memory to store all of the information that the user requires.  (Ex. 1001, 1:61-63.)  Pervasive devices also may not have sufficient software to access all of the data that a user might wish to use.  (Ex. 1001, 2:3-5.)  Pervasive devices further may not have the necessary drivers installed with which to support all the data manipulation operations a user might wish to perform.  (Ex. 1001, 2:12-14.) Accordingly, the '481 Patent discloses a technique for enabling pervasive devices to access and manipulate data that avoids these drawbacks.  (Ex, 1001, 3:26-27.)

Illustrative Claim

Independent claim 1 is reproduced below:

1.      A method of enabling data access and manipulation from a pervasive device, comprising steps of:

receiving a data access request from a pervasive device;

obtaining the requested data;

determining what data manipulation operations are available for the obtained data, as well as a location of each available data manipulation operation; and

returning the determined data manipulation operations and locations to the pervasive device, in addition to the obtained data.

Prior Art References Applied by Petitioner

Oracle challenges the patentability of claims 1, 2, 25, 28, 32, and 50-57 on the basis of the following items of prior art:

| | | |
|---|---|---|
| US 6,670,968 B1 ("Schilit") | Dec. 30, 2003 | Ex. 1003 |
| US 7,269,664 B2 ("Hutsch") | Sep. 11, 2007 | Ex. 1004 |

IPR2013-00075
Patent 6,925,481

Flynn, M., et al., "The Satchel System Architecture: Mobile Access to Documents and Services," 5 Mobile Networks and Applications, 243("Flynn")                                    Dec. 2000                        Ex. 1005

Barrett, R., et al., "Intermediaries: New Places for Producing and Manipulating Web Content," 30 Computer Networks and ISDN Systems 509 ("Barrett")                        Apr. 1998                    Ex. 1006

Further, Oracle relies upon the declaration testimony of its witness, Dr. Benjamin B. Bederson ("Bederson Decl.").  (Ex. 1007.)

### The Alleged Grounds of Unpatentability.

Oracle alleges the following grounds of unpatentability:

a.      Claims 1, 2, 25, 28, and 50-57 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Schilit;

b.      Claim 32 is unpatentable under 35 U.S.C. § 103(a) as obvious over Schilit and Hutsch;

c.      Claims 1, 2, 25, 28, and 50-57 are unpatentable under 35 U.S.C. § 103(a) as obvious over Flynn and Schilit;

d.      Claim 32 is unpatentable under 35 U.S.C. § 103(a) as obvious over Flynn, Schilit, and Hutsch; and

e.      Claims 1, 2, 25, 28, and 50-57 are unpatentable under 35 U.S.C. § 103(a) as obvious over Barrett and Schilit.

II.    ANALYSIS

### A. Findings of Fact

The following findings of facts as well as those contained in the discussion portion of this opinion are supported by a preponderance of the evidence.

IPR2013-00075
Patent 6,925,481

*Schilit*

1.      Schilit relates to a Web Browser program, referred to as an "m-link," which converts HTML documents for displaying on a mobile display.  (Ex. 1003, 5:30-32.)

2.      The m-link program accesses a server to retrieve a document as identified by a user-selected URL.  (Ex. 1003, 5:32-34.)

3.      The document received from the server is then parsed and hyper-links contained in the document are separated from the content.  (Ex. 1003, 5:34-36.)

4.      The hyper-links are processed, re-organized, and provided for display on the mobile device.  (Ex. 1003, 5:36-37.)

5.      Once the links are displayed, the mobile-device keypad can be used to navigate to and select one of the displayed links.  (Ex. 1003, 5:46-48.)

6.      As shown below in Figures 6A and 6B, Schilit discloses a menu tree of links that can be navigated by user selection so as to allow a user to select the "Publications" link, and then the "Hypertext Interaction revisited" link.  (Ex. 1003, Figs. 6A-6B.)



FIG. 6A          FIG. 6B

7.      As shown below in Figure 6C, a list of situations, or content-appropriate services, such as reading, printing, or faxing, is then provided to the

5

IPR2013-00075
Patent 6,925,481

mobile device display after the "Hypertext Interaction revisited" link is selected in Figure 6B.  (Ex. 1003, 5:48-49).



*FIG. 6C*

8.    The services are hosted on a database.  (Ex. 1003, 10:1-2.)

9.    The list of content-appropriate services, including printing and faxing, are provided dynamically by the database, for display on the mobile device display, based on the link owner or link type selected by the user.  (Ex. 1003, 10:1-4.)

10.    Selecting one of the services from the list enables the service selected to be performed on the user-selected URL.  (Ex. 1003, 5:49-51.)

### B. Claim Construction

In assessing the merit of Oracle's petition, we have construed the claim terms "a data access request," "location of each data manipulation operation," and "data" in light of the specification of the '481 Patent.

The Board construes a claim in an *inter partes* review using the "broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see Office Patent Trial Practice Guides*, 77 *Fed. Reg.* 48756, 48766 (Aug. 14, 2012).  Claims terms usually are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art

in the context of the underlying patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d
1303, 1313 (Fed. Cir. 2005) (en banc). Indeed, the construction that stays true to
the claim language and most naturally aligns with the inventor's description is
likely the correct construction. *Renishaw PLC v. Marposs Societa' per Azioni*, 158
F.3d 1243, 1250 (Fed. Cir. 1998).

### 1. Whether No More Than One Data Access Request is Permitted

Independent claims 1, 50, 52, and 54 each recite "receiving a data access
request." Independent claim 55 recites "requesting an access." Based on the
recitation of these claim limitations, Clouding IP contends that all of the other
steps recited in each independent claim must occur *only* in response to the
particular data access request referenced in the aforementioned "receiving" or
"requesting" step, and cannot also occur in response to other additional data access
requests. (Prel. Resp. 4-6.) Clouding IP is incorrect. Taking independent claim 1
as an example, it recites the open-ended transitional phrase "comprising" in
conjunction with all of the recited steps, including "receiving a data access
request." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir.
2003) ("The transition 'comprising' in a method claim indicates that the claim is
open-ended and allows for additional steps"). Thus, the recitation of "receiving a
data access request" does not preclude receiving additional data access requests or
having steps performed also in response to another request.

Other language in each independent claim is consistent with this claim
construction. For example, a subsequent step recited in independent claim 1 is
"obtaining the requested data." While the requested data must be obtained in
response to the previously recited "data access request," it does not follow that the
requested data must be obtained *only* in response to that particular "data access
request," and cannot also be obtained in response to other additional data access

requests.  Obtaining data in response to other data access requests, in addition to the one particular data access request, is not excluded by the claim language at issue.

The Specification is consistent with the Board's claim construction.  The embodiments in the Specification do disclose performing the obtaining, determining, and returning steps in response to one data access request.  But that disclosure does not indicate that other embodiments are excluded.  Indeed, the Specification nowhere disclaims other embodiments.  Moreover, the Specification actually indicates the contrary by stating "[t]he foregoing description of a preferred embodiment is for purposes of illustrating the present invention, and is not to be construed as limiting thereof."  (Ex. 1001, 18:36-38.)

To support its assertion that independent claim 1 should be construed such that all of the steps of independent claim 1 subsequent to the receiving step must occur in response to only one and the same data access request, Clouding IP cites *On-Line Tech., Inc. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1138 (Fed. Cir. 2004) ("a claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.")  Clouding IP's argument is misplaced.  The Board's construction is broad and covers in its scope, rather than excludes, Clouding IP's preferred embodiment having only one data access request.

The above analysis similarly applies to independent claims 50, 52, 54, and 55.

Accordingly, while independent claims 1, 50, 52, 54, and 55 do require that the steps recited therein, other than the receiving step and the requesting, be responsive to a particular data access request, they do not preclude receiving

IPR2013-00075
Patent 6,925,481

additional data access requests, or having steps performed also in response to another request.

## 2. *"Location of Each Data Manipulation Operation"*

Independent claims 1, 50, 52, and 54 each recite "location of each data manipulation operation." Oracle contends that "location of each data manipulation operation" should be construed as "a URL or other similar reference specifying the location on a computer network of an available data manipulation." (Pet. 12-13.) Clouding IP contends that "location of each data manipulation operation" should be construed as "[a] service invocation address corresponding to the available data manipulation operation." (Prel. Resp. 7-8.) For reasons discussed below, there is no meaningful difference between the respective interpretations proffered by Oracle and Clouding IP.

The Specification interchangeably refers to a data manipulation operation and a data manipulation service. (Ex. 1001, 4:17-29.) A service invocation address specifies a location of a data manipulation service. (Ex. 1001, 9:10-14.) The service invocation address is specified for each data manipulation service and indicates an address at which the data manipulation service may be invoked. (Ex. 1001, 8:57-60.) These addresses are provided as Uniform Resource Locators ("URLs"). (Ex. 1001, 8:60-62.) In alternative embodiments, service invocation addresses may employ address formats other than URLs, such as e-mail addresses, or a combination of an e-mail address and subject line, to designate a service to be invoked. (Ex. 1001, 9:15-19.) Thus, we construe "location of each data manipulation operation" as a location identified by an address, such as a URL, an e-mail address, or a combination of an e-mail address and subject line, specifying where on a computer network a data manipulation operation or service may be

9

IPR2013-00075
Patent 6,925,481

invoked.  This construction is essentially the same as the interpretations proffered
by Oracle and by Clouding IP, only stated more precisely.

### 3. "Data"

All the claims recite "data."  Data is defined in the Specification as
"virtually any type of information, including Web content, e-mail messages, or
files in various formats."  (Ex. 1001, 3:31-33.)  Accordingly, that is what it means,
without need of construction.

### C. 35 U.S.C. § 102(e) Ground of Unpatentability—Claims 1, 2, 25, 28, and 50-57 as Unpatentable based on Schilit

A claim is anticipated only if each and every element as set forth in the
claim is described, either expressly or inherently, in a single prior art reference.
*Verdegaal Bros., Inc. v. Union Oil Co..*, 814 F.2d 628, 631 (Fed. Cir. 1987).
Oracle contends that claims 1, 2, 25, 28, and 50-57 are anticipated by Schilit.  (Pet.
16-29.)  We have considered Oracle's allegations and supporting evidence.  The
arguments have merit.  For example, independent claim 1 recites "receiving a data
access request from a pervasive device" and "obtaining the requested data."  Schilit
discloses that an m-link program accesses a server to retrieve a document
identified by a user-selected URL.  (Ex. 1003, 5:32-34.)  Independent claim 1 also
recites "determining what data manipulation operations are available for the
obtained data, as well as a location of each available data manipulation operation;"
and "returning the determined data manipulation operations and locations to the
pervasive device."  Schilit discloses that in response to receipt of a user-identified
URL, a list of situations, or content-appropriate services, such as reading, printing,
or faxing, for that user-identified URL are located on a database (Ex. 1003, 10:1-4)
and provided to a mobile device display.  (Ex. 1003, 5:48-49; Figure 6C).

IPR2013-00075
Patent 6,925,481

Clouding IP contends that Schilit discloses a process in which multiple links must be selected by a user before a mobile device displays the links shown in Figure 6C of Schilit.  By contrast, according to Clouding IP, independent claim 1 recites a more efficient process, because the obtaining, determining, and returning steps all are performed in response to only one and the same data access request.  (Prel. Resp. 12-15.)

Clouding IP's arguments are unpersuasive.  As set forth above, independent claim 1 does not require that the obtaining, determining, and returning steps all are limited to being performed in response to only one and the same data access request.  The obtaining, determining, and returning steps of independent claim 1 are met notwithstanding that in Schilit, multiple user selections are made prior to arriving at the screen of the mobile display device shown in Figure 6C.

Clouding IP contends that at no time during the Schilit process, even when requiring the user to select from the services menu, is the Web site content actually returned to the mobile device.  (Prel. Resp. 14.)  Clouding IP's argument is misplaced.  Independent claim 1 recites "obtaining the requested data."  Data is defined in the Specification as any type of information, and not just Web site content.  (Ex. 1001, 3:31-33.)  Schilit discloses that hyper-links from the user-selected URL are provided for display on the mobile device.  (Ex. 1003, 5:36-37.)  Thus, Schilit satisfies the claim limitation at issue.

Moreover, Schilit discloses that one content-appropriate service related to the user-selected URL is reading.  (Ex. 1003, 5:48-51, Fig. 6C.)  Thus, if a user selects that option, the Web site's content is delivered to Schilit's Web Browser.  (Ex. 1001, 8:65-67.)

Clouding IP presents the same arguments for independent claims 50, 52, 54, and 55 as it does for independent claim 1.  (Prel Resp. 15.)  The arguments

11

IPR2013-00075
Patent 6,925,481

similarly are unpersuasive for claims 50, 52, 54, and 55.  Like claim 1, claims 50, 52, and 54 each also recite receiving, obtaining, determining, and returning steps with almost identical wording.  Similarly, claim 55 recites "requesting an access of the remotely-stored data from the pervasive device; and receiving the requested data at the pervasive device, along with information about one or more data manipulation operations that have been determined to be available for the obtained data."  Our discussion above with regard to claim 1 also applies to claims 50, 52, 54, and 55.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the ground that claims 1, 2, 25, 28, and 50-57 are anticipated by Schilit.

<u>D. Claim 32 as Unpatentable over Schilit and Hutsch</u>

A patent claim is unpatentable under 35 U.S.C. § 103(a) "if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing 35 U.S.C. § 103(a)).  The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

Oracle contends that claim 32 is unpatentable for obviousness over Schilit and Hutsch (Pet. 29-31).  Claim 32 depends directly from independent claim 1, which Oracle contends is anticipated by Schilit.  Claim 32 requires the added

IPR2013-00075
Patent 6,925,481

limitation of "determining what data manipulation operations are available for a user group of which a user of the pervasive device is a member." Oracle contends that that claim limitation is suggested by a combination of Schilit and Hutsch. Oracle provides a rationale for applying Hutsch's disclosure into the system disclosed by Schilit. (Pet. 30; Bederson Decl., ¶ 41.) We have considered Oracle's arguments and supporting evidence.

Oracle's arguments have merit. Specifically, Schilit discloses that a list of content-appropriate services, including printing and faxing, are provided dynamically by a database based on the link owner or link type selected by the user. (Ex. 1003, 10:1-4.) Hutsch discloses organizing data based on user groups. (Ex. 1004, 39:16-20.) Thus, the combination of Hutsch and Schilit suggests that in addition to link owner and link type, it was known to consider what user group the user belonged to, in determining the list of content-appropriate services to be provided dynamically to the user.

Clouding IP contends that claim 32 is patentable for the same reasons independent claim 1 is patentable. (Prel. Resp. 16-17.) Clouding IP's allegations regarding independent claim 1 already have been discussed above. They are unpersuasive and need not be repeated here

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the ground that claim 32 is unpatentable for obviousness over Schilit and Hutsch.

E. Claims 1, 2, 25, 28, and 50-57 as Unpatentable over Barrett and Schilit

Oracle contends that claims 1, 2, 25, 28, and 50-57 are unpatentable for obviousness over Barrett and Schilit. (Pet. 49-60.) This alleged ground of

IPR2013-00075
Patent 6,925,481

unpatentability is redundant in light of the grounds on the basis of which we institute review for the same claims.

### F. Claims 1, 2, 25, 28, and 50-57 as Unpatentable over Flynn and Schilit

Oracle contends that claims 1, 2, 25, 28, and 50-57 are unpatentable for obviousness over Flynn and Schilit.  (Pet. 32-47.)  This alleged ground of unpatentability is redundant in light of the grounds on the basis of which we institute review for the same claims.

### G. Claim 32 as Unpatentable over Flynn, Schilit, and Hutsch

Oracle contends that claim 32 is unpatentable for obviousness over Flynn, Schilit, and Hutsch.  (Pet. 47-48.)  This alleged ground of unpatentability is redundant in light of the grounds on the basis of which we institute review for the same claims.

### III.    ORDERS

After due consideration of the record before us, and for the foregoing reasons it is:

**ORDERED** that Oracle's Petition is **<u>granted</u>** as to the following alleged grounds of unpatentability:

a.    Claims 1, 2, 25, 28, and 50-57 are unpatentable under 35 U.S.C. § 102(e) as anticipated by Schilit.

b.    Claim 32 is unpatentable under 35 U.S.C. § 103(a) as obvious over Schilit and Hutsch.

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; and

14

IPR2013-00075
Patent 6,925,481

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on May 23, 2013.  The parties are directed to the Office Patent Trial Practice Guide, 77 *Fed. Reg.* 48756, 48765-66 (Aug. 14, 2012), for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

IPR2013-00075
Patent 6,925,481

For PETITIONER:

Greg Gardella
and
Scott McKeown
OBLON SPIVAK
CPDocketGardella@oblon.com
cpdocketmckeown@oblon.com


For PATENT OWNER

Tarek Fahmi
and
Amy Embert
FAMHI, SELLERS, EMBERT & DAVITZ
tarek.fahmi@tnfip.com
amy.embert@fseip.com

Case 1:12-cv-00675-LPS   Document 77   Filed 07/12/13   Page 84 of 263 PageID #: 1446

Copyrighted Materials
Copyright © 2004 Wiley-IEEE Press Retrieved from www.knovel.com

even field                                    266                                    excitation

strate, through selective condensation, vaporization, or sub-limation.

**even field** In interlaced scanning, the pattern created by trac-ing the even-numbered lines. The odd-numbered lines cre-ate the **odd field**, and together these compose a displayed frame.

**even harmonic** A harmonic whose frequency is an even-numbered multiple of the fundamental frequency. For in-stance, if the fundamental frequency is 200 Hz, then 400 Hz and 2000 Hz are each even harmonics. This contrasts with **odd harmonics**, which are odd-numbered multiples of the fundamental frequency.

**even line** In a TV, an even-numbered active line. Also called **even-numbered line**.

**even-numbered line** Same as **even line**.

**even parity** 1. The presence of an even number of ones or zeroes within a group of bits. 2. An error-detection proce-dure which verifies if there is **even parity (1)**. For each byte transmitted, an additional bit is added, which can be a 0 or 1, so that all bytes are even. At the receiving location, the parity is checked, to be sure it is even. If it is, the transmis-sion has passed this test of data integrity. Also used for data storage. Also called **even parity check**.

**even parity check** Same as **even parity (2)**.

**event** 1. An action or occurrence. It is similar to an **incident (2)**, but an incident may imply a less significant happening than an event. 2. In computers, an **event (1)** which has sig-nificance to a task or program. For instance, interrupts, mouse movements, or menu selections.

**event counter** A circuit, device, register, mechanism, or sys-tem used for counting events, such as pulses, or changes in state.

**event-driven** 1. Pertaining to programs which wait for user actions, such as mouse clicks and key pressings, responds to them, and then returns to waiting for further events. This contrasts with **procedure-driven**, in which a predetermined sequence of steps must be followed. 2. A specific program which is **event-driven (1)**. Also called **event-driven pro-gram**.

**event-driven processing** In a computer system, processing of actions which is **event-driven (1)**. Interrupts are utilized for all connected devices to request resources. This contrasts with **autopolling**, where there is the periodic detection of the status of all connected devices, to address any needs for resources.

**event-driven program** Same as **event-driven (2)**.

**event-management system** Software which monitors the activity of a given network. It can provide real-time obser-vation of servers, nodes, and other network devices, and keeps track of events such as successful log-ons, unsuccess-ful log-ons, time logged-on, resources accessed, and so on. Used, for instance, in the analysis of the use of system re-sources, to gauge network performance, and for security. Its abbreviation is **EMS**.

**ewallet** Abbreviation of **electronic wallet**.

**exa-** A metric prefix representing $10^{18}$. For example, exa-hertz. Its symbol is **E**.

**exabit** $2^{60}$ bits, or approximately $1.153 \times 10^{18}$ bits. Often it is rounded to $1.0 \times 10^{18}$. Its abbreviation is **Eb**, or **Ebit**.

**exabyte** $2^{60}$ bytes, or approximately $1.153 \times 10^{18}$ bytes. Often it is rounded to $1.0 \times 10^{18}$. Its abbreviation is **EB**, or **Ebyte**.

**exahertz** $10^{18}$ Hz. This is within the X-ray region of the elec-tromagnetic spectrum. Its abbreviation is **EHz**.

**exalted-carrier reception** A form of radio reception in which the carrier is separated from the sidebands, filtered and am-plified, and then recombined with the sidebands at an in-creased level. This helps counteract selective fading.

**exbi-** A binary prefix meaning $2^{60}$, or 1,152,921,504,606,846,976. For example, an exibibyte is equal to $2^{60}$ bytes. This prefix is utilized to refer to only bi-nary quantities, such bits and bytes Its abbreviation is **Ei-**.

**exibibyte** $2^{60}$, or 1,152,921,504,606,846,976 bytes. Its abbre-viation is **EiB**.

**Excel** A popular spreadsheet program.

**except gate** A logic gate which provides an output pulse when at least one of its input terminals provides a pulse, and at the same time at least one of its input terminals does not.

**exception** A condition, usually an error, which diverts the attention of the processor. It is similar to an **interrupt**, the difference being that an exception usually indicates the pres-ence of an error.

**exception handling** The manner in which **exceptions** are handled by a program. Ideally, most exceptions can be ad-dressed without the program aborting.

**exception report** A report detailing **exceptions**.

**excess 3 code** Same as **excess three code**.

**excess conduction** In a semiconductor material, electrical conduction by excess electrons.

**excess electron** In a semiconductor material, an electron which is added by a donor impurity. Such electrons are available for conduction.

**excess information rate** In a frame relay circuit, the rate at which information is transmitted in excess of the committed information rate. Used, for instance, to support burst trans-missions. Its abbreviation is **EIR**.

**excess minority carrier** In a semiconductor material, a mi-nority charge carrier which is in excess of the equilibrium amount.

**excess noise** Also called **current noise**. 1. Electrical noise produced by current flowing through an electrical compo-nent, especially a resistor. 2. Electrical noise produced by current flowing through a semiconductor material.

**excess rate** A rate of transmission which exceeds a given rate, such as that which is guaranteed.

**excess three code** A code which represents numbers as the four-bit binary equivalent of a decimal digit plus three. For instance, the number 0 is represented by 0011, which is 3 (decimal 0 + 3). Its abbreviation is **excess 3 code**.

**exchange** 1. A structure which houses one or more telephone switching systems. At this location, customer lines termi-nate and are interconnected with each other, in addition to being connected to trunks, which may also terminate there. A typical exchange handles about 10,000 subscribers, each with the same area code plus first three digits of the 10 digit telephone numbers. Also called **central office, local cen-tral office, telephone central office**, or **telephone ex-change**. 2. The act or process of substituting a thing or function for another. 3. In computers, to replace the con-tents of one location with that of the other, and vice versa.

**exchange line** A telephone line which connects a subscriber to an **exchange (1)**.

**exchange sort** A sorting technique in which adjacent pairs of items within a list are sequentially compared and ordered, until the entire list has been evaluated. This process is then repeated as many times as required to obtain the correct or-der. Also called **bubble sort**, or **sifting sort**.

**excimer laser** A gas laser in which two atoms, one from a reactive gas, such as chlorine or fluorine, the other from an inert gas, such as argon or krypton, form a meta-sable bond which is electrically excited. The transitions be-tween energy levels generate laser emissions. It is a type of pulsed laser.

**excitation** 1. The signal, such as a voltage or current, that causes the function of a component, circuit, device, piece of

equipment, system, process, or mechanism. Also called **excitation signal**, or **drive** (1). **2.** The action of providing excitation (1). Examples include the application of signal power to a transmitting antenna, a voltage to an oscillating crystal, or a signal voltage to the control electrode of an electron tube. Also called **drive** (2). **3.** The process by which a particle, such as an electron or atom, moves from a lower state, usually the ground state, to a state with a higher energy level.

**excitation current** A current which provides **excitation** (1).

**excitation energy** The energy required for **excitation**.

**excitation signal** Same as **excitation** (1).

**excitation voltage** A voltage which provides **excitation** (1).

**excited atom** An atom which contains at least one **excited electron**.

**excited electron** **1.** An electron which is in an energy state higher than the ground state. **2.** An electron which is in an energy state with a higher level of energy than another given state, such as the ground state.

**excited state** The condition of an atom, molecule, or radical containing at least one **excited electron**.

**exciter** Also spelled **excitor**. **1.** A component, circuit, or device which provides **excitation** (1). **2.** An oscillator which generates the carrier frequency of a transmitter. **3.** A part of an antenna which is driven directly by the transmission line. **4.** A small auxiliary generator which supplies field current for an AC generator. **5.** Same as **exciter lamp** (1). **6.** A probe or loop which projects into a resonant cavity or waveguide.

**exciter lamp** **1.** A high-intensity incandescent lamp utilized to focus on the optical soundtrack of a motion picture film. Also called **exciter** (5). **2.** An incandescent lamp utilized to illuminate what is being scanned by a fax or similar device.

**exciting current** **1.** The current which flows through an **exciter** (4). Also called **magnetizing current** (2). **2.** A small current which flows through the primary winding of a transformer to which no load is connected. Also called **magnetizing current** (3).

**exciton** **1.** In a semiconductor, a bound electron-hole pair. **2.** In a semiconductor or dielectric, an electron-hole pair which is a mobile concentration of energy, and which does not does not participate in electric conduction.

**excitor** Same as **exciter**.

**excitron** A single-anode mercury-pool tube which sustains a continuous cathode spot.

**exclusion principle** A principle that states that no two fermions can occupy the same quantum state. In the case of electrons, for instance, this means that two electrons in the same atom can not have the same values of all quantum numbers. This leads to there only being able to be two electrons, each with opposite spin, in the same atomic orbital. Also called **Pauli exclusion principle**, or **Pauli principle**.

**exclusive NOR** A logical operation which is true if all of its elements are the same. For example, if all of its multiple inputs have a value of 0, then the output is 1. And, if all of its inputs have a value of 1, then the output is 1. Any other combination yields an output of 0. For such functions, a 1 is considered as a true, or high, value, and 0 is a false, or low, value. Its abbreviation is **XNOR**. Also called **exclusive NOR operation**.

**exclusive NOR circuit** Same as **exclusive NOR gate**.

**exclusive NOR gate** A circuit which has two or more inputs, and whose output is high only if all its inputs are the same. Its abbreviation is **XNOR gate**. Also called **exclusive NOR circuit**.

**exclusive NOR operation** Same as **exclusive NOR**.

**exclusive OR** A logical operation which is false if all of its elements are the same. For example, if all of its multiple inputs have a value of 0, then the output is 0. And, if all of its inputs have a value of 1, then the output is 0. Any other combination yields an output of 1. For such functions, a 1 is considered as a true, or high, value, and 0 is a false, or low, value. Its abbreviation is **XOR**. Also called **exclusive OR operation**.

**exclusive OR circuit** Same as **exclusive OR gate**.

**exclusive OR gate** A circuit which has two or more inputs, and whose output is low if all of its inputs are the same. Its abbreviation is **XOR gate**. Also called **exclusive OR circuit**.

**exclusive OR operation** Same as **exclusive OR**.

**excursion** **1.** For a movable or oscillatory body, a movement from a rest or average position, especially outward and back. For instance, the piston-like movement of the cone of a speaker. Also, the distance traveled in such a movement. **2.** The maximum possible interval or movement in an excursion (1).

**executable** **1.** That which can be executed. **2.** Same as **executable program**.

**executable file** A file which is in a format the computer can directly execute. Usually refers to a program.

**executable program** A computer program which can be run. Such a programs is translated into machine code, enabling it to be executed by the computer it is run on. Also called **executable** (2).

**execute** **1.** To carry out, or put into effect, especially according to a given set of requirements. **2.** To run a computer program. Also, to carry out other computer processes, such as commands.

**execution** **1.** The action or process of carrying out, or putting into effect, especially according to a given set of requirements. **2.** The running of a computer program. Also, the carrying out of other computer processes, such as commands.

**execution time** **1.** In computers, the time required for the execution of a single instruction or operation. Also, the time required to complete a series of instructions or operations. **2.** The time required for **execution**.

**executive** The software which runs all the software and hardware of a computer. It is the first program the computer loads when powered on, remains memory-resident, and continuously controls and allocates all resources. Without it, for example, a computer can not recognize input, such as that from a keyboard, it can not process, as the executive controls the use of the CPU, nor can it provide an output, as it manages all peripherals including the monitor. Also called **operating system**, or **supervisor**. When disk-based, also called **disk operating system**.

**Executive Information System** An information system which provides access to data pertaining to one or more areas of a given business. It should be able to provide the desired data from internal and external sources using a straightforward format, with the presented information preferably in graphical form. Its abbreviation is **EIS**.

**exhaust** **1.** Same as **evacuate** (1). **2.** To consume entirely. For instance, to completely drain a battery.

**exhaustion** **1.** Same as **evacuation**. **2.** The process or action of consuming entirely. For instance, the complete draining of a battery.

**exit** **1.** In computers, to get out of an operation, routine, or program. For instance, to exit a calling routine and return control to the program that initiated the call. **2.** A point at which an **exit** (1) may, or does take place.

**exit point** Within a subroutine or program, the last instruction.

**exosphere** The outermost region of a planet's atmosphere. In the case of the earth, it begins at approximately 500 kilometers above the surface, and within it are contained the Van Allen radiation belts.

**exothermic** Pertaining to a reaction or process in which heat is liberated to the surroundings. This contrasts with **endothermic**, where heat is absorbed from the surroundings.

**exothermic process** A process in which heat is liberated to the surroundings.

**exothermic reaction** A reaction in which heat is liberated to the surroundings.

**expand** To increase the extent, size, volume, quantity, number, or scope. For instance, to increase the memory or storage of a computer, to restore the dynamic range of a compressed signal, or to widen an electron beam.

**expandable** Capable of being expanded. For instance, a computer which provides expansion slots.

**expanded memory** Computer memory whose use is defined by the **Expanded Memory Specification**.

**Expanded Memory Manager** A memory manager implementing the **Expanded Memory Specification**. Its abbreviation is **EMM**.

**Expanded Memory Specification** In some older computer systems, a technique for the utilization of more than 1 megabyte of memory. Its abbreviation is **EMS**.

**expanded sweep** In an oscilloscope, the acceleration of the deflection of the electron beam during a given interval of the sweep.

**expander** 1. That which serves to **expand**. 2. A circuit or device which automatically increases the volume range of an audio-frequency signal. It works, essentially, to reverse the effect of volume compression, thus restoring the volume range of the original program. Also called **volume expander**. 3. A circuit or device whose output has a greater amplitude range than its input.

**expansion** 1. An increase in extent, size, volume, quantity, number, or scope. Also, the extent of such an increase. 2. The restoration of the space and/or bandwidth of data after compression. 3. The increase of the volume range of an audio-frequency signal, to reverse the effect of volume compression. 4. The restoration of the gain of a signal, so that so that the higher magnitude levels have a higher effective gain than the lower magnitude levels, reversing the effects of compression. 5. In communications, a circuit with more outputs than inputs.

**expansion board** Same as **expansion card**.

**expansion bus** A computer bus to which **expansion cards** connect. When such a card is properly installed in an expansion slot, it is connected to said bus. Examples include PCI and EISA buses.

**expansion card** A circuit board which is plugged into the bus or an expansion slot of a computer, in order to add functions or resources. Common examples include graphics accelerators, sound cards, and Ethernet adapters. Also called by various other names, including **expansion board, accessory card, add-on board, adapter card, card (1), adapter (3)**, and **add-on**.

**expansion slot** A slot within a computer, into which **expansion cards** are plugged in. When such a card is properly installed, it is connected to the expansion bus. Also called **slot (3)**.

**expected life** The period of time during which a component, circuit, device, piece of equipment, system, apparatus, material, or other item is expected to operate, function, or otherwise be of use. This will depend on various factors, including the environmental conditions surrounding said use. Also called **useful life**.

**expendable** 1. A component, device, piece of equipment, or system which is designed to be replaced once performance

drops below a given threshold, as opposed to being repaired. 2. That which is naturally consumed during operation.

**experiment** One or more procedures which are undertaken under controlled conditions, and which serve for research, testing, proving or disproving a hypothesis, or for demonstration.

**experimental** 1. Pertaining to, or based on **experiments**. 2. Pertaining to that which is still under investigation, evolving, or otherwise requiring further testing and/or research.

**experimental conditions** Controlled conditions, such as those in a laboratory, utilized for research, tests, proving or disproving hypotheses, or for demonstrations.

**experimental data** Data collected through experimentation.

**experimental design** A design which is still under investigation, evolving, or otherwise requiring further testing and/or research.

**experimental device** A device which is still under investigation, evolving, or otherwise requiring further testing and/or research.

**experimental equipment** Equipment which is still under investigation, evolving, or otherwise requiring further testing and/or research.

**experimental station** In communications, a station which utilizes radio-frequency waves for experimentation. Used, for instance, in the development of new techniques and equipment.

**experimental system** A system which is still under investigation, evolving, or otherwise requiring further testing and/or research.

**experimental technology** Technology which is under investigation, evolving, or otherwise requiring further testing and/or research

**experimentation** The conducing of **experiments**.

**expert system** Its abbreviation is **ES**. 1. An application of artificial intelligence which incorporates a knowledge base and an inference engine. It assists users in problem solving within its knowledge base, and is meant be the equivalent of a human expert, though a well-designed expert system can amply exceed such capabilities. Some such systems incorporate new knowledge with problem-solving experience. Used, for instance, to assist in medical diagnosis, weather projections, and so on. 2. A computer system incorporating an **expert system (1)**.

**expiration date** The date after which a program, component, code, or data is not available, ceases to function, or is no longer valid. For instance, after this date trail software may no longer work, or a cookie or key may expire.

**exploded view** An illustration, such as a diagram, which shows the components of a structure slightly separated from each other, but drawn in relation to each other and to the whole.

**exploring coil** A small coil which is inserted into a magnetic field to measure its field strength, or any variations in it. Such a coil is connected to an indicating instrument, such as a ballistic galvanometer or a fluxmeter, and may or may not incorporate an amplifier. An exploring coil may also be utilized to examine the magnetic flux distribution of a magnetic field. Also called **search coil, flip coil, magnetic test coil, magnetic probe**, or **pickup coil**.

**explosion** A reaction, such as that of a chemical or nuclear nature, in which a large amount of energy is released in a very short time interval, and which is usually accompanied by high temperatures and the release of gases.

**explosion-proof** Also spelled **explosionproof**. 1. A component, circuit, device, piece of equipment, or system designed so that none of its processes or ensuing results, such as sparking or heating, causes any nearby material to explode. For instance, a device that does not emit sparks, which could

in turn make a surrounding gas explode. **2.** Able to withstand a nearby explosion and continue functioning within specified parameters. **3.** That which is contained in an **explosion-proof enclosure (2)**.

**explosion-proof enclosure** **1.** An enclosure which is designed so that none of the processes or ensuing results of its contained components, such as sparking or heating, causes any nearby material to explode. **2.** An enclosure which hermetically seals the inside from the outside. In this manner, contained components could emit sparks or radiate heat, but these would not be in contact with the surrounding environment. **3.** An enclosure which is designed to withstand an internal explosion, without provoking any nearby material to explode. **4.** An enclosure which is able to withstand a nearby explosion and continue functioning within specified parameters.

**explosion-proof equipment** Equipment which is **explosion-proof**.

**explosion-proof lighting** Lighting which is **explosion-proof**.

**explosion-proof motor** A motor which is **explosion-proof**.

**explosion-proof switch** A switch that is **explosion-proof**.

**explosionproof** Same as **explosion-proof**.

**exponent** A number indicating the power to which another number, the base, is raised. For example, in $2^8$, the 8 is the exponent, and the 2 is the base. Also called **power (3)**.

**exponential** **1.** Pertaining to, or involving **exponents**. **2.** Pertaining to, or expressed by an **exponential function**. **3.** Same as **exponential function**.

**exponential amplifier** An amplifier whose output signal is an **exponential function** of its input signal.

**exponential change** An increase or decrease in a quantity, such as radiation or charge, whose rate of change follows an **exponential function**.

**exponential curve** A curve or graph representing an **exponential function**.

**exponential decay** A decrease in a quantity, such as radiation or charge, whose rate of change follows an **exponential function**. Also called **exponential decrease**.

**exponential decrease** Same as **exponential decay**.

**exponential function** Also called **exponential (3)**. Such functions are frequently utilized to quantify physical phenomena. **1.** A function which varies as the power of another quantity. Such a function may be expressed, for instance, as $y = a^x$, where $a$ is a constant. **2.** The function $y = e^x$, where $e$ is the base of natural logarithms. An alternate expression for this function is: $y = \exp(x)$ where $x$ is the number to which $e$ is raised. It is the inverse function of the **natural logarithm function**.

**exponential growth** An increase in a quantity, such as radiation or charge, whose rate of change follows an **exponential function**. Also called **exponential increase**, or **logarithmic growth**.

**exponential horn** A horn speaker whose cross-sectional area flares out exponentially as the axial distance increases. Usually utilized to reproduce high frequencies.

**exponential increase** Same as **exponential growth**.

**exponential notation** A numeric format in which each number is represented by two numbers, and in which the decimal point is not in a fixed location. The first number, the mantissa, specifies the significant digits, while the second number, or exponent, specifies its magnitude. For example, 314,000,000 may be expressed as $3.14 \times 10^8$. Although any number, with any radix, may be represented in this manner, it is usually used only for very small or very large numbers. Also called **scientific notation**, or **floating-point notation**. When an E is used instead of a 10, or the radix utilized, it is also called **E notation**.

**exponential transmission line** A transmission line whose characteristic impedance varies exponentially as a function of its electric length.

**exponential waveform** A waveform whose rate of change follows an **exponential function**.

**export** To format, move, or save a file or data in a manner that it can be fully utilized by another application, or within another environment. For example, a given word processor application saving a file in a format which can be used by a given spreadsheet program. This contrasts with **import**, in which the conversion takes place after the data has been received in foreign format.

**export filter** A filter utilized to **export**.

**exposed** **1.** Unshielded, not insulated, or otherwise unprotected or vulnerable. **2.** Open to view, or not concealed.

**exposure** **1.** The condition or state of being **exposed**. For instance, to light, radiation, or a high voltage. **2.** An act or circumstance which results in being exposed, or exposing something else. **3.** The quantity or extent of **exposure (1)**.

**exposure meter** A device which measures exposure to light or radiation.

**exposure time** The time a body or material is exposed to light or radiation.

**expression** **1.** In computer programming, a segment of program code which when executed returns a value. Such an expression may include constants, variables, operators, operands, functions, or the like. A Boolean expression is an example. **2.** In mathematics, a combination of numbers, variables, and operations. Also called **arithmetic expression**.

**extended addressing** The use of additional bits for addressing. May be used, for instance, when added addressing information is required for direct access to memory beyond a given limit. Its abbreviation is **EA**.

**extended ASCII** An ASCII character set with additional assigned codes for foreign languages, graphics, and other special characters. Extended ASCII is an 8-bit code, providing a total of 256 characters, as compared to the standard 7-bit code providing 128. Extended ASCII numeric values span from 128 to 255, and the specific characters assigned to each number will depend on the systems, programs, and fonts used. Also called **extended ASCII character set**, **extended ASCII set**, or **8-bit ASCII**.

**extended ASCII character** A character within an **extended ASCII character set**.

**extended ASCII character set** Same as **extended ASCII**.

**extended ASCII code** The standard code utilized to express extended ASCII text and control characters.

**extended ASCII set** Same as **extended ASCII**.

**Extended Binary Coded Decimal Interchange Code** Same as **EBCDIC**.

**Extended Capabilities Port** A parallel port standard supporting high-speed bi-directional communications between a computer and a peripheral. It is compatible with a Centronics parallel port, but is much faster, and allows for a longer cable to be used. Its abbreviation is **ECP**. Also called **Enhanced Capabilities Port**.

**extended data out dynamic random-access memory** Same as **EDO DRAM**.

**extended data out random-access memory** Same as **EDO DRAM**.

**extended data output dynamic random-access memory** Same as **EDO DRAM**.

**extended data output random-access memory** Same as **EDO DRAM**.

**Extended Graphics Array**   An enhanced VGA standard supporting resolutions up to 1024 x 768. Its abbreviation is **XGA**.

**Extended Industry Standard Architecture**   Same as **EISA**.

**extended memory**   In certain computer systems, memory beyond 1 megabyte.

**extended play**   Playback time which is longer than ordinarily available. Also refers to storage capacity which is greater than usual. In the case of videocassette recorders, it also refers to recording time which is longer than ordinarily available. Its abbreviation is **EP**.

**extended-range communication**   Communication by means of radio waves that are propagated well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon communication**, **forward-scatter communication**, **scatter communication**, or **beyond-the-horizon communication**.

**extended-range propagation**   Propagation of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon propagation**, **forward-scatter propagation**, **scatter propagation**, or **beyond-the-horizon propagation**.

**extended-range transmission**   Transmission of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon transmission**, **forward-scatter transmission**, **scatter transmission**, or **beyond-the-horizon transmission**.

**extended superframe**   A T-carrier framing format or standard with enhanced features, such as less-frequent synchronization, and real-time monitoring of the line. It encompasses 24 DS1 frames, while a **superframe** assembles 12. Its abbreviation is **ESF**. Also called **extended superframe format**.

**extended superframe format**   Same as **extended superframe**. Its abbreviation is **ESF format**.

**Extended TACACS**   Abbreviation of **Extended Terminal Access Controller Access Control System**. An enhanced version of **TACACS**, which provides additional support for auditing and accounting. Its abbreviation is **XTACACS**.

**Extended Terminal Access Controller Access Control System**   Same as **Extended TACACS**.

**Extended VGA**   Abbreviation of **Extended Video Graphics Array**. Any of various graphics standards which provide for higher resolution than VGA. SVGA resolutions range from 800 x 600 pixels to 1600 x 1200 pixels, with support for over 16.7 million colors. Also called **SVGA**.

**Extended Video Graphics Array**   Same as **Extended VGA**.

**extensible**   **1.** That which can be extended or enhanced. For example, a computer system which provides expansion slots, enabling it to incorporate additional peripherals. **2.** That which can be extended or protruded. For instance, a panel which can project out, facilitating its use.

**Extensible HTML**   Abbreviation of **Extensible Hypertext Markup Language**. A markup language that combines HTML and XML, and which features greater portability and ease of extension and enhancement. Its own abbreviation is **XHTML**.

**Extensible Hypertext Markup Language**   Same as **Extensible HTML**.

**Extensible Markup Language**   A specification for the format of documents and data to be used on the Web. It is a scaled-down version of SGML, and seeks to retain the comparative simplicity of HTML, yet offer greater flexibility in areas such as organization and presentation, while being fully compatible with both. Its abbreviation is **XML**.

**Extensible Stylesheet Language**   Within **Extensible Markup Language**, a standard defining stylesheets. Its abbreviation is **XSL**.

**Extensible Stylesheet Language Transformations**   A language utilized for converting XML documents into other XML documents with different structures. Its abbreviation is **XSLT**.

**extension**   **1.** An enlargement in scope, or in length of time. For instance, a plug-in which adds functionality to an application. **2.** A set of characters appearing at the end of a filename, indicating the file type. For example, in the filename *notepen.exe*, the **.exe** portion is the extension, and in this case specifies an executable program. Also called **filename extension**. **3.** A telephone, modem, or similar device connected to a main line, such as a PBX.

**extensometer**   An instrument which measures small variations in the dimensions of a solid. For instance, it may measure deformation due to stress. An example is a laser extensometer.

**extent**   In a direct-access storage device, such as a hard disk, a contiguous block reserved for a specific data set or program.

**Exterior Gateway Protocol**   A routing protocol used between autonomous systems on the Internet. Its abbreviation is **EGP**.

**external bus**   A bus between a CPU and peripherals. A PCI bus is an example. An **internal bus** runs between a CPU and memory.

**external cache**   A memory cache which utilizes a memory bank between the CPU and main memory. This contrasts with **internal cache**, which is built right into the CPU. Internal cache is faster, but smaller than external cache, while external cache is still faster than main memory. Also called **level 2 cache**, or **L2 cache**.

**external capacitor**   A capacitor which is externally connected to an oscillator, to vary its frequency.

**external circuit**   A circuit, or part of a circuit, which is outside of a main circuit, or any other circuit in question. For instance, that which is externally connected to a battery, including its load.

**external device**   A device which is not part of a central system, but which is utilized with it. For instance, a peripheral, such as a mouse or printer, used with a computer system.

**external drive**   A drive, such as a disk drive or tape drive, that is not located within the system unit of a computer, as opposed to an **internal drive**, which is.

**external electric field**   **1.** An electric field other than that being considered. **2.** An electric field affecting a given particle or body situated in the medium surrounding said field.

**external error**   An error caused by an **external device**.

**external feedback**   Feedback provided by an **external circuit**.

**external field**   An **external electric field**, or an **external magnetic field**.

**external interrupt**   In a computer, an interrupt generated by an **external device**. This contrasts with an **internal interrupt**, which is generated by the CPU.

**external magnetic field**   **1.** A magnetic field other than that being considered. **2.** A magnetic field affecting a given particle or body situated in the medium surrounding said field.

**external memory**   A deprecated term for **external storage**.

**external modem**   A modem which is self-contained, and which usually connects to a computer via a cable to a serial port. This contrasts with an **internal modem**, which is plugged into an expansion slot.

**external photoelectric effect**   The ejection of electrons from a surface through the absorption of sufficient incident electromagnetic radiation, such as infrared, visible, or ultraviolet

radiation. Said surface is usually a solid, but may be a liquid. Also called **photoemission.**

**external power supply** A power supply which is physically separated from the device, piece of equipment, or system it is powering. For instance, a robot requiring multiple energy sources, each with different voltages, may be powered by such a supply, thus eliminating the need to convert any voltages within the robot itself.

**external $Q$** In a microwave tube, the reciprocal of the difference between the reciprocal of the unloaded $Q$ value and the reciprocal of the loaded $Q$ value.

**external reference** Within a computer program or routine, a call to a separate program or routine.

**external sensor** A sensor which is not physically a part of the device or apparatus sampling a given environment. For instance, a remote sensing device which transmits information to a control system.

**external storage** Also called **external memory,** though this latter term is deprecated. **1.** Computer storage which is removable. For instance, a tape cartridge. **2.** Computer storage which is physically separate from the computer accessing it.

**external triggering** **1.** The use of external pulses as the triggering signals of an oscilloscope. **2.** The use of external pulses as triggering signals.

**external viewer** A separate computer application which is called upon to interpret and view files and data which could otherwise not be seen by the current application. Also refers to multimedia files. For instance, a Web browser plug-in utilized to display video in a format that is not currently supported. Also called **viewer.**

**extinction coefficient.** Also called **absorption ratio, absorption factor, absorptive power,** or **absorptivity. 1.** The proportion of certain wavelengths or energy retained by a medium to which another has been exposed. **2.** The proportion of certain wavelengths or energy retained by a medium to which another has been exposed, per unit of area or thickness.

**extinction potential** In a gas-filled tube, the potential at which the ionization of the contained gas ceases, and conduction stops. Also called **deionization potential.**

**extinction voltage** In a gas-filled tube, the voltage at which the ionization of the contained gas ceases, and conduction stops. Also called **deionization voltage.**

**extra-high tension** Same as **extra-high voltage.** Its abbreviation is EHT.

**extra-high voltage** A voltage greater than a given amount, such as 240,000 volts or 345,000 volts. Usually used in the context of electric power transmission. Its abbreviation is EHV. Also called **extra-high tension.**

**extract** **1.** To remove via a physical or chemical process. For instance, to utilize electrowinning to extract a metal from its molten ore. **2.** To remove one or more components from a complex signal. For example, in color TV, to extract the chrominance components from the chrominance signal. **3.** In computers, to remove items from a larger group, such as components of expressions, or to remove bits or characters from words. **4.** To decompress data, files, or the like.

**extract instruction** A computer instruction to remove components from expressions to form new ones, or to remove bits or characters from words to form new ones.

**extractor** That which serves to **extract.**

**extraneous** **1.** Coming from the outside, and often undesired. For instance, extraneous interference. **2.** Not forming an indispensable part, or unrelated to the central or intended function. Also called **extrinsic (2).**

**extraneous emission** An emission from a transmitter which contains undesired components. For example, an output other than the intended carrier and sidebands.

**extraneous response** The undesired response of a receiver or recorder, due to an undesired signal, or the combination of desired and undesired signals.

**extraneous signal** A transmitted or received signal other than that intended. Such a signal may cause interference.

**extranet** Portions of an intranet which are available to authorized outsiders. For instance, a business which allows existing customers to use the Internet to access certain areas, such as those designated for product information and ordering.

**extraordinary component** Same as **extraordinary wave.**

**extraordinary ray** One of the two rays into which a ray of light incident upon a doubly-refracting material is split, the other being the **ordinary ray.** Both rays are plane-polarized perpendicular to each other, and the extraordinary ray passes through the material, while the ordinary ray is completely absorbed. Its abbreviation is E-ray.

**extraordinary wave** One of the two components into which a radio wave entering the ionosphere is split, under the combined influence of the earth's magnetic field and atmospheric ionization, the other being the **ordinary wave.** The electric vector of the extraordinary wave rotates in the sense opposite of that of the ordinary wave. Its abbreviation is X-wave. Also called **extraordinary component, extraordinary-wave component.**

**extraordinary-wave component** Same as **extraordinary wave.**

**extrapolation** A technique for obtaining an approximation of an unknown value, based on values already known. May be used, for instance, to estimate the value of a variable which is outside of, or between known ranges.

**extraterrestrial radiation** Electromagnetic radiation from sources not related to the earth. The chief component is solar radiation.

**extreme** The highest or lowest value, or that furthest from a center or reference value. Used, for instance, to describe the highest or lowest indications of a measuring instrument.

**extreme ultraviolet** Its abbreviation is extreme UV. **1.** Pertaining to **extreme-ultraviolet radiation. 2.** Same as **extreme-ultraviolet radiation.**

**extreme-ultraviolet imaging telescope** An instrument which detects emitted and reflected ultraviolet radiation outside the earth's atmosphere, to obtain images of interstellar matter and celestial bodies such as a planets or stars, in addition to other information, such as that pertaining to their compositions and densities. Its abbreviation is EIT. Also called **ultraviolet imaging telescope.**

**extreme-ultraviolet radiation** Electromagnetic radiation in the ultraviolet region which is nearest to X-rays. It corresponds to wavelengths of approximately 4 to 200 nm, though the defined interval varies. Also called **extreme ultraviolet (2),** or **vacuum ultraviolet.**

**extreme UV** Abbreviation of **extreme ultraviolet.**

**extremely-hard vacuum** Same as **extremely-high vacuum.**

**extremely high frequency** A range of radio frequencies spanning from 30 to 300 GHz, corresponding to wavelengths of 1 cm to 1 mm, respectively. Also, pertaining to this interval of frequencies. Its abbreviation is EHF.

**extremely-high vacuum** An environment or system whose pressure is below $10^{-12}$ torr. One torr equals 1 millimeter of mercury, or approximately 133.3 pascals. Also called **extremely-hard vacuum.**

**extremely low frequency** Waves whose frequencies are usually defined to be between 3 and 30 Hz, corresponding to wavelengths of between 100,000 and 10,000 kilometers, respectively. Its abbreviation is ELF.

**extrinsic** **1.** Coming from the outside, and often incorporated for a specific purpose or effect. For instance, extrinsic properties. **2.** Same as **extraneous (2).**

**extrinsic conductivity** In a pure semiconductor material, the conductivity provided by imperfections in the crystal and intentionally-introduced impurities, as opposed to **intrinsic conductivity,** which is that inherently present.

**extrinsic photoconductivity** For a given material, photoconductivity due to the addition of impurities, or to external causes.

**extrinsic properties 1.** Properties of a component, circuit, device, piece of equipment, or system which are **extrinsic.** **2.** Electrical characteristics of a semiconductor material which are determined by imperfections in the crystal and intentionally-introduced impurities. This contrasts with **intrinsic properties,** which are those present in the pure crystal.

**extrinsic semiconductor** A semiconductor material whose intentionally-introduced impurities, called dopants, determine its electrical characteristics, such as concentration of charge carriers. This contrasts with an **intrinsic**

semiconductor, which has no dopants added. Also called **extrinsic semiconductor material.**

**extrinsic semiconductor material** Same as **extrinsic semiconductor.**

**extrusion** The give a desired shape and/or finish to a molten or semisolid material, by forcing it through a die. Utilized, for instance, to form rods or tubes.

**eye candy** Images, such as flashy graphics, whose primary purpose is to gratuitously please a user visually, without providing anything useful, such as functionality or information. Often utilized as a marketing scheme, and may be seen, for instance, in certain Web sites.

**eye-in-hand system** A robot which incorporates a close-range camera in an end-effector. Such an arrangement is useful in ensuring that a gripper properly identifies and grasps objects, or may navigate collision-free through tight and/or unknown environments.

**ezine** Abbreviation of **electronic magazine.**

Trials@uspto.gov                                                              Paper 9
571-272-7822                                                      Date: May 7, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**ORACLE CORPORATION**
Petitioner

v.

**CLOUDING IP, LLC**
Patent Owner

_____

Case IPR2013-00089
Patent 6,631,449

_____

Before JAMESON LEE, MICHAEL W. KIM, and RAMA G. ELLURU,
*Administrative Patent Judges.*

KIM, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2013-00089
Patent 6,631,449

## I.     INTRODUCTION

### Background

Oracle Corporation ("Oracle") petitioned for *inter partes* review of claims 1, 2, 5-7, 16, 27-29, and 34 of US Patent 6,631,449 (" '449 Patent") (Ex. 1001) pursuant to 35 U.S.C. §§ 311 et seq.  The patent owner, Clouding IP, LLC ("Clouding IP"), filed a preliminary response on March 19, 2013.  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

The petition is granted and we institute an *inter partes* review of claims 6, 7, 16, 27-29, and 34.

### Summary of the Invention

The '449 Patent sets forth (Ex. 1001, 1:13-18):

> The invention relates generally to systems and methods for maintaining storage object consistency across distributed storage networks and more particularly to a dynamic distributed data system and method which provides for minimized latency, reduced complexity and is extensible, scalable and isotropic.

As explained in the '449 Patent, when a processor requests data, and the data is not in its cache, a main memory supplies the data and a copy then is stored in the processor cache.  (Ex. 1001, 1:24-26.)  In multiprocessor configurations, each processor cache can have its own copy of the same data.  (Ex. 1001, 1:31-33.)

2

IPR2013-00089
Patent 6,631,449

However, when the data is updated in the main memory, one processor cache may have copied data from the main memory prior to the update, while another processor cache may have copied data from the main memory after the update. (Ex. 1001, 1:33-34.)  Accordingly, inconsistencies can be present across processor caches for the same data.  (Ex. 1001, 1:30-31, 36-37.)

One prior solution uses a snoopy cache coherence protocol, where each processor keeps track of the data on other processors.  (Ex. 1001, 1:43-49.) However, performance typically is limited by the number of processors a shared interconnect can accommodate, making it difficult to scale or extend.  (Ex. 1001, 2:7-17.)

Another prior solution uses a directory-based cache coherence protocol, where a processor periodically performs a table lookup in a directory to determine whether its cache needs to be updated.  (Ex. 1001, 2:18-22.)  However, a directory-based scheme is not scalable or extensible, because each cache needs to keep a directory entry for other interested caches in the system and as new caches are added, the existing tables must be expanded.  (Ex. 1001, 2:30-33.)

Illustrative Claim

Claims 1, 6, 7, 16, 27-29, and 34 are independent claims, of which claims 1 and 7 are reproduced below:

> 1.     A method for maintaining storage object consistency among nodes in a distributed storage architecture including a repository of last resort, the method comprising the steps of:
> (a) monitoring storage object requests to the repository of last resort;
> (b) deciding whether to migrate the repository of last resort; and
> (c) migrating the repository of last resort.
>
> 7.     A distributed storage network, comprising:

3

IPR2013-00089
Patent 6,631,449

> a plurality of connected nodes, each node being capable of
caching a storage object,
>> a name tag for the storage object, and
>> state bits for the storage object including
>>> an ownership bit,
>>> a shared direction bit, and
>>> a repository of last resort pointer.

### Prior Art References Applied by Petitioner

Oracle challenges the patentability of claims 1, 2, 5-7, 16, 27-29, and 34 on the basis of the following items of prior art:

US 5,893,922 ("Baylor")                   Apr. 13, 1999               Ex. 1006

Borrill, P.L.; Onufryk, P.Z., "Extending Snoopy Cache Consistency to General Interconnection Networks," published in the Proceedings of the IEEE International Conference on Industrial Technology ("Borrill Article")
                                          Dec. 1994                  Ex. 1004

Soundararajan, V., Flexible Use of Memory for Replication/Migration in Cache-Coherent DSM Multiprocessors ("Soundararajan")
                                          Nov. 1999                  Ex. 1005

Raymond, K., "A Tree-Based Algorithm for Distributed Mutual Exclusion," published in ACM Transactions on Computer Systems, Vol. 7, No. 1, p. 61-77 ("Raymond")                  Feb. 1989                  Ex. 1007

Demmer, M. and Herlihy, M., The Arrow Distributed Directory Protocol ("Herlihy")                           1998                       Ex. 1008

Further, Oracle relies upon declaration testimony of its witness, Dr. Paul F. Reynolds, Jr. ("Reynolds Decl.").  (Ex. 1010.)

### The Alleged Grounds of Unpatentability

Oracle alleges the following grounds of unpatentability:

a.      Claims 6-7, 16, 27, 29, and 34 are unpatentable under 35 U.S.C. § 102(b) as anticipated by the Borrill Article.

4

b.      Claims 6-7, 16, 27-29, and 34 are unpatentable under 35 U.S.C.

§ 103(a) as obvious over Herlihy in view of the Borrill Article.

c.      Claims 1, 2, and 5 are unpatentable under 35 U.S.C. § 103(a) as

obvious over the Borrill Article and Soundararajan.

d.      Claims 1, 2, and 5 are unpatentable under 35 U.S.C. § 103(a) as

obvious over the Borrill Article and Baylor.

e.      Claim 28 is unpatentable under 35 U.S.C. § 103(a) as obvious

over the Borrill Article and Raymond.

II.    ANALYSIS

## A. Findings of Fact

The following findings of facts as well as those contained in the discussion

portion of this decision are supported by a preponderance of the evidence.

### *1. Borrill Article*

1.      The Borrill Article relates to a cache consistency scheme in a

multiprocessor system.  (Ex. 1004, p. 752, § II.)

2.      The Borrill Article discloses that each processor in the multiprocessor

system includes a local cache ("cache").  (Ex. 1004, p. 752, § I.)

3.      The Borrill Article discloses that a particular block of data ("cache

block") may exist on multiple caches.  (Ex. 1004, p. 752, § II.A)

4.      The Borrill Article discloses that due to being updated at different

times, the same cache block on different caches may be inconsistent.  (Ex. 1004, p.

752, § I.)

5.      The Borrill Article discloses that in order to update a cache block, the

corresponding cache may upload a newer version of the cache block from other

caches.  (Ex. 1004, p. 753, § II.B.)

IPR2013-00089
Patent 6,631,449

6.      The Borrill Article discloses that a cache may possess an "ownership" attribute for a cache block if it assumes all responsibility for accuracy of the cache block in the entire system.  (Ex. 1004, p. 752, § II.A.)

7.      The Borrill Article discloses that a cache block may possess an "exclusive" attribute if it is the only cached copy of the cache block in the entire system.  (Ex. 1004, p. 752, § II.A.)

8.      The Borrill Article defines a Repository of Last Resort (RLR) as a cache which is responsible for ownership of a cache block of sharable data.  (Ex. 1004, p. 754, § VI.A.)

9.      According to the Borrill Article, in traditional architectures, the RLR is simply a home memory module which contains a region of physical address space.  (Ex. 1004, p. 754, § VI.A.)

10.     According to the Borrill Article, in a cache only memory architecture, the RLR is a physical location in one of the caches to which a logical address is bound.  (Ex. 1004, p. 754, § VI.A.)

11.     As shown below, Figure 3 of the Borrill Article discloses an illustrative system called "block #1" where cache A is the RLR, and thus has ownership of "block #1."  (Ex. 1004, p. 755, § VI.D.)

IPR2013-00089
Patent 6,631,449



Fig. 3. Example System

12.     The Borrill Article discloses an example using Figure 3, where cache
D requests ownership of block #1 from cache A.

13.     The Borrill Article discloses that once ownership is transferred such
that cache D is the RLR, cache C responds by diverting all requests for block #1
from cache A to cache D.  (Ex, 1004, p. 755, § VI.D.)

### *2. Herlihy*

14.     Herlihy discloses a distributed multiprocessor system including
mobile objects and nodes.  (Ex, 1008, p. 119, § 1.)

15.     According to Herlihy, mobile objects may be a file, a process, or any
other data structure.  (Ex, 1008, p. 119, § 1.)

16.     Herlihy discloses that a node can store mobile objects and perform
functions related to storage of mobile objects.  (Ex, 1008, p. 119, § 1.)

17.     Herlihy discloses that a given mobile object is stored only on one
node at a time.  (Ex, 1008, p. 119, § 1.)

18.     According to Herlihy, the mobile object may move from one node to
another.  (Ex, 1008, p. 119, § 1.)

IPR2013-00089
Patent 6,631,449

19.     Herlihy discloses a directory service stored on each node.  (Ex, 1008, p. 119, § 1.)

20.     According to Herlihy, the directory service allows each node to keep track of mobile objects stored on itself, and on other nodes in the system.  (Ex, 1008, p. 119, § 1.)

21.     As shown below, Figure 2 of Herlihy discloses a tree system *T* that contains linked nodes *u, v, w, u₁, u₂, u₃*.  (Ex, 1008, p. 122, § 3.)



**Fig. 2.** Three steps after *u* issues *find*(u) message

22.     Herlihy discloses that node *v* stores directory entry *link(v)* for a particular mobile object that may or may not be stored on node *v*.  (Ex, 1008, p. 121, § 3.)

23.     Herlihy discloses that *link(v)* can either reference a node on which *link(v)* is stored, or a node directly linked to the node on which *link(v)* is stored.  (Ex, 1008, p. 121, § 3.)

24.     Thus, in Figure 2 of Herlihy shown above, *link(v)* can reference either node *v* or node *u₁*.  (Ex, 1008, p. 121, § 3.)

25.     According to Herlihy, when *link(v)* references node *v*, the particular mobile object is stored on node *v*.  (Ex. 1008, p. 121, § 3.)

26.     According to Herlihy, when *link(v)* references a node other than node *v*, the particular mobile object is not stored on node *v*.  (Ex. 1008, p. 121, § 3.)

8

IPR2013-00089
Patent 6,631,449

27.     Herlihy discloses that when *link(v)* references a node other than node *v*, that does not necessarily indicate that the particular mobile object is stored on the node referenced in *link (v)*.  (Ex. 1008, p. 121, § 3.)

28.     Instead, Herlihy discloses that when *link(v)* references a node other than node *v*, that indicates that the particular mobile object is stored in a node in the direction of the node referenced in *link (v)*.  (Ex. 1008, p. 121, § 3.)

29.     For example, in Figure 2 of Herlihy shown above, when *link(v)* references node $u_1$, that indicates that the particular mobile object is stored on any one of nodes $u, w, u_1, u_2, u_3$.  (Ex. 1008, p. 121, § 3.)

30.     Herlihy discloses that an embodiment of the directory service supports read-only replication.  (Ex. 1008, p. 130, § 5.)

31.     According to Herlihy, when multiple read-only copies of a particular mobile object exist in a system, one copy is designated as a primary copy.  (Ex. 1008, p. 130, § 5.)

32.     Herlihy discloses that each directory entry consists of a primary link pointing toward a node storing the primary copy, and a set of secondary links, each pointing toward a node storing a copy other than the primary copy.  (Ex. 1008, p. 130, § 5.)

33.     Herlihy discloses that when a node storing a primary copy requests exclusive access, it modifies each primary link on each directory entry of every node to reference itself.  (Ex. 1008, p. 130, § 5.)

34.     According to Herlihy, when the node has acquired exclusive access to the primary copy, it invalidates all of the other read-only copies in the system.  (Ex. 1008, p. 130, § 5.)

35.     Herlihy discloses that when all invalidations are complete, the node has acquired exclusive access to the object.  (Ex. 1008, p. 130, § 5.)

9

IPR2013-00089
Patent 6,631,449

## B. Claim Construction

In assessing the merit of Oracle's petition, we have construed the claim terms "a repository of last resort," "a name tag," and "a storage object" in light of the specification of the '449 Patent.

The Board construes a claim in an *inter partes* review using the "broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see Office Patent Trial Practice Guides*, 77 *Fed. Reg.* 48756, 48766 (Aug. 14, 2012).  Claims terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the underlying patent disclosure.  *Phillips v. AWH Corp*., 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  Indeed, the construction that stays true to the claim language and most naturally aligns with the inventor's description is likely the correct construction.  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

### 1. "A Repository of Last Resort"

Independent claims 1, 6, 7, 16, 27-29, and 34 each recite "a repository of last resort."  Both Oracle and Clouding IP contend that "a repository of last resort" should be defined as a facility for storing a last or only remaining data replica that may not be deleted.  (Pet. 13; Prel. Resp. 5.)  The Specification provides the same definition.  (Ex. 1001, 4:57-59).  Thus, we agree that "a repository of last resort" is defined as a facility for storing a last or only remaining data replica that may not be deleted.

### 2. "Name Tag"

Independent claims 7, 16, and 28 each recite "a name tag."  Oracle contends that the purpose of "a name tag" and "an address tag" are the same.  (Pet. 13.)

10

Assuming that as true, it does not affect our construction of "name tag." We do not find anything in the Specification that specifically relates "name tag" to "address tag." The two terms are used in different contexts in the Specification.

Clouding IP contends that name tags are identifiers for storage objects, whereas address tags are means by which data blocks can be identified uniquely. (Prel. Resp. 6.) "Address tag" is not recited in the claims, and thus it is unnecessary to construe that term. For "name tag," we disagree with Clouding IP's proposed construction. The Specification does disclose storage objects 410, 510 having name tags 420, 520. (Ex. 1001, Figs. 4-5, 5:16-17, 5:28-29.) However, that does not mean "name tag" has significance and meaning only with respect to storage objects. Unless expressly required by a claim recitation to be associated with a storage object, a name tag can be associated with any object. We construe "a name tag" as any identifier associated with any object, including storage objects.

### 3. "Storage Object"

Independent claims 1, 6, 7, 16, 27-29, and 34 each recite "a storage object." Clouding IP contends a storage object is "any consistent storage entity such as a file, a block or an extent which may need to be updated atomically." (Prel. Resp. 7.) The Specification provides the same definition. (Ex. 1001, 5:19-21.) Thus, we agree that a storage object is "any consistent storage entity such as a file, a block or an extent which may need to be updated atomically."

To further clarify the meaning of "storage object," we elaborate on additional terms. Wiley Electrical Engineering Dictionary defines "extent" as "[i]n a direct-access storage device, such as a hard disk, a contiguous block reversed for a specific data set or program." Wiley Electrical and Electronics Engineering Dictionary 270 (2004). An entity is said to be consistent if a transaction involving

IPR2013-00089
Patent 6,631,449

the entity either creates a new and valid state of data, or, if any failure occurs, returns all data to its state before the transaction was started. ISO/IEC 10026-1:1992 Section 4. Similarly, atomicity is a concept where in a transaction involving two or more discrete pieces of information, either all of the pieces are committed or none are. ISO/IEC 10026-1:1992 Section 4.

C. Claims 6-7, 16, 27, 29, and 34 as Anticipated by the Borrill Article

A claim is anticipated only if each and every element as set forth in the claim is described, either expressly or inherently, in a single prior art reference. *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987). Oracle contends that claims 6-7, 16, 27, 29, and 34 are unpatentable as anticipated by the Borrill Article. (Pet. 27-37.) We have considered Oracle's contentions and supporting evidence, but are unpersuaded in light of Clouding IP's contentions.

Clouding IP contends the "repository of last resort" disclosed in the Borrill Article is different from the "repository of last resort" recited in the claims. (Prel. Resp. 9-10, 18-20.) We agree. As set forth above, the "repository of last resort" recited in the claims is defined as a facility for storing a last or only remaining data replica that may not be deleted. While the Borrill Article uses the same words "repository of last resort," it defines "a repository of last resort" as the storage location which is responsible for ownership of sharable data. (Ex. 1004, p. 754, § VI.A.) The "repository of last resort" disclosed in the Borrill Article makes no mention of either storing a last or only remaining data replica, or that the data may not be deleted, as required by the "repository of last resort" recited in the claims. The fact that the same words are used in the Borrill Article is not itself sufficient to regard the claim limitation as satisfied. Oracle has not presented any reasoning on

12

IPR2013-00089
Patent 6,631,449

why the repository of last resort defined and disclosed in the Borrill Article
satisfies and meets the claimed "repository of last resort."

For the foregoing reasons, we conclude that there is not a reasonable
likelihood that Oracle would prevail on the grounds that claims 6-7, 16, 27, 29, and
34 are unpatentable as anticipated by the Borrill Article.

D. Claims 6, 7, 16, 27-29, and 34 as Obvious over Herlihy and the Borrill Article

A patent claim is unpatentable under 35 U.S.C. § 103(a) "if the differences
between the claimed subject matter and the prior art are such that the subject
matter as a whole would have been obvious at the time the invention was made to a
person having ordinary skill in the art to which said subject matter pertains." *KSR
Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing 35 U.S.C. § 103(a)).
The question of obviousness is resolved on the basis of underlying factual
determinations including: (1) the scope and content of the prior art; (2) any
differences between the claimed subject matter and the prior art; (3) the level of
skill in the art; and (4) where in evidence, so-called secondary considerations.
*Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).  Oracle
contends that claims 6, 7, 16, 27-29 and 34 are unpatentable for obviousness over
Herlihy and the Borrill Article.  (Pet. 41-49, 54-58.)  We have considered Oracle's
arguments and supporting evidence.  Oracle's arguments have merit.

Clouding IP contends that Herlihy's primary nodes do not correspond to the
recited "repository of last resort."  (Prel. Resp. 21-22.)  Clouding IP is incorrect.
The recited "repository of last resort" is defined as a facility for storing a last or
only remaining data replica that may not be deleted.  According to Herlihy, when
multiple read-only copies of a particular mobile object exist in a system, one copy
is designated as a primary copy.  (Ex. 1008, p. 130, § 5.)  Each directory entry for

IPR2013-00089
Patent 6,631,449

that particular mobile object on every node in the system consists of a primary link pointing toward a node storing the primary copy, and a set of secondary links, each pointing toward a node storing a copy other than the primary copy. (Ex. 1008, p. 130, § 5.) When a node storing a primary copy requests exclusive access, it modifies each primary link on each directory entry of every node to reference itself. (Ex. 1008, p. 130, § 5.) When the node has acquired exclusive access to the primary copy, it invalidates all of the other read-only copies in the system. (Ex. 1008, p. 130, § 5.) When all invalidations are complete, the node has acquired exclusive access to the object. (Ex. 1008, p. 130, § 5.). Thus, the node that has acquired exclusive access to the particular mobile object contains the only remaining read-only copy. Because that copy is recognized by the system as the only remaining copy, it is implicit that the copy is non-deletable. If it were deleted, the system would lose the information. Indeed, it is self-evident that preservation of information is the reason why the only remaining copy would be designated as "read-only" in Herlihy. Note also that "read-only" has a dictionary definition of "[c]apable of being displayed or used, but not deleted." Webster's New World Computer Dictionary (7th ed. Webster's New World 2003), http://www.credoreference.com/entry/webstercom/read_only.

In any event, even assuming that non-deletable is not a characteristic of Herlihy's last remaining "read-only" copy, it would have been obvious to one with ordinary skill in the art to make it non-deletable, to keep the system from losing the valuable data contained therein.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on showing that claims 6, 7, 16, 27-29, and 34 are unpatentable as obvious over Herlihy and the Borrill Article.

IPR2013-00089
Patent 6,631,449

### E. Claims 1, 2, and 5 as Obvious over the Borrill Article and Soundararajan

Oracle contends that claims 1, 2, and 5 are unpatentable for obviousness over the Borrill Article and Soundararajan.  (Pet. 14-22.)  We have considered Oracle's contentions and supporting evidence, but are unpersuaded in light of Clouding IP's contentions.

Clouding IP correctly contends that the "repository of last resort" disclosed in the Borrill Article is different from the "repository of last resort" recited in the claims.  (Prel. Resp. 9-10.)  The subject of the claimed "repository of last resort" and the Borrill Article already has been discussed above, and need not be repeated here.

For the foregoing reasons, we conclude that there is not a reasonable likelihood that Oracle would prevail on its contention that claims 1, 2, and 5 are unpatentable for obviousness over the Borrill Article and Soundararajan.

### F. Claims 1, 2, and 5 as Obviousover the Borrill Article and Baylor

Oracle contends that claims 1, 2, and 5 are unpatentable for obviousness over the Borrill Article and Baylor.  (Pet. 22-27.)  We have considered Oracle's contentions and supporting evidence, but are unpersuaded in light of Clouding IP's contentions.

Clouding IP correctly contends that the "repository of last resort" disclosed in the Borrill Article is different from the "repository of last resort" recited in the claims.  (Prel. Resp. 9-10, 17-18.)  The subject of the claimed "repository of last resort" and the Borrill Article already has been discussed above, and need not be repeated here.

IPR2013-00089
Patent 6,631,449

For the foregoing reasons, we conclude that there is not a reasonable likelihood that Oracle would prevail on the grounds that claims 1, 2, and 5 are unpatentable for obviousness over the Borrill Article and Baylor.

## G. Claim 28 as Obvious over the Borrill Article and Raymond

Oracle contends that claim 28 is unpatentable for obviousness over the Borrill Article and Raymond.  (Pet. 37-40.)  We have considered Oracle's contentions and supporting evidence, but are unpersuaded in light of Clouding IP's contentions.

Clouding IP correctly contends that the "repository of last resort" disclosed in the Borrill Article is different from the "repository of last resort" recited in the claim.  (Prel. Resp. 9-10, 20-21.)  The subject of the "repository of last resort" and the Borrill Article already has been discussed above, and need not be repeated here.

Furthermore, independent claim 28 recites that "the repository of last resort [is] one of the plurality of connected nodes designed to cache an undeletable copy of the storage object."  The Borrill Article defines its "repository of last resort" as the storage location which is responsible for ownership of sharable data, which facially does not satisfy the claim recitation of "one of the plurality of connected nodes designed to cache an undeletable copy of the storage object."  The fact that the same words are used in the Borrill Article is not itself sufficient to regard the claim limitation as satisfied.  Oracle has not presented any reasoning on why the repository of last resort defined and disclosed in the Borrill Article satisfies and meets the claimed "repository of last resort."

16

IPR2013-00089
Patent 6,631,449

For the foregoing reasons, we conclude that there is not a reasonable likelihood that Oracle would prevail on the grounds that claim 28 is unpatentable for obviousness over the Borrill Article and Raymond.

III.   ORDERS

After due consideration of the record before us, and for the foregoing reasons it is:

**ORDERED** that Oracle's Petition is **<u>granted</u>** as to the following alleged ground of unpatentability:

a.     Claims 6, 7, 16, 27-29, and 34 are unpatentable under 35 U.S.C.

§ 103(a) as obvious over Herlihy and the Borrill Article.

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; and

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on May 30, 2013.  The parties are directed to the Office Patent Trial Practice Guide, 77 *Fed. Reg.* 48756, 48765-66 (Aug. 14, 2012), for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

17

IPR2013-00089
Patent 6,631,449

For PETITIONER:

Greg H. Gardella
Scott A. McKeown
Oblon Spivak
cpdocketgardella@oblon.com
cpdocketmckeown@oblon.com

For PATENT OWNER

Tarek N. Fahmi
Amy J. Embert
Fahmi, Sellers & Embert
tarek.fahmi@fseip.com
amy.embert@fseip.com

**Extended Graphics Array**  An enhanced VGA standard supporting resolutions up to 1024 x 768. Its abbreviation is **XGA**.

**Extended Industry Standard Architecture**  Same as **EISA**.

**extended memory**  In certain computer systems, memory beyond 1 megabyte.

**extended play**  Playback time which is longer than ordinarily available. Also refers to storage capacity which is greater than usual. In the case of videocassette recorders, it also refers to recording time which is longer than ordinarily available. Its abbreviation is **EP**.

**extended-range communication**  Communication by means of radio waves that are propagated well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon communication**, **forward-scatter communication**, **scatter communication**, or **beyond-the-horizon communication**.

**extended-range propagation**  Propagation of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon propagation**, **forward-scatter propagation**, **scatter propagation**, or **beyond-the-horizon propagation**.

**extended-range transmission**  Transmission of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon transmission**, **forward-scatter transmission**, **scatter transmission**, or **beyond-the-horizon transmission**.

**extended superframe**  A T-carrier framing format or standard with enhanced features, such as less-frequent synchronization, and real-time monitoring of the line. It encompasses 24 DS1 frames, while a **superframe** assembles 12. Its abbreviation is **ESF**. Also called **extended superframe format**.

**extended superframe format**  Same as **extended superframe**. Its abbreviation is **ESF format**.

**Extended TACACS**  Abbreviation of **Extended Terminal Access Controller Access Control System**. An enhanced version of **TACACS**, which provides additional support for auditing and accounting. Its abbreviation is **XTACACS**.

**Extended Terminal Access Controller Access Control System**  Same as **Extended TACACS**.

**Extended VGA**  Abbreviation of **Extended Video Graphics Array**. Any of various graphics standards which provide for higher resolution than VGA. SVGA resolutions range from 800 x 600 pixels, to 1600 x 1200 pixels, with support for over 16.7 million colors. Also called **SVGA**.

**Extended Video Graphics Array**  Same as **Extended VGA**.

**extensible**  **1.** That which can be extended or enhanced. For example, a computer system which provides expansion slots, enabling it to incorporate additional peripherals. **2.** That which can be extended or protruded. For instance, a panel which can project out, facilitating its use.

**Extensible HTML**  Abbreviation of **Extensible Hypertext Markup Language**. A markup language that combines HTML and XML, and which features greater portability and ease of extension and enhancement. Its own abbreviation is **XHTML**.

**Extensible Hypertext Markup Language**  Same as **Extensible HTML**.

**Extensible Markup Language**  A specification for the format of documents and data to be used on the Web. It is a scaled-down version of SGML, and seeks to retain the comparative simplicity of HTML, yet offer greater flexibility in areas such as organization and presentation, while being fully compatible with both. Its abbreviation is **XML**.

**Extensible Stylesheet Language**  Within **Extensible Markup Language**, a standard defining stylesheets. Its abbreviation is **XSL**.

**Extensible Stylesheet Language Transformations**  A language utilized for converting XML documents into other XML documents with different structures. Its abbreviation is **XSLT**.

**extension**  **1.** An enlargement in scope, or in length of time. For instance, a plug-in which adds functionality to an application. **2.** A set of characters appearing at the end of a filename, indicating the file type. For example, in the filename *notepen.exe*, the **.exe** portion is the extension, and in this case specifies an executable program. Also called **filename extension**. **3.** A telephone, modem, or similar device connected to a main line, such as a PBX.

**extensometer**  An instrument which measures small variations in the dimensions of a solid. For instance, it may measure deformation due to stress. An example is a laser extensometer.

**extent**  In a direct-access storage device, such as a hard disk, a contiguous block reserved for a specific data set or program.

**Exterior Gateway Protocol**  A routing protocol used between autonomous systems on the Internet. Its abbreviation is **EGP**.

**external bus**  A bus between a CPU and peripherals. A PCI bus is an example. An **internal bus** runs between a CPU and memory.

**external cache**  A memory cache which utilizes a memory bank between the CPU and main memory. This contrasts with **internal cache**, which is built right into the CPU. Internal cache is faster, but smaller than external cache, while external cache is still faster than main memory. Also called **level 2 cache**, or **L2 cache**.

**external capacitor**  A capacitor which is externally connected to an oscillator, to vary its frequency.

**external circuit**  A circuit, or part of a circuit, which is outside of a main circuit, or any other circuit in question. For instance, that which is externally connected to a battery, including its load.

**external device**  A device which is not part of a central system, but which is utilized with it. For instance, a peripheral, such as a mouse or printer, used with a computer system.

**external drive**  A drive, such as a disk drive or tape drive, that is not located within the system unit of a computer, as opposed to an **internal drive**, which is.

**external electric field**  **1.** An electric field other than that being considered. **2.** An electric field affecting a given particle or body situated in the medium surrounding said field.

**external error**  An error caused by an **external device**.

**external feedback**  Feedback provided by an **external circuit**.

**external field**  An **external electric field**, or an **external magnetic field**.

**external interrupt**  In a computer, an interrupt generated by an **external device**. This contrasts with an **internal interrupt**, which is generated by the CPU.

**external magnetic field**  **1.** A magnetic field other than that being considered. **2.** A magnetic field affecting a given particle or body situated in the medium surrounding said field.

**external memory**  A deprecated term for **external storage**.

**external modem**  A modem which is self-contained, and which usually connects to a computer via a cable to a serial port. This contrasts with an **internal modem**, which is plugged into an expansion slot.

**external photoelectric effect**  The ejection of electrons from a surface through the absorption of sufficient incident electromagnetic radiation, such as infrared, visible, or ultraviolet

Trials@uspto.gov                                                    Paper 8
571-272-7822                                              Date:  May 16, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

**ORACLE CORPORATION**
Petitioner

v.

**CLOUDING IP, LLC**
Patent Owner

_____

Case IPR2013-00098
Patent 6,918,014

_____

Before JAMESON LEE, MICHAEL W. KIM, and RAMA G. ELLURU,
*Administrative Patent Judges.*

KIM, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2013-00098
Patent 6,918,014

I.    INTRODUCTION

Background

Oracle Corporation ("Oracle") petitioned for *inter partes* review of claims 1, 3, 4, 6, 8-11, 18, 22, and 24-27 of US Patent 6,918,014 (" '014 Patent") (Ex. 1001.) pursuant to 35 U.S.C. §§ 311 et seq.  The patent owner, Clouding IP, LLC ("Clouding IP"), filed a preliminary response.  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

The petition is granted and we institute an *inter partes* review of all the challenged claims.

Summary of the Invention

The '014 Patent sets forth (Ex. 1001, 1:15-22):

> The invention relates generally to systems and methods for maintaining storage object consistency across distributed storage networks and more particularly to a dynamic distributed data system and method which provides for minimized latency, reduced complexity and is extensible, scalable and isotropic.

As explained in the '014 Patent, when a processor requests data, and the data is not in its cache, a main memory supplies the data and a copy then is stored in the processor cache.  (Ex. 1001, 1:28-30.)  In multiprocessor configurations, each processor cache can have its own copy of the same data.  (Ex. 1001, 35-37.)

2

IPR2013-00098
Patent 6,918,014

However, when the data is updated in the main memory, one processor cache may have copied data from the main memory prior to the update, while another processor cache may have copied data from the main memory after the update. (Ex. 1001, 1:37-38.)  Accordingly, inconsistencies can result across processor caches for the same data.  (Ex. 1001, 1:34-38.)

One prior solution is to use a snoopy cache coherence protocol, where each processor keeps track of the data on other processors.  (Ex. 1001, 1:48-53.) However, performance typically is limited to an optimum number of processors connected to the shared interconnect, making it difficult to scale or extend.  (Ex. 1001, 2:11-21.)

Another prior solution is directory-based cache coherence protocol, where a processor periodically performs a table lookup in a directory to determine whether its cache needs to be updated.  (Ex. 1001, 2:22-26.)  However, a directory-based scheme is not scalable or extensible, because each cache needs to keep a directory entry for other interested caches in the system and as new caches are added, the existing tables must be expanded.  (Ex. 1001, 2:34-37.)

<u>Illustrative Claim</u>

Claims 1 and 18 are independent claims, both of which are reproduced below:

> 1. A system comprising:
> a plurality of connected nodes; and
> a storage object,
> wherein each node of the plurality of connected nodes is configured to maintain a storage object routing table;
> wherein a first node of the plurality of connected nodes is further configured to:
> identify one or more neighbor nodes of the first node;

IPR2013-00098
Patent 6,918,014

      send a message to each neighbor node of the one or more
           neighbor nodes, indicative of an availability of the storage
           object at the first node; and
      wherein each neighbor node of the one or more neighbor nodes
is further configured to:
      create an entry for the storage object within a storage object
           routing table at the neighbor node in response to the
           message;
      store an indication of a path to the first node within the entry.

      18.    A method comprising:
      maintaining a storage object routing table at each node of a
plurality of connected nodes;
      identifying one or more neighbor nodes of a first node of the
plurality of connected nodes;
      sending a message to each neighbor node of the one or more
neighbor nodes from the first node, indicative of
      an availability of the storage object at the first node;
      creating an entry for the storage object within a storage object
routing table at each neighbor node of the one or more neighbor nodes;
and
      storing an indication of a path to the first node within the entry.

<u>Prior Art References Applied by Petitioner</u>

Oracle challenges the patentability of claims 1, 3-4, 6, 8-11, 18, 22, and 24-

27 on the basis of the following items of prior art:

Borrill, P.L.; Onufryk, P.Z., "Extending Snoopy Cache Consistency to
General Interconnection Networks," published in the Proceedings of the
IEEE International Conference on Industrial Technology ("Borrill Article")
                               Dec. 1994               Ex. 1004

Demmer, M. and Herlihy, M., The Arrow Distributed Directory Protocol
("Herlihy")                    1998               Ex. 1005

Hennessy, J. and Patterson, D., Computer Architecture: A Quantitative
Approach, 2nd Ed. ("Hennessy")     1996               Ex. 1006

IPR2013-00098
Patent 6,918,014

Raymond, K., "A Tree-Based Algorithm for Distributed Mutual Exclusion," published in ACM Transactions on Computer Systems, Vol. 7, No. 1, p. 61-77 ("Raymond")                    Feb. 1989                    Ex. 1007

Further, Oracle relies upon declaration testimony of its witness, Dr. Paul F. Reynolds, Jr. ("Reynolds Decl.")[1].  (Ex. 1008.)

<u>The Alleged Grounds of Unpatentability</u>

Oracle alleges the following grounds of unpatentability:

a.      Claims 1, 3-4, 8-10, 18, and 24-26 are unpatentable under 35 U.S.C. § 102(b) as anticipated by the Borrill Article.

b.      Claims 6 and 22 are unpatentable under 35 U.S.C. § 103(a) as obvious over the Borrill Article and Herlihy.

c.      Claims 11 and 27 are unpatentable under 35 U.S.C. § 103(a) as obvious over the Borrill Article and Hennessy.

d.      Claims 1, 3-4, 6, 9, 18, 22, and 25 are unpatentable under 35 U.S.C. § 103(a) as obvious over Herlihy and Raymond.

e.      Claims 8, 10, 24, and 26 are unpatentable under 35 U.S.C. § 103(a) as obvious over Herlihy, Raymond, and the Borrill Article.

f.      Claims 11 and 27 are unpatentable under 35 U.S.C. § 103(a) as obvious over Herlihy, Raymond, and Hennessy.

---

[1] Dr. Reynolds holds a Ph.D. in computer science from the University of Texas at Austin and since the mid-1970s conducted research in the field of parallel and distributed systems.  (Ex. 1008, ¶¶ 1-12.)  From 1980 until August 2012, Dr. Reynolds was employed by the University of Virginia's School of Engineering and Applied Science as a Professor of Computer Science.  (*Id*.)  We conclude that Dr. Reynolds is qualified to testify as to the understanding of one skill in the art.

IPR2013-00098
Patent 6,918,014

II.     ANALYSIS

## A. Findings of Fact

The following findings of facts and those in our Analysis are supported by a preponderance of the evidence.

### *1. Borrill Article*

1.      The Borrill Article relates to a cache consistency scheme in multiprocessor system.  (Ex. 1004, p. 752, § II.)

2.      The Borrill Articles discloses that processors are partitioned into clusters.  (Ex. 1004, p. 754, § VI.)

3.      The Borrill Articles discloses that a cluster may be a PC, workstation, server, or any system which uses a shared interconnect, such as a bus.  (Ex. 1004, p. 754, § VI.)

4.      As shown below, Figure 3 of the Borrill Article discloses a network spanning tree consisting of all clusters in a system.  (Ex. 1004, p. 754-755, § VI.)



Fig. 3. Example System

5.      The Borrill Article discloses that point-to-point links are used to interconnect clusters.  (Ex. 1004, p. 754-755, § VI.)

6

IPR2013-00098
Patent 6,918,014

6.      The Borrill Article discloses that these links may be implemented as point-to-point transmission media or as virtual channels in general purpose networks.  (Ex. 1004, p. 754, § VI.)

7.      The Borrill Article discloses that a cluster may cache data associated with a resource.  (Ex. 1004, p. 754, § VI.A.)

8.      The Borrill Article discloses that a cluster may possess an "ownership" attribute for a resource if it assumes all responsibility for accuracy of the resource in the entire system.  (Ex. 1004, p. 752, § II.A.)

9.      The Borrill Article discloses that one of the clusters is a Repository of Last Resort ("RLR").  (Ex. 1004, p. 754, § VI.A.)

10.      The Borrill Article discloses that the RLR is a cluster which is responsible for ownership of a resource.  (Ex. 1004, p. 754, § VI.A.)

11.      The Borrill Article discloses that a Multicast Controller serves as an interface between a cluster and its links.  (Ex. 1004, p. 755, § VI.C.)

12.      The Borrill Article discloses that a Multicast Controller receives requests for a resource.  (Ex. 1004, p. 755, § VI.D.)

13.      According to the Borrill Article, if a cluster associated with a particular Multicast Controller is an RLR for the resource, the resource is provided to the requester.  (Ex. 1004, p. 754, § VI.A.)

14.      According to the Borrill Article, if a cluster associated with a particular Multicast Controller does not possess the resource, the Multicast Controller forwards the request to another Multicast Controller via one of the links connected to the Multicast Controller.  (Ex. 1004, p. 755, § VI.C.)

15.      The Borrill Article discloses that the decision as to which Multicast Controller to send the request to, is accomplished utilizing two parts of the

IPR2013-00098
Patent 6,918,014

Multicast Controller: an RLR Routing Table and a Routing Cache.  (Ex. 1004, p. 755, § VI.C.)

16.    The Borrill Article discloses that the RLR Routing Table maintains forward path information for every published resource in the system.  (Ex. 1004, p. 755, § VI.C.)

17.    The Borrill Article discloses that the Routing Cache examines the request for a resource and, if necessary, relays the request only in the direction of the RLR for the resource.  (Ex. 1004, p. 755, § VI.C.)

18.    Using Figure 3 as an example, the Borrill Article discloses that if Multicast Controller C receives a request for a resource stored at a cluster associated with Multicast Controller A, the Routing Cache of Multicast Controller C will examine the request, determine by consulting the RLR Routing Table of Multicast Controller C the forward path information of the resource, and forward the request to Multicast Controller A.  (Ex. 1004, p. 755, §§ VI.C, VI.D.)

19.    The Borrill Article discloses that a publication process is used by an RLR to announce an availability of a resource to other Multicast Controllers in the system.  (Ex. 1004, p. 754, § VI.A.)

20.    The Borrill Article discloses that during the publication process, forward path information concerning the newly available resource is established in the RLR Routing Table of each Multicast Controller.  (Ex. 1004, p. 754, § VI.C.)

### *2. Herlihy*

21.    Herlihy discloses a distributed multiprocessor system including mobile objects and nodes.  (Ex, 1005, p. 119, § 1.)

22.    According to Herlihy, mobile objects may be a file, a process, or any other data structure.  (Ex, 1005, p. 119, § 1.)

IPR2013-00098
Patent 6,918,014

23.   Herlihy discloses that a node can store mobile objects and perform functions related to storage of mobile objects.  (Ex, 1005, p. 119, § 1.)

24.   Herlihy discloses that a given mobile object is stored only on one node at a time.  (Ex, 1005, p. 119, § 1.)

25.   According to Herlihy, the mobile object may move from one node to another.  (Ex, 1005, p. 119, § 1.)

26.   Herlihy discloses a directory service stored on each node.  (Ex, 1005, p. 119, § 1.)

27.   According to Herlihy, the directory service allows each node to keep track of mobile objects stored on itself, and on other nodes in the system.  (Ex, 1005, p. 119, § 1.)

28.   As shown below, Figure 2 of Herlihy discloses a tree system *T* that contains linked nodes *u, v, w, u₁, u₂, u₃*.  (Ex, 1005, p. 122, § 3.)



**Fig. 2.** Threee steps after *u* issues *find(u)* message

29.   Herlihy discloses that node *v* stores directory entry *link(v)* for a particular mobile object that may or may not be stored on node *v*.  (Ex, 1005, p. 121, § 3.)

30.   Herlihy discloses that *link(v)* can either reference a node on which *link(v)* is stored, or a node directly linked to the node on which *link(v)* is stored. (Ex, 1005, p. 121, § 3.)

IPR2013-00098
Patent 6,918,014

31.     Thus, in Figure 2 of Herlihy shown above, *link(v)* can reference either node *v* or node *u₁*.  (Ex, 1005, p. 121, § 3.)

32.     According to Herlihy, when *link(v)* references node *v*, the particular mobile object is stored on node *v*.  (Ex. 1005, p. 121, § 3.)

33.     According to Herlihy, when *link(v)* references a node other than node *v*, the particular mobile object is not stored on node *v*.  (Ex. 1005, p. 121, § 3.)

34.     Herlihy discloses that when *link(v)* references a node other than node *v*, that does not necessarily indicate that the particular mobile object is stored on the node referenced in *link (v)*.  (Ex. 1005, p. 121, § 3.)

35.     Instead, Herlihy discloses that when *link(v)* references a node other than node *v*, that indicates that the particular mobile object is stored in a node in the direction of the node referenced in *link (v)*.  (Ex. 1005, p. 121, § 3.)

36.     For example, in Figure 2 of Herlihy shown above, when *link(v)* references node *u₁*, that indicates that the particular mobile object is stored on any one of nodes *u, w, u₁, u₂, u₃*.  (Ex. 1005, p. 121, § 3.)

37.     Herlihy discloses a network that provides a routing service that allows node *v* to send a message to node *u*.  (Ex, 1005, p. 121, § 3.)

### *3. Raymond*

38.     Raymond discloses an algorithm for distributed mutual exclusion in a computer network of *N* nodes that communicate by messages.  (Ex. 1007, p. 61.)

39.     Raymond discloses that the network of nodes are arranged in a tree structure.  (Ex. 1007, p. 62, § 2.)

40.     Raymond discloses that one node in the tree may be designated as a PRIVILEGE node.  (Ex. 1007, p. 62, § 2.)

41.     Raymond discloses that each node has a variable HOLDER which indicates a location of a PRIVILEGE node relative to itself.  (Ex. 1007, p. 62, § 2.)

IPR2013-00098
Patent 6,918,014

42.     Raymond discloses that to initialize a network, one node is chosen as an initial PRIVILEGE node.  (Ex. 1007, p. 73, § 7.)

43.     Raymond discloses that the initial PRIVILEGE node sends an INITIALIZE message to each of its neighbor nodes.  (Ex. 1007, p. 73, § 7.)

44.     Raymond discloses that once a node has received the INITIALIZE message, it may request the PRIVILEGE from the PRIVILEGE node.  (Ex. 1007, p. 73, § 7.)

45.     Raymond discloses that in an exemplary system of connected nodes A and B, when node A receives an INITIALIZE message from neighboring node B, A assigns HOLDER$_A$ to B.  (Ex. 1007, p. 73, § 7.)

## B. Claim Construction

In assessing the merit of Oracle's petition, we have construed the claim term "a storage object" and "a storage object routing table" in light of the specification of the '014 Patent.

The Board construes a claim in an *inter partes* review using the "broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see Office Patent Trial Practice Guides*, 77 *Fed. Reg.* 48756, 48766 (Aug. 14, 2012).  Claims terms usually are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the underlying patent disclosure.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  Indeed, the construction that stays true to the claim language and most naturally aligns with the inventor's description is likely to be the correct construction.  *Renishaw PLC v. Marposs Societa per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

11

IPR2013-00098
Patent 6,918,014

### 1. *"Storage Object"*

Independent claims 1 and 18 each recite "a storage object."  Clouding IP contends a storage object is "a consistent storage entity that is persisted within a storage network (*e.g.*, through the facility of an associated RLR).  (Prelim. Resp. 3-4.)  We agree to an extent.  The Specification discloses a storage object is "any consistent storage entity such as a file, a block or an extent which may need to be updated atomically."  (Ex. 1001, 5:20-22).  The Specification also discloses an RLR as an example of a storage object.  (Ex. 1001, 5:62-64.)  Thus, we construe a storage object as "any consistent storage entity such as a file, a block or an extent which may need to be updated atomically."  This is essentially no different than Clouding IP's definition, but is more consistent with the specification language.

To further clarify the meaning of "storage object," we elaborate on additional terms.  Wiley Electrical Engineering Dictionary defines "extent" as "[i]n a direct-access storage device, such as a hard disk, a contiguous block reversed for a specific data set or program."  Wiley Electrical and Electronics Engineering Dictionary 270 (2004).  An entity is said to be consistent if a transaction involving the entity either creates a new and valid state of data, or, if any failure occurs, returns all data to its state before the transaction was started.  ISO/IEC 10026-1:1992 Section 4.  Similarly, atomicity is a concept where in a transaction involving two or more discrete pieces of information, either all of the pieces are committed or none are.  ISO/IEC 10026-1:1992 Section 4.

### 3. *"Storage Object Routing Table"*

Independent claims 1 and 18 each recite "a storage object routing table."  Clouding IP contends a storage object routing table is "a table including path information for a storage object."  (Prelim. Resp. 4-5.)  We agree.  The Specification discloses that "[t]he Routing Table provides a forward path, that is, a

IPR2013-00098
Patent 6,918,014

path for transactions destined to the RLR." (Ex. 1001, 5:5-7.) The Specification

discloses an RLR as an example of a storage object. (Ex. 1001, 5:62-64.) "The

Routing Table provides a pointer indicating a direction to the RLR." (Ex. 1001,

5:14-15.) "Each node **210** maintains a direction or forward path for all published

resources in the associated Routing Table." (Ex. 1001, 5:67-6:2.) Accordingly, we

construe a storage object routing table as a table including forward path, pointer, or

direction information for a storage object. This is essentially no different than

Clouding IP's definition, but is more consistent with the specification language.

<u>C. 35 U.S.C. § 102(b) Grounds of Unpatentability—Claims 1, 3-4, 8-10, 18,
and 24-26 as Unpatentable based on the Borrill Article</u>

A claim is anticipated only if each and every element as set forth in the

claim is described, either expressly or inherently, in a single prior art reference.

*Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987).

Oracle contends that claims 1, 3-4, 8-10, 18, and 24-26 are unpatentable as

anticipated by the Borrill Article. (Pet. 16-24.) We have considered Oracle's

contentions and supporting evidence, and they have merit.

Taking independent claim 1 as an example, independent claim 1 recites a

system comprising a plurality of connected nodes and a storage object. The Borrill

Article discloses a cluster, which may be a PC, workstation, server, or any system

which uses a shared interconnect, such as a bus. (Ex. 1004, p. 754, § VI.) Figure 3

of the Borrill Article discloses a network spanning tree consisting of all clusters in

a system. (Ex. 1004, p. 754-755, § VI.) The Borrill Article discloses that point-to-

point links are used to interconnect clusters. (Ex. 1004, p. 754-755, § VI.) The

Borrill Article discloses that these links may be implemented as point-to-point

transmission media or as virtual channels in general purpose networks. (Ex. 1004,

p. 754, § VI.) The Borrill Article discloses that a cluster may cache data associated

IPR2013-00098
Patent 6,918,014

with a resource.  (Ex. 1004, p. 754, § VI.A.).  The cluster meets the definition of a
storage object, which is "any consistent storage entity such as a file, a block or an
extent which may need to be updated atomically."

Independent claim 1 then recites "wherein each node of the plurality of
connected nodes is configured to maintain a storage object routing table; wherein a
first node of the plurality of connected nodes is further configured to: identify one
or more neighbor nodes of the first node."  As defined herein, a storage object
routing table is a table including forward path, pointer, or direction information for
a storage object.  The Borrill Article discloses that a Multicast Controller serves as
an interface between a cluster and its links.  (Ex. 1004, p. 755, § VI.C.)  The
Borrill Article discloses that the Multicast Controller includes an RLR Routing
Table, which maintains forward path information for every published resource in
the system.  (Ex. 1004, p. 755, § VI.C.)

Independent claim 1 further recites "wherein a first node of the plurality of
connected nodes is further configured to. . . : send a message to each neighbor
node of the one or more neighbor nodes, indicative of an availability of the storage
object at the first node."  The Borrill Article discloses that a publication process is
used by an RLR to announce an availability of a resource to other clusters in the
system.  (Ex. 1004, p. 754, § VI.A.)

Independent claim 1 additionally recites "wherein each neighbor node of the
one or more neighbor nodes is further configured to: create an entry for the storage
object within a storage object routing table at the neighbor node in response to the
message" and "store an indication of a path to the first node within the entry."  The
Borrill Article discloses that during the publication process, forward path
information concerning the newly available resource is established in the RLR
Routing Table of each Multicast Controller.  (Ex. 1004, p. 754, § VI.C.)

IPR2013-00098
Patent 6,918,014

We similarly are persuaded that Oracle has demonstrated a reasonable likelihood that claims 3, 4, 8-10, 18, and 24-26 are unpatentable based upon the teachings of the Borrill Article.  (Pet. 20-24.)

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the grounds that claims 1, 3-4, 8-10, 18, and 24-26 are unpatentable as anticipated by the Borrill Article.

### D. 35 U.S.C. § 103(a) Grounds of Unpatentability—Claims 6 and 22 are Unpatentable based on the Borrill Article and Herlihy

A patent claim is unpatentable under 35 U.S.C. § 103(a) "if the differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (citing 35 U.S.C. § 103(a)). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).  Oracle contends that claims 6 and 22 are unpatentable for obviousness over the Borrill Article and Herlihy.  (Pet. 25-26.)  We have considered Oracle's contentions and supporting evidence, and they have merit.

Both claims 6 and 22 recite "wherein the storage object is a file."  As discussed above, a cluster of the Borrill Article meets the definition of a storage object.  However, the Borrill Article does not disclose that the cluster is a file. Herlihy discloses mobile object are stored on nodes.  (Ex, 1005, p. 119, § 1.) Herlihy's nodes are analogous to the Borrill Article's clusters.  Herlihy discloses

15

IPR2013-00098
Patent 6,918,014

that mobile objects may be files.  (Ex, 1005, p. 119, § 1.)  We are persuaded by the testimony of Dr. Reynolds that a combination of the Borrill Article and Herlihy reasonably would have suggested files stored on clusters, which would meet the claim limitation.  (Ex, 1008, ¶¶ 45-47.)

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on showing that claims 6 and 22 are unpatentable for obviousness over the Borrill Article and Herlihy.

### E. 35 U.S.C. § 103(a) Grounds of Unpatentability—Claims 11 and 27 as Unpatentable based on the Borrill Article and Hennessy

Oracle contends that claims 11 and 27 are unpatentable for obviousness over the Borrill Article and Hennessy.  (Pet. 27-29.)  We have considered Oracle's contentions and supporting evidence, and they have merit.

Both claims 11 and 27 recite "wherein the message is sent over a TCP/IP packet-switched network."  The Borrill Article discloses that a publication process is used by an RLR to announce an availability of a resource to other Multicast Controllers in the system.  (Ex. 1004, p. 754, § VI.A.)  Hennessy discloses that TCP/IP is the most popular communication standard between networks.  (Ex. 1006, p. 609, § 7.9.)  We are persuaded by the testimony of Dr. Reynolds that a combination of the Borrill Article and Hennessy reasonably would have suggested announcing an availability of a resource using TCP/IP, which would meet the claim limitation.  (Ex, 1008, ¶¶ 50-51.)

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on showing that claims 11 and 27 are unpatentable for obviousness over the Borrill Article and Hennessy.

IPR2013-00098
Patent 6,918,014

F. 35 U.S.C. § 103(a) Grounds of Unpatentability—Claims 1, 3-4, 6, 9, 18, 22, and 25 as Unpatentable based on Herlihy and Raymond

Oracle contends that claims 1, 3-4, 6, 9, 18, 22, and 25 are unpatentable for obviousness over Herlihy and Raymond.  (Pet. 30-40.)  We have considered Oracle's contentions and supporting evidence, and they have merit.

Taking independent claim 1 as an example, independent claim 1 recites a system comprising a plurality of connected nodes and a storage object.  Herlihy discloses a distributed multiprocessor system including mobile objects and nodes. (Ex, 1008, p. 119, § 1.)  According to Herlihy, mobile objects may be a file, a process, or any other data structure.  (Ex, 1008, p. 119, § 1.)  Herlihy discloses that a node can store mobile objects and perform functions related to storage of mobile objects.  (Ex, 1008, p. 119, § 1.)  Figure 2 of Herlihy discloses a tree system $T$ that contains linked nodes $u, v, w, u_1, u_2, u_3$.  (Ex, 1008, p. 122, § 3.)  The mobile object meets the definition of a storage object, which is "any consistent storage entity such as a file, a block or an extent which may need to be updated atomically."

Independent claim 1 then recites "wherein each node of the plurality of connected nodes is configured to maintain a storage object routing table."  As defined herein, a storage object routing table is a table including forward path, pointer, or direction information for a storage object.  Herlihy discloses a directory service stored on each node.  (Ex, 1008, p. 119, § 1.)  According to Herlihy, the directory service allows each node to keep track of mobile objects stored on itself, and on other nodes in the system.  (Ex, 1008, p. 119, § 1.)

Independent claim 1 also recites "wherein a first node of the plurality of connected nodes is further configured to: identify one or more neighbor nodes of the first node."  Herlihy discloses that node $v$ stores directory entry $link(v)$ for a particular mobile object that may or may not be stored on node $v$.  (Ex, 1008, p.

17

IPR2013-00098
Patent 6,918,014

121, § 3.)  Herlihy discloses that *link(v)* can either reference a node on which *link(v)* is stored, or a node directly linked to the node on which *link(v)* is stored. (Ex, 1008, p. 121, § 3.)

Independent claim 1 further recites "wherein a first node of the plurality of connected nodes is further configured to…: send a message to each neighbor node of the one or more neighbor nodes, indicative of an availability of the storage object at the first node."  Herlihy discloses a network that provides a routing service that allows node *v* to send a message to node *u*.  (Ex, 1005, p. 121, § 3.) Raymond discloses that to initialize a network, one node is chosen as an initial PRIVILEGE node.  (Ex. 1006, p. 73, § 7.)  Raymond discloses that the initial PRIVILEGE node sends an INITIALIZE message to each of its neighbor nodes. (Ex. 1006, p. 73, § 7.)  Raymond discloses that once a node has received the INITIALIZE message, it may request the PRIVILEGE from the PRIVILEGE node.  (Ex. 1006, p. 73, § 7.)  The INITIALIZE message of Raymond corresponds to the recited "message… indicative of an availability of the storage object at the first node."

Independent claim 1 additionally recites "wherein each neighbor node of the one or more neighbor nodes is further configured to: create an entry for the storage object within a storage object routing table at the neighbor node in response to the message; store an indication of a path to the first node within the entry."  Raymond discloses that each node has a variable HOLDER which indicates a location of a PRIVILEGE node relative to itself.  (Ex. 1006, p. 62, § 2.)  Raymond discloses that in an exemplary system of connected nodes A and B, when node A receives an INITIALIZE message from neighboring node B, A assigns HOLDER$_A$ to B.  (Ex. 1006, p. 73, § 7.)

18

IPR2013-00098
Patent 6,918,014

We are similarly persuaded that Oracle has demonstrated a reasonable likelihood that claims 3, 4, 6, 9, 18, 22, and 25 are unpatentable based upon the teachings of Herlihy and Raymond.  (Pet. 36-40.)

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on showing that claims 1, 3-4, 6, 9, 18, 22, and 25 are unpatentable for obviousness over Herlihy and Raymond.

### G. 35 U.S.C. § 103(a) Grounds of Unpatentability—Claims 8, 10, 24, and 26 are Unpatentable based on Herlihy, Raymond, and the Borrill Article

Oracle contends that claims 8, 10, 24, and 26 are unpatentable for obviousness over Herlihy, Raymond, and the Borrill Article.  (Pet. 41-43.)  This alleged ground of unpatentability is redundant in light of the grounds on the basis of which we institute review for the same claims.

### H. 35 U.S.C. § 103(a) Grounds of Unpatentability—Claims 11 and 27 are Unpatentable based on Herlihy, Raymond, and Hennessy

Oracle contends that claims 11 and 27 are unpatentable for obviousness over Herlihy, Raymond, and Hennessy.  (Pet. 44-45.)  We have considered Oracle's contentions and supporting evidence, and they have merit.

Both claims 11 and 27 recite "wherein the message is sent over a TCP/IP packet-switched network."  Herlihy discloses a network that provides a routing service that allows node $v$ to send a message to node $u$.  (Ex, 1005, p. 121, § 3.)  Hennessy discloses that TCP/IP is the most popular communication standard between networks.  (Ex. 1006, p. 609, § 7.9.)  We are persuaded by the testimony of Dr. Reynolds that a combination of Herlihy, Raymond, and Hennessy reasonably would have suggested announcing an availability of a resource using TCP/IP, which would meet the claim limitation.  (Ex, 1008, ¶¶ 83-84.)

IPR2013-00098
Patent 6,918,014

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on showing that claims 11 and 27 are unpatentable for obviousness over Herlihy, Raymond, and Hennessy.

III.   ORDERS

After due consideration of the record before us, and for the foregoing reasons it is:

**ORDERED** that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claims 1, 3-4, 8-10, 18, and 24-26 of the '014 patent on the ground of unpatentability under 35 U.S.C. § 102 as anticipated by the Borrill Article; claims 6 and 22 on the ground of unpatentability under 35 U.S.C. § 103 for obviousness over the Borrill Article and Herlihy; claims 11 and 27 on the ground of obviousness over the Borrill Article and Hennessy; claims 1, 3-4, 6, 9, 18, 22, and 25 on the ground of obviousness over Herlihy and Raymond; and claims 11 and 27 on the ground of obviousness over Herlihy, Raymond, and Hennessy.

**FURTHER ORDERED** that *inter partes* review is not instituted with respect to claims 8, 10, 24, and 36 on the ground of obviousness over Herlihy, Raymond, and the Borrill Article;

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; and

**FURTHER ORDERED** that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on June 6, 2013.  The parties are directed to the Office Patent Trial Practice Guide, 77 *Fed. Reg.* 48756, 48765-66 (Aug. 14, 2012), for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

20

IPR2013-00098
Patent 6,918,014


For PETITIONER:

Greg Gardella
cpdocketgardella@oblon.com

Scott McKeown
cpdocketmckeown@oblon.com


For PATENT OWNER:

Tarek Fahmi
tarek.fahmi@tnfip.com

Amy Embert
amy.embert@fseip.com

**Extended Graphics Array** An enhanced VGA standard supporting resolutions up to 1024 x 768. Its abbreviation is **XGA**.

**Extended Industry Standard Architecture** Same as EISA.

**extended memory** In certain computer systems, memory beyond 1 megabyte.

**extended play** Playback time which is longer than ordinarily available. Also refers to storage capacity which is greater than usual. In the case of videocassette recorders, it also refers to recording time which is longer than ordinarily available. Its abbreviation is **EP**.

**extended-range communication** Communication by means of radio waves that are propagated well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon communication**, **forward-scatter communication**, **scatter communication**, or **beyond-the-horizon communication**.

**extended-range propagation** Propagation of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon propagation**, **forward-scatter propagation**, **scatter propagation**, or **beyond-the-horizon propagation**.

**extended-range transmission** Transmission of radio waves well beyond line-of-sight distances. This is usually due to scattering by the ionosphere or troposphere. Also called **over-the-horizon transmission**, **forward-scatter transmission**, **scatter transmission**, or **beyond-the-horizon transmission**.

**extended superframe** A T-carrier framing format or standard with enhanced features, such as less-frequent synchronization, and real-time monitoring of the line. It encompasses 24 DS1 frames, while a **superframe** assembles 12. Its abbreviation is **ESF**. Also called **extended superframe format**.

**extended superframe format** Same as **extended superframe**. Its abbreviation is **ESF format**.

**Extended TACACS** Abbreviation of **Extended Terminal Access Controller Access Control System**. An enhanced version of **TACACS**, which provides additional support for auditing and accounting. Its abbreviation is **XTACACS**.

**Extended Terminal Access Controller Access Control System** Same as **Extended TACACS**.

**Extended VGA** Abbreviation of **Extended Video Graphics Array**. Any of various graphics standards which provide for higher resolution than VGA. SVGA resolutions range from 800 x 600 pixels, to 1600 x 1200 pixels, with support for over 16.7 million colors. Also called **SVGA**.

**Extended Video Graphics Array** Same as **Extended VGA**.

**extensible 1.** That which can be extended or enhanced. For example, a computer system which provides expansion slots, enabling it to incorporate additional peripherals. **2.** That which can be extended or protruded. For instance, a panel which can project out, facilitating its use.

**Extensible HTML** Abbreviation of **Extensible Hypertext Markup Language**. A markup language that combines HTML and XML, and which features greater portability and ease of extension and enhancement. Its own abbreviation is **XHTML**.

**Extensible Hypertext Markup Language** Same as **Extensible HTML**.

**Extensible Markup Language** A specification for the format of documents and data to be used on the Web. It is a scaled-down version of SGML, and seeks to retain the comparative simplicity of HTML, yet offer greater flexibility in areas such as organization and presentation, while being fully compatible with both. Its abbreviation is **XML**.

**Extensible Stylesheet Language** Within **Extensible Markup Language**, a standard defining stylesheets. Its abbreviation is **XSL**.

**Extensible Stylesheet Language Transformations** A language utilized for converting XML documents into other XML documents with different structures. Its abbreviation is **XSLT**.

**extension 1.** An enlargement in scope, or in length of time. For instance, a plug-in which adds functionality to an application. **2.** A set of characters appearing at the end of a filename, indicating the file type. For example, in the filename *notepen.exe*, the **.exe** portion is the extension, and in this case specifies an executable program. Also called **filename extension**. **3.** A telephone, modem, or similar device connected to a main line, such as a PBX.

**extensometer** An instrument which measures small variations in the dimensions of a solid. For instance, it may measure deformation due to stress. An example is a laser extensometer.

**extent** In a direct-access storage device, such as a hard disk, a contiguous block reserved for a specific data set or program.

**Exterior Gateway Protocol** A routing protocol used between autonomous systems on the Internet. Its abbreviation is **EGP**.

**external bus** A bus between a CPU and peripherals. A PCI bus is an example. An **internal bus** runs between a CPU and memory.

**external cache** A memory cache which utilizes a memory bank between the CPU and main memory. This contrasts with **internal cache**, which is built right into the CPU. Internal cache is faster, but smaller than external cache, while external cache is still faster than main memory. Also called **level 2 cache**, or **L2 cache**.

**external capacitor** A capacitor which is externally connected to an oscillator, to vary its frequency.

**external circuit** A circuit, or part of a circuit, which is outside of a main circuit, or any other circuit in question. For instance, that which is externally connected to a battery, including its load.

**external device** A device which is not part of a central system, but which is utilized with it. For instance, a peripheral, such as a mouse or printer, used with a computer system.

**external drive** A drive, such as a disk drive or tape drive, that is not located within the system unit of a computer, as opposed to an **internal drive**, which is.

**external electric field 1.** An electric field other than that being considered. **2.** An electric field affecting a given particle or body situated in the medium surrounding said field.

**external error** An error caused by an **external device**.

**external feedback** Feedback provided by an **external circuit**.

**external field** An **external electric field**, or an **external magnetic field**.

**external interrupt** In a computer, an interrupt generated by an **external device**. This contrasts with an **internal interrupt**, which is generated by the CPU.

**external magnetic field 1.** A magnetic field other than that being considered. **2.** A magnetic field affecting a given particle or body situated in the medium surrounding said field.

**external memory** A deprecated term for **external storage**.

**external modem** A modem which is self-contained, and which usually connects to a computer via a cable to a serial port. This contrasts with an **internal modem**, which is plugged into an expansion slot.

**external photoelectric effect** The ejection of electrons from a surface through the absorption of sufficient incident electromagnetic radiation, such as infrared, visible, or ultraviolet

Trials@uspto.gov                                                    Paper 8
571-272-7822                                           Date: May 23, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

ORACLE CORPORATION
Petitioner

v.

CLOUDING IP, LLC
Patent Owner

_____

Case IPR2013-00094
Patent 7,596,784

_____

Before JAMESON LEE, MICHAEL W. KIM, and RAMA G. ELLURU,
*Administrative Patent Judges.*

ELLURU, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2013-00094
Patent 7,596,784


I.    INTRODUCTION

Petitioner Oracle Corporation ("Oracle") requests *inter partes* review of claims 1-3, 5-7, 19, 20, and 22 of US Patent 7,596,784 ("the '784 patent"). ("Pet" Paper 1.)  The Patent Owner, Clouding IP, LLC ("Clouding IP"), filed a preliminary response opposing the institution of the review.  ("Prelim. Resp." Paper 7.)  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an inter partes review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be  instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

We determine that the information presented in the petition and patent owner preliminary response shows that there is a reasonable likelihood that Oracle would prevail with respect to all the challenged claims.  Accordingly, we authorize an *inter partes* review to be instituted for the '784 patent.

Oracle indicates that Clouding IP has asserted the '784 patent in co-pending litigation captioned *Clouding IP, LLC v. Oracle Corp.*, D. Del., Case No. 1:12-cv-00642.  (Pet. 3.)


A. The '784 Patent

The invention of the '784 patent relates generally to a system and method for providing on-demand, scalable computational resources over a distributed network and system.  (Ex. 1001, Abstract, 1:26-31.)  According to the '784 patent,

IPR2013-00094
Patent 7,596,784

the invention is aimed at addressing problems faced by application or website providers (*e.g.*, Charles Schwab or Walmart.com).  (Ex. 1001, 1:51-3:40; 7:34-39.)  One of the problems, for example, is that such a provider has difficulty predicting how much demand they will have for their applications.  (Ex. 1001, 1:51-54.)  Thus, it is difficult for a provider to determine how large a server farm to deploy which will allow greater user access to its services.  (Ex. 1001, 1:54-56.)

According to the '784 patent, the present invention solves capacity planning problems by providing on-demand application processing capacity.  (Ex. 1001, 7:32-34, 7:44-46.)  The present invention, for example, provides application providers with access to the network, where the network includes distributed "compute resources."  (Ex. 1001, 4:13-15.)  The compute resources are configured to allow the application provider to distribute applications onto the network to utilize the distributed compute resources for processing of the applications. (Ex. 1001, 4:15-18.)  The '784 patent specification interchangeably uses "compute resources" with "computing resources" "computational resources," and "computer resources."  (*See e.g.*, Ex. 1001, Title, Abstract, 3:45-48, 4:13-28, 4:44-46, 11:24-25, 15:10, 32:18-21.)  Application processing may include, for example, running and operating an application.  (Ex. 1001, 7:17-19.)  The disclosed system and method increase the amount of resources available for processing an application as demand for the application increases (*e.g.*, as user access to the application grows).  (Ex. 1001, 4:20-23; 8:9-12.)  As the amount of resources is increased, the amount of money charged to the application provider is increased based on the amount of resources utilized by its application.  (Ex. 1001, 4:23-26.)  As demand decreases (*e.g.*, user access decreases), the amount of resources is decreased and

3

IPR2013-00094
Patent 7,596,784

the amount of money charged to the application provider is reduced.  (Ex. 1001, 4:26-28.)

## B. Illustrative Claims

Independent claims 1 and 19 are illustrative of the challenged claims and are reproduced below:

1. A method for providing distributed, on-demand application processing, comprising:

   allowing a first application provider to deploy at least a first application onto a network, wherein the network includes distributed compute resources configured to provide application execution;

   receiving a request for execution of the first application from the first application provider; and utilizing the distributed compute resources for execution of the first application in response to receiving the request for execution of the first application from the first application provider;

   metering and monitoring an amount of the compute resources utilized in execution of the first application; charging the first application provider based on the amount of compute resources utilized in execution of the first application

   increasing the amount of compute resources utilized in execution of the first application by a first set of compute resources; and increasing the amount charged to the first application provider based on the first set of compute resources.

19. An apparatus for providing on-demand compute resources, comprising:

   a plurality of compute resources including at least one memory, wherein the plurality of compute resources are distributed across a network, wherein the plurality of compute resources are coupled to allow communication between at least first compute resources and second compute resources; a conduit coupled to the network, and

   configured to provide an application provider access to the network to distribute at least a first application onto the network and request execution of the first application using the plurality of

4

IPR2013-00094
Patent 7,596,784

compute resources;

a first resource manager coupled with at least the first compute
resources, wherein the first resource manager is configured
to activate at least a first set of the first compute resources
for processing of the first application when demand for the
first application exceeds a first threshold;

and a metering module coupled with the first compute resources,
wherein the metering module is configured to monitor
the first compute resources including the first set of the
first computer resource being activated for processing of
the first application, and wherein the metering module is
configured to determine an amount to bill the first application
provider based on the first set of the first compute resources
utilized;

wherein the first resource manager is configured to activate a second
set of the first compute resources for processing of the first
application when demand for the first application exceeds a
second threshold;

and wherein the metering module is configured to monitor the second
set of the first computer resource being activated for
processing of the first application, and wherein the metering
module is configured to determine an increased amount
to bill the first application provider based on the second set
of the first compute resources utilized.

## C. Prior Art References Applied by Petitioner

Oracle challenges the patentability of claims 1-3, 5-7, 19, 20, and 22 of the

'784 patent on the basis of the following prior art:

Aziz et al.          US Patent 6,779,016          August 17, 2004
(Ex. 1003)

Landherr et al.      US Patent 6,880,156          April 12, 2005
(Ex. 1004)

Reed, D., et al. *Xenoservers: Accountable Execution of Untrusted
Programs,* The Seventh Workshop on Hot Topics in Operating Systems,
March 29-30, 1999 ("Reed").    (Ex. 1005)

5

IPR2013-00094
Patent 7,596,784

> Foster, et al.  *The Grid: Blueprint for a New Computing Infrastructure*,
> Morgan Kauffman Publishers, Inc., August 12, 1988 ("Foster").  (Ex. 1006)

> Grimshaw, A., et al.  *Campus-Wide Computing: Early Results Using
> Legion at the University of Virginia*, The International Journal of High
> Performance Computing Applications, 1997 ("Grimshaw-1").     (Ex. 1007)

> London, Shmulik.  *POPCORN – A Paradigm for Global-Computing*,
> Master's Thesis, The Hebrew University of Jerusalem, June, 1998.
> (Ex. 1008)

> Camiel, Noam, *The Shared Object POPCORN System* Master's Thesis, The
> Hebrew University of Jerusalem, July, 1999.  (Ex. 1009)

> Neuman, et al. *The Prospero Resource Manager: A Scalable Framework
> for Processor Allocation in Distributed Systems*, 6 Concurrency: Practice
> and Experience 4, June, 1994.  (Ex. 1010)

> Grimshaw, et al.  *Legion 1.4 Basic User Manual*, University of Virginia,
> 1998 ("Grimshaw-2").  (Ex. 1011)

(Pet. 6-8.)  Further, Oracle relies upon declaration testimony of its witness,

Dr. Andrew Grimshaw ("Grimshaw Decl.").  (Ex. 1012.)


### D. The Alleged Grounds of Unpatentability

Oracle alleges the following grounds of unpatentability:

1.  Claims 1-3 and 5-7 as obvious under 35 U.S.C. § 103(a) over Aziz
    and Reed;

2.  Claims 19, 20, and 22 as obvious under 35 U.S.C. § 103(a) over Aziz
    and Landherr;

3.  Claims 1, 5, 6, 19, 20, and 22 as obvious under 35 U.S.C. § 103(a)
    over Foster, Grimshaw-1, and Grimshaw-2;

4.  Claim 1 as obvious under 35 U.S.C. § 103(a) over Reed and Aziz;

6

5. Claims 1, 2, 19, 20, and 22 as obvious under 35 U.S.C. § 103(a) over London and Camiel; and

6. Claims 1, 5, and 6 as obvious under 35 U.S.C. § 103(a) over Neuman and London.

Pet. 8-9.

II. ANALYSIS

A. Prior Art References

Aziz (Ex. 1003)

Aziz describes methods and apparatus that provide a dynamically sized, highly scalable server farm. (Ex. 1003, Abstract.) Aziz teaches a wide scale computing grid which is physically constructed once, and then divided into virtual server farms ("VSF") which are allocated to each of a plurality of organizations on demand. (Ex. 1003, Abstract, 4:24-31.) Aziz illustrates a VSF consisting of a plurality of resources, for example, distributed and connected web servers and a storage device. (Ex. 1003, 10:9-15, Fig. 3, Fig. 6.)

An organization can use the VSF to host its content and applications, which may be accessed via the internet. (Ex. 1003, 4:51-53.) Aziz discloses that an organization can provision a VSF via a "Control Plane." (Ex. 1003, 15:42-44.) After the organization enters a provisioning order, the Control Plane can configure a VSF that matches the order and return a password to the organization so that the organization can upload master copies of the applications to execute on the VSF. (Ex. 1003, 15:52-63.) Aziz illustrates an embodiment wherein the application is a web site. (Ex. 1003, 10:16-24.) We credit the opinion of Oracle's declarant, Dr. Grimshaw, that the Aziz system teaches allowing an organization to update its application by uploading a newer vision of the application. (Ex. 1012

7

(Grimshaw Decl.), ¶ 22.)  We further credit the opinion of Dr. Grimshaw that one of ordinary skill in the art would have understood that uploading an application for execution in the Aziz system represents a request by the organization for execution of the application, and that in response to this request, the VSF utilizes the computing elements to execute the application.  (Ex. 1012 (Grimshaw Decl.), ¶ 22.)  Furthermore, the organization, via the Control Plane, can monitor real-time information related to usage, loads of elements, hits or transactions per second, and adjust the characteristics of a VSF based on the real-time information. (Ex. 1003, 5:3-6, 16:12-15.)

Aziz teaches that an organization can choose automatic growth and shrinkage of a VSF based on real-time load.  (Ex. 1003, 16:1-5.)  The Aziz system can add elements kept in reserve to different organizations at different times of the day, as necessary, thereby enabling each VSF to grow when necessary and shrink when traffic to the application falls down to normal.  (Ex. 1003, 7:19-22.)  The Aziz system may add elements kept in reserve to a particular VSF for reasons such as varying web traffic loads and related peak processing loads.  (Ex. 1003, 7:6-26.)  For example, the Control Plane may determine that in addition to the current web servers in a VSF, another CPU programmed as a web server is necessary for the VSF because of an increased number of requests coming to the web site.  (Ex. 1003, 10:16-27, Fig. 6, Fig. 7.)  The Aziz system also can reduce the amount of elements in a particular VSF.  (Ex. 1003, 11: 1-9.)  For example, Aziz illustrates an embodiment wherein the VSF no longer needs a particular CPU, and therefore the CPU is moved out of the VSF and back into the reserve pool.  (Ex. 1003, 7:42-44.)

Also, the enterprise that hosts the VSF may bill service fees to an organization using a VSF based on actual usage of the elements of the VSF.  (Ex.

1003, 16:24-43.)   Because the VSF architecture enables a "pay-as-you-go" billing model, the system bills a particular organization at a rate that reflects a running average of usage, instantaneous usage, etc.  (Ex. 1003, 16:28-36.)  For example, when the real time load of a VSF requires more than a pre-set number of servers, the user is billed at an incremental rate for the extra servers, based on how many extra servers were needed and for the length of time that they are needed.  (Ex. 1003, 16:37-43.)  We also credit the opinion of Dr. Grimshaw that a person of ordinary skill in the art would have understood that, if an organization uploaded only one application to the VSF, the Aziz system would only monitor and provide billing information for that specific application.  (Ex. 1012 (Grimshaw Decl.), ¶ 23.)

Reed (Ex. 1005)

Reed describes system architecture that supports organizations, such as content providers, in providing computation servers within the Internet that execute untrusted code supplied by third parties.  (Ex. 1005, Abstract, § 1, ¶ 5.) Reed teaches that a content provider could use the disclosed servers to deploy key parts of its web server application throughout the network.  (Ex.1005, Abstract, § 1.1, ¶ 1.)  The Reed system will accept programs from users, such as online banking services, and prepare them for execution.  (Ex. 1005, § 2.3, ¶ 1.)  In the Reed system, all resources that an application consumes, directly or indirectly, is accounted to the application.  (Ex. 1005, § 2, ¶ 2.)  The Reed system logs the work done by each server on behalf of each application and charges applications for those pieces of work.  (Ex. 1005, § 2.3, ¶ 2.)  The Reed system bills users for the resources consumed by their application.  (Ex. 1005, Abstract, § 1, ¶ 5.)  Reed recognizes that the disclosed system needs to provide mechanisms for setting the prices of system resources, and for charging users for the total money spent by

IPR2013-00094
Patent 7,596,784

their applications.  (Ex. 1005, § 2.2, ¶ 2.)  Reed explains that no single accounting mechanism is suitable and that all resources are scheduled or allocated for, including for example, CPU cycles spent executing an application.  (Ex. 1005, § 2.2, ¶ 1.)

<u>Landherr (Ex. 1004)</u>

Landherr describes automatically adapting a server on a computer network, such as the Internet.  (Ex. 1004, 1:7-9, 12-13.)  Landherr discloses a server connected to a network that includes one or more active server applications, a load detector, an additional server application that is initially inactive, and a system allocator.  (Ex. 1004, 2:13-16.)  In an initial state, an additional server application is off-line and not utilized.  (Ex. 1004, 2:23-24, 3:11-13.)  The system allocator monitors the load measured on the server, detects when the loads exceed a threshold, and in response, activates an additional server application on the server.  (Ex. 1004, 2:23-27, 3:41-47.)  Landherr teaches that the additional server application is preferably owed by a computer vendor and not the owner of the server.  (Ex. 1004, 3:19-21.)  Landherr further teaches that during the initial state, when the additional server application is off-line, the server owner is not charged for the additional server application.  (Ex. 1004, 3:22-24.)  The server owner pays for the use of the additional server application when the additional server application is brought on-line and remains on-line.  (Ex. 1004, 3:24-28.)  Landherr explains that any number of additional server applications can be brought on-line either serially or in parallel.  (Ex. 1004, 5:46-50.)  Landherr also teaches detecting when a load is less than a deactivation threshold, and in response, deactivating the additional server application.  (Ex. 1004, 2:27-30, 3:45-47.)

Foster (Ex. 1006)

Foster describes a distributed scalable computer grid architecture system called "Legion."  (Ex. 1006, p. 222-23, §§ 9.4, 9.4.1.)  Legion supports millions of hosts and trillions of objects existing in a loose confederation, and tied together with high-speed links.  (Ex. 1006, p. 222, § 9.4.)  The Legion system is composed of resources, including computational and storage resources owned and controlled by an array of organizations.  (Ex. 1006, pp. 223, 233 §§ 9.4.1, 9.5.3.)  A user of the Legion system can sit at a terminal and manipulate objects, such as applications, on several processors, but Legion presents to the user the illusion of working on a single powerful computer.  (Ex. 1006, p. 223, § 9.4.)  Foster teaches the implementation of specific applications that exploit the Legion system referred to as "teleimmersion" and "Digital Sky." (Ex. 1006, p. 234, § 9.6.)

In addition, Foster teaches accounting methods that provide the means to track and charge for consumption of resources in a system. (Ex.  1006, p. 398, § 16.1.4.)   For example, Foster teaches a distributed accounting system that maintains account balances for the users of a system, including how much of a resource was used.  (Ex. 1006, p. 406, § 16.2.5.)   Foster further teaches that a user's job can run under a temporary ID, and the resources consumed can be charged against the original user's allocated quota of resources.  (Ex. 1006, p. 417, § 16.4.2.) Foster also teaches that when a resource is consumed, the Legion system can debit the user's account.  (Ex. 1006, p. 417, § 16.4.2.)

Foster describes dynamically increasing resources when the computational load exceeds allotted computation requirements.  The Legion

11

IPR2013-00094
Patent 7,596,784

system includes a "Scheduler" that identifies a set of available resources that match the Scheduler's requirements.  (Ex. 1006, pp. 233, § 9.5.3.) Specifically, Foster teaches an embodiment wherein a user of an MRI application can view and manipulate three-dimensional images.  (Ex. 1006, pp. 167, § 7.2.4.)  The user can zoom in on a particular area of the model which increases the computational load of the system and exceeds an established threshold.  (Ex. 1006, pp. 170, § 7.2.4.)  In response, the system may obtain additional processors or resources with sufficient bandwidth and migrate the computation.  (Ex. 1006, pp. 170, § 7.2.4; Ex. 1012 ("Grimshaw Decl."), ¶ 45.)  This process may involve negotiating with a local resource broker and restructuring the computation to use additional resources.  (Ex. 1006, pp. 167, 170, § 7.2.4.)

<u>Grimshaw-1 (Ex. 1007)</u>

Grimshaw-1 describes the Legion project at the University of Virginia.  (Ex. 1007, Summary.)  Grimshaw-1 teaches that Legion is architecture for designing and building system services that provide the illusion of a single virtual machine to users.  (Ex. 1007, Summary.) Grimshaw-1 further teaches that Legion accounts for resource consumption by associating each instantiated user object with a resource owner and a user of the resource.  (Ex. 1007, §§ 3.3, 3.4.)  The Legion system then monitors user object activity.  (Ex. 1007, § 3.4.)  Grimshaw-1 teaches that resource consumption is monitored on an object-by-object basis, for example, based on the amount of CPU times used.  (Ex. 1007, § 3.4.) Furthermore, the system tracks the amount of resource a user contributes to the Legion system and the amount the user consumes, rewards users who

IPR2013-00094
Patent 7,596,784

contribute more resources than they use, and charges those who consume more resources than they contribute.  (Ex. 1007, § 1.1.)

## Grimshaw-2 (Ex. 1011)

Grimshaw-2 is the basic user manual for Legion.  Grimshaw-2 teaches that Legion's remote execution allows a user to run remotely executed programs from the Legion command line, thereby taking advantage of Legion's distributed resources.  (Ex. 1011, § 11.)  The user's workload is spread out on several processors.  (Ex. 1011, § 11.)  Grimshaw-2 further teaches that the user can execute multiple instances of a single program or execute several different programs in parallel.  (Ex. 1011, § 11.)  Specifically, Legion's "legion_run" command line executes a single instance of a program and Legion chooses a host with a suitable architecture (specified when the program was registered) to execute the program.  (Ex. 1011, § 11.4.)

## B. Claim Construction

Consistent with the statute and the legislative history of the AIA, the Board interprets claims by applying the broadest reasonable construction in the context of the specification in which the claims reside.  37 C.F.R. § 42.100(b); *see Office Patent Trial Practice Guide*, 77 *Fed. Reg*. 48756, 48766 (Aug. 14, 2012). Claims are to be given their broadest reasonable interpretation consistent with the specification, reading the claim in light of the specification as it would be interpreted by one of ordinary skill in the art.  *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).  This means that the words of the claim will be given their plain meaning unless the plain meaning is inconsistent with the

13

IPR2013-00094
Patent 7,596,784

'784 patent specification.  *In re Zletz*, 893 F.2d 319, 321 (Fed. Cir. 1989).  In

some cases, the ordinary meaning of claim language as understood by a person of

skill in the art may be readily apparent even to lay judges, and claim construction

in such cases involves little more than the application of widely accepted meaning

of commonly understood words. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314

(Fed. Cir. 2005) (en banc).

In assessing the merit of Oracle's arguments, we have construed the

following claim terms in light of the specification of the '784 patent.

### 1.  Application provider

Independent claims 1 and 19 recite "first application provider" and

"application provider," respectively.  We determine that the '784 patent

specifically defines "application provider."  The '784 patent states that "an

application provider is an entity that provides a service via a computer network

such as, Charles Schwab, Web Van-like entities, Walmart.com, and Intuit, which

provide various types of applications accessed by individuals or entities over the

internet."  (Ex. 1001, 7:34-39.)  Accordingly, we construe "first application

provider" and "application provider" as "an entity that provides a service via a

computer network."

### 2.  Access

Independent claim 19 requires a conduit configured to provide an

application provider "access to the network."  The plain and ordinary meaning of

the phrase "access" is the ability to use or enter.  The '784 patent specification

does not require us to narrow that construction.  The specification uses the term

"access" broadly, according to its plain and ordinary meaning.  For example, the

'784 patent specification states that application providers "access the network" to

distribute applications onto network.  (Ex. 1001, Abstract.)  The specification

IPR2013-00094
Patent 7,596,784

further states the system contains "[a] conduit couple[d] with the deploy module, and is configured to provide the application providers with access to the deploy module to distribute applications or updates for application processing."  (Ex. 1001, 4:51-54.)  The '784 patent specification explains that application providers can deploy or access their applications through any one of a plurality of terminals or locations.  (Ex. 1001, 16:15-26.)

3.   Deploy/distribute an application onto a network

Independent claim 1 recites "deploy at least a first application onto a network" and independent claim 19 recites "distribute at least a first application onto the network."  The '784 patent specification explains that an application provider loads an application onto the system, and can designate specific locations, such as an "edgepoints," to allow users to access the deployed application.  (Ex. 1001, 16:42-55.)  Once the application provider designates the areas of distribution, the system distributes the application to the edgepoints in the areas designated by the application provider.  (Ex. 1001, 16:42-55.)  Importantly, the '784 patent specification state that an "edgepoint" includes at least one and usually a plurality of servers or processors.  (Ex. 1001, 11:50-51.)  Thus, we construe the aforementioned claim phrases as distributing an application to at least one compute resource, such as a server or processor, in a network.

Clouding IP's proposed construction, "distributing at least one instance of an application to compute resources that make up the network" is not supported by the '784 patent specification.  (Prelim. Resp. 6.)  Clouding IP has not pointed to any portion of the specification that requires distributing an application to more than one edgepoint or distributing an application to plural compute resources. While the '784 patent specification discloses a preferred embodiment of

15

IPR2013-00094
Patent 7,596,784

distributing an application to plural edgepoints (Ex. 1001, 16:42-55), Clouding IP

has not demonstrated that claims 1 and 19 should be restricted to this embodiment.


C. Obviousness of Claims 1-3 and 5-7 over the Combination of Aziz and Reed

Oracle contends that the combination of Aziz and Reed renders obvious

claims 1-3 and 5-7.  Based on the evidence of record, we are persuaded that there

is a reasonable likelihood that that is the case.  (Pet. 18-24.)

For example, Aziz teaches "allowing a first application provider to deploy

at least a first application onto a network, wherein the network includes

distributed compute resources configured to provide application execution"

required by claim 1.  Aziz describes a virtual server farm ("VSF") that includes

multiple web servers and storage devices.  (Ex. 1003, 6:27-36; Fig. 3.)  Aziz

teaches that an organization, such as a website, can upload master copies of

applications to execute in the VSF.  (Ex. 1003, 10:16-24, 15:61-63.)  The VSF

hosts the applications which may be accessed via the Internet.  (Ex. 1003, 4:51-

53.)  Aziz further teaches "metering and monitoring an amount of the compute

resources utilized in execution of the first application" required by claim 1.

Aziz's "Control Plane" monitors the loads of elements in the system, and

determines, for example, whether another web server is required in the VSF.

(Ex. 1003, 5:3-6, 10:16-18.).  Aziz indicates that the system monitors the actual

amount of resources utilized because fees are based on such usage.  Specifically,

Aziz teaches "charging the first application provider based on the amount of

compute resources utilized in execution of the first application" required by

claim 1.  In the Aziz system, the enterprise that hosts the VSF may bill service

fees to organizations using a "pay-as-you-go" billing model based on the actual

usage of the storage elements of a VSF.  (Ex. 1003, 16:24-36.)  In addition, Aziz

16

IPR2013-00094
Patent 7,596,784

teaches "increasing the amount of compute resources utilized in execution of the first application by a first set of compute resources" required by claim 1.  The Aziz system adds elements, such as a web server, kept in reserve to a VSF when necessary, *e.g.*, when the web site receives an increased number of requests. (Ex. 1003, 7:6-15, 10:16-27.)

Like Aziz, Reed also teaches the "monitoring" limitation, identified above. Reed teaches that content providers could use the disclosed system to deploy copies of key parts of their web server applications through the network, such as the Internet.  (Ex. 1005, §§ 1, 1.1.)  Furthermore, Reed teaches that all resources an application consumes, directly or indirectly, should be accounted to the application.  (Ex. 1005, § 2, ¶ 2.)  Reed teaches that all utilized resources are charged for by, for example, logging the work done by each server on behalf of each application and charging applications for these pieces of work.  (Ex. 1005, §§ 2.2, 2.3.)

We similarly are persuaded that Oracle has demonstrated a reasonable likelihood that claims 2, 3, and 5-7 are unpatentable based upon the teachings of Aziz and Reed.  (Pet. 19-24.)

We further credit Dr. Grimshaw's opinion that a person of ordinary skill would have had reason to combine the teachings of the references in a manner that yields the claimed invention.  (Ex. 1012, (Grimshaw Decl.), ¶¶ 25-26, 33-38.)  For example, both Aziz and Reed are directed towards providing distributed resources to content providers and efficiently and economically charging the content providers based on the resources utilized. (Ex. 1012, (Grimshaw Decl.), ¶ 26.)

Clouding IP maintains that Oracle has failed to establish a reasonable likelihood that claims 1-3 and 5-7 are unpatentable over the combination of Aziz and Reed.  (Prelim. Resp. 7-10.)  In support, Clouding IP makes two arguments.

17

IPR2013-00094
Patent 7,596,784

First, Clouding IP alleges that Aziz does not teach "charging [an] application provider based on the amount of compute resources *utilized in execution of the first application*." (Prelim. Resp. 8 (emphasis added).)  According to Clouding IP, Aziz defines elements of a VSF at the resource level, not the application level. (Prelim. Resp. 9.)  Clouding IP argues that because Aziz teaches that VSF elements may perform different roles, Aziz teaches that an enterprise will be billed for a given VSF resource independently of whatever role it fulfills, *i.e.*, on a basis other than whether it is utilized in execution of an application.  (Prelim. Resp. 9 (citing Ex. 1003, 8:33-34).)  We are not persuaded by Clouding IP's argument.

Aziz teaches that a particular element may perform different roles in different VSFs because it may act as a web server in one VSF, but when it is placed into a different VSF, it may be a database server.  (Ex. 1003, 8:33-38.) Aziz does not refer to an element's ability to perform different roles as an indication that the element is not utilized in executing an application on the VSF. Also, we credit the opinion of Dr. Grimshaw that if an organization uploaded only one application to the VSF in the Aziz system, a person of ordinary skill in the art would have understood that the Aziz system would only have monitored and provided billing information for that specific application.  (Ex. 1012 (Grimshaw Decl.), ¶ 23.)

Clouding IP also argues that it would not have been obvious for one of ordinary skill in the art to use Reed's methods of charging per CPU cycles in the Aziz system.  (Prelim. Resp. 9.)  Because we determine that Aziz teaches the "charging" limitation, Clouding IP's arguments with respect to Reed are moot. For further clarity, however, we determine that Clouding IP's argument with respect to Reed lacks merit.

18

IPR2013-00094
Patent 7,596,784

Clouding IP reads Reed in isolation, separately from the combination of Aziz and Reed.  Reed teaches monitoring the amount of resources used in executing an application.  Specifically, Reed teaches that all resources that an application consumes, directly or indirectly, is accounted to the application.  (Ex. 1005, § 2, ¶ 2.)  For example, the Reed system logs the work done by each server on behalf of each application and charges applications for those pieces of work.   (Ex. 1005, § 2.3, ¶ 2.)  These teachings of Reed can be substituted into the Aziz system, which charges users of a VSF based on actual usage of the elements.  Furthermore, even though Oracle does not refer to Reed for satisfying the "charging" limitation (Pet. 22), Reed teaches that its system needs to provide mechanisms for charging users for the total money spent by their applications and charging applications for the work done by each server on behalf of each application.  (Ex. 1005, § 2.2, ¶ 2, § 2.3, ¶ 2.)  Thus, we determine that the combination of Aziz and Reed teaches the "charging [an] application provider based on the amount of resources utilized in execution of the first application" feature of claim 1.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the ground that claims 1-3 and 5-7 are unpatentable as obvious over Aziz and Reed.


D. Obviousness of Claims 19, 20, and 22 over the Combination of Aziz and Landherr

Oracle contends that the combination of Aziz and Landherr renders obvious claims 19, 20, and 22.  Based on the evidence of record, we are persuaded that there is a reasonable likelihood that that is the case.  (Pet. 25-30.)

IPR2013-00094
Patent 7,596,784

Whereas independent claim 1 is a method claim, independent claim 19 is an apparatus claim. Aziz's disclosure was discussed above in relation to claim 1. The issue raised by Clouding IP with respect to the combination of Aziz and Landherr is whether the combination teaches "a conduit . . . configured to provide an application provider access to the network" as required by claim 19. Aziz teaches that its "Control Plane" evaluates an organization's provisioning order for a VSF, and may configure a VSF that matches the order and return to the customer a password providing access to one or more of the elements in the VSF. (Ex. 1003, 15:42-63.) The customer may then upload master copies of the applications to execute in the VSF. (Ex. 1003, 15:42-63.)

Furthermore, Landherr, which describes the automatic adaptation of a server on a network, teaches the "first resource manager . . . configured to activate at least a first set of the first compute resources for processing of the first application when demand for the first application exceeds a first threshold" required by claim 19. Landherr describes a "system allocator" that monitors the load of elements and activates additional server applications for hosting a website when a load exceeds an activation threshold. (Ex. 1004, 1:45-49, 3:41-46, 3:56-69.) Only when additional server application is brought on-line and remains on-line does the server owner pay for the use of the additional server application. (Ex. 1004, 3:25-29.)

We are similarly persuaded that Oracle has demonstrated a reasonable likelihood that claims 20 and 22 are unpatentable based upon the teachings of Aziz and Landherr. (Pet. 25-30.)

We further credit Dr. Grimshaw's opinion that a person of ordinary skill would have had reason to combine the teachings of the references in a manner that yields the claimed invention. (Ex. 1012, (Grimshaw Decl.), ¶ 30-32.) For

example, both Aziz and Landherr are directed to dynamically scalable computing systems. For instance, both Aziz and Landherr use load balancing and monitor the real-time loads of resources with respect to application execution, such as a website, to effectively provide dynamically scalable resources. (Ex. 1012, (Grimshaw Decl.), ¶ 31.) Further, both Aziz and Landherr describe billing content providers based on usage of resources. (Ex. 1012, (Grimshaw Decl.), ¶ 31.)

Clouding IP maintains that Oracle has failed to establish a reasonable likelihood that claims 19, 20, and 22 are unpatentable over the combination of Aziz and Reed. (Prelim. Resp. 7-10.) Clouding IP argues that Aziz does not teach the claimed "conduit" that provides the application provider "access to the network to distribute at least a first application onto the network" as required by independent claim 19. Specifically, Clouding IP alleges that Aziz's Control Plane does not provide access to distribute an application onto the network, because while a user can utilize the Control Plane to provision a VSF, the user must "separately" load applications onto that VSF once it is provisioned. (Prelim. Resp. 11.) Clouding IP further contends that the combination of Aziz and Landherr does not cure this alleged deficiency. (Prelim. Resp. 11.) We are not persuaded.

Aziz specifically states that after the Control Plane, *i.e.*, the claimed "conduit," configures a VSF that matches an organization's provisioning order, it returns to the organization a password that provides "root access to one or more of the computing elements in the VSF." (Ex. 1003, 15:52-63.)) The organization may *then* upload master copies of the applications to execute in the VSF. (Ex. 1003, 15:52-63 (emphasis added).) The fact that an organization in Aziz would not upload the applications to the VSF via the Control Plane is irrelevant, as claim

IPR2013-00094
Patent 7,596,784

19 only requires "a conduit . . . configured to provide an application provider access to the network," which the Control Plane accomplishes by providing the password to the organization.  Thus, we determine that Aziz's Control Plane provides an organization the ability to use the elements in the VSF upon sending the organization a password.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the ground that claims 19, 20, and 22 are unpatentable as obvious over Aziz and Landherr.


### E. Obviousness of Claims 1, 5, 6, 19, 20, and 22 over the Combination of Foster, Grimshaw-1, and Grimshaw-2

Oracle contends that the combination of Foster, Grimshaw-1, and Grimshaw-2 renders obvious claims 1, 5, 6, 19, 20, and 22.  Based on the arguments and claim chart set forth in the Petition, we are persuaded that there is a reasonable likelihood that that is the case.  (Pet. 42-51.)  For example, this combination of references suggests "deploy at least a first application onto a network," as recited in independent claim 1, and "distribute at least a first application onto the network," as recited in independent claim 19.

Specifically, all three references describe the Legion system, architecture for designing a distributed scalable computer grid architecture system called "Legion."  (Ex. 1006, p. 222-23, §§ 9.4, 9.4.1.)  The Legion system is composed of resources, including computational and storage resources owned and controlled by an array of organizations.  (Ex. 1006, pp. 223, 233 §§ 9.4.1, 9.5.3.)  Grimshaw-2 teaches that Legion's "legion_run" command line executes a single instance of a program and Legion chooses a host with a suitable architecture (specified when the program was registered) to execute the program.  (Ex. 1011, § 11.4.)  The

22

IPR2013-00094
Patent 7,596,784

program would then be deployed/distributed to that host.  Furthermore, Grimshaw-2 teaches that the user's workload may be spread out on several processors.  (Ex. 1011, § 11.)  Thus, the Legion system allows a user to sit at a terminal and manipulate objects, such as applications, on several processors, but Legion presents to the user the illusion of working on a single powerful processor.  (Ex. 1006, p. 223, § 9.4.)

We are similarly persuaded that Oracle has demonstrated a reasonable likelihood that claims 5, 6, 20, and 22 are unpatentable based upon the teachings of Foster, Grimshaw-1, and Grimshaw-2.  (Pet. 42-51.)

We further credit Dr. Grimshaw's opinion that a person of ordinary skill would have had reason to combine the teachings of the references in a manner that yields the claimed invention.  (Ex. 1012, (Grimshaw Decl.), ¶¶ 48.)  For example, the Legion system described in Foster implements several features described in the Legion systems of Grimshaw-1 and Grimshaw-2.  (Ex. 1012, (Grimshaw Decl.), ¶¶ 48.)

Clouding IP maintains that Oracle has failed to establish a reasonable likelihood that claims 1, 5, 6, 19, 20, and 22 are unpatentable over the combination of Foster, Grimshaw-1, and Grimshaw-2.  (Prelim. Resp. 18-20.)  Clouding IP alleges the Legion system does not disclose "deploying/distributing an application onto a network."  (Prelim. Resp. 19.)  Clouding IP alleges that while the Legion system allows users to manipulate objects at various distributed resources throughout the Legion system and run application at those resources, it does not describe an application provider distributing instances of that application to various facilities that make up the network.  (Prelim. Resp. 19.)  Clouding IP acknowledges that different computations involved in the execution of an application are performed on different resources of the Legion system, but

23

IPR2013-00094
Patent 7,596,784

contends that that disclosure does not teach distributing instances of an application across those different platforms.  (Prelim. Resp. 19.)  Clouding IP's argument lacks merit.

Grimshaw-2 teaches that Legion's "legion_run" command line executes a single instance of a program and Legion chooses a host with a suitable architecture (specified when the program was registered) to execute the program. (Ex. 1011, § 11.4.)  Even assuming a "host" is limited to a single compute resource, that teaching satisfies "deploy/distribute an application onto a network" because Grimshaw-2 teaches distributing an application to at least one compute resource in a network, which is all that is required by our claim construction of the deploy/distribute step.

For the foregoing reasons, we conclude that there is a reasonable likelihood that Oracle would prevail on the ground that claims 1, 5, 6, 19, 20, and 22 are unpatentable as obvious over Foster, Grimshaw-1, and Grimshaw-2.


### F. Other Asserted Grounds

Oracle also challenges claim 1 as obvious over the combination of Reed and Aziz; claims 1, 2, 19, 20, and 22 as obvious under over the combination of London and Camiel, and claims 1, 5, and 6 as obvious over the combination of Neuman and London.  Those asserted grounds are redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable as obvious based on the grounds identified above.

III.   ORDERS

After due consideration of the record before us, and for the foregoing reasons it is:

IPR2013-00094
Patent 7,596,784

**ORDERED** that Oracle's Petition is **<u>granted</u>** as to the following alleged

ground of unpatentability:

a.      Claims 1-3 and 5-7 as obvious over Aziz and Reed;

b.      Claims 19, 20, and 22 as obvious over Aziz and Landherr;

c.      Claims 1, 5, 6, 19, 20, 22 as obvious over Foster, Grimshaw-1, and

         Grimshaw-2;

**FURTHER ORDERED** that Oracle's Petition is **<u>denied</u>** as to the

following alleged grounds of unpatentability:

a.      Claim 1 as obvious over Reed and Aziz;

b.      Claims 1, 2, 19, 20, and 22 as obvious over London and Camiel;

c.      Claims 1, 5, and 6 as obvious over Neuman and London;

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R.

§ 42.4, notice is hereby given of the institution of a trial; and

**FURTHER ORDERED** that an initial conference call with the Board is

scheduled for 1:00 PM Eastern Time on June 13, 2013.  The parties are directed to

the Office Patent Trial Practice Guide, 77 *Fed. Reg.* 48756, 48765-66 (Aug. 14,

2012), for guidance in preparing for the initial conference call, and should come

prepared to discuss any proposed changes to the Scheduling Order entered

herewith and any motions the parties anticipate filing during the trial.

IPR2013-00094
Patent 7,596,784

cc:

For Petitioner:

Greg Gardella
Scott A. McKeown
Oblon Spivak
cpdocketgardella@oblon.com
cpdocketmckeown@oblon.com

For Patent Owner:

Tarek N. Fahmi
Amy J. Embert
Fahmi, Sellers & Embert
Tarek.fahmi@fseip.com
Amy.embert@fseip.com

# Exhibit "B"

## To

# DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS INDIRECT INFRINGEMENT CLAIMS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MONEC HOLDING AG, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 1:11-cv-00798-LPS |
| | : | |
| MOTOROLA MOBILITY, INC., | : | |
| SAMSUNG ELECTRONICS AMERICA, | : | |
| INC., SAMSUNG ELECTRONICS, CO., | : | |
| LTD., HTC CORP., HTC AMERICA, INC., | : | |
| and EXEDEA, INC. | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Monec Holding AG ("MONEC"), by and through its undersigned counsel, as and for its First Amended Complaint for direct and indirect patent infringement against defendants Motorola Mobility, Inc. ("Motorola Mobility"), Samsung Electronics America, Inc. ("SEA"), Samsung Electronics, Co., LTD, ("Samsung Electronics") (SEA and Samsung Electronics are collectively referred to herein as the "Samsung Defendants"), HTC Corp., ("HTC"), HTC America, Inc., ("HTC America"), and Exedea, Inc. (Exedea") (HTC, HTC America, and Exedea are collectively referred to herein as the "HTC Defendants") alleges as follows:

## THE PARTIES

1.    MONEC is a corporation organized and existing under the laws of Switzerland with a principal place of business located at Galgenfeldweg 18 CH-3006 Berne Switzerland.

2.    Upon information and belief, Motorola Mobility is a corporation organized under the laws of the State of Delaware with a principal place of business located at 600 North U.S.

Highway 45, Libertyville, Illinois 60048. Motorola Mobility is in the business of designing, manufacturing, and selling, among other things, smartphones and tablet computers, throughout the United States.

3.    Upon information and belief Samsung Electronics is a corporation organized under the laws of Korea, with its principal place of business located at 416 Maetan-3dong, Yeongtong-gu, Suwon-City, Gyeonggi-do, Korea 443-742. Upon further information and belief Samsung Eletronics is the parent of SEA. Samsung Electronics is in the business of designing, manufacturing, importing into the United States, and selling, among other things, smartphones and tablet computers, throughout the United States.

4.    Upon information and belief, SEA is a Corporation organized under the laws of the State of New York with a principal place of business located at 105 Challenger Road, Ridgefield Park, New Jersey 07660. Upon further information and belief SEA is a direct and wholly owned subsidiary of Samsung Electronics. SEA markets and sells, among other things, smartphones and tablet computers, throughout the United States.

5.    Upon Information and belief HTC is a corporation organized under the laws of Taiwan with its principal place of business located at 23 Xinghau Road, Taoyuan City, Taoyuan 330, Taiwan, R.O.C. Upon further information and belief HTC is the parent of HTC America and Exedea. HTC is in the business of designing, manufacturing, importing into the United States, and selling, among other things, smartphones and tablet computers, throughout the United States.

6.    Upon information and belief HTC America is a corporation organized under the laws of the State of Texas with a principal place of business located at 13920 SE Eastgate Way, Suite 400, Bellevue, Washington 98005. Upon further information and belief HTC America is a

subsidiary of HTC. HTC America supports HTC's United States operations by, among other things, marketing and selling smartphones and tablet computers, throughout the United States.

7.     Upon information and belief Exedea is a corporation organized under the laws of the state of Texas, with a principal place of business located at 5950 Corporate Drive, Houston, Texas 77036. Upon further information and belief Exedea is a subsidiary of HTC. Exedea is in the business of importing, selling, and distributing mobile communication devices in the United States.

## JURISDICTION AND VENUE

8.     This action arises under the Patent Laws of the United States, 35 U.S.C. § 271 *et seq.* This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.     This Court has personal jurisdiction over Motorola Mobility, the Samsung Defendants and the HTC Defendants (collectively, "Defendants") because Defendants have established minimum contacts with the forum state of Delaware. Defendants, either directly or through third-parties, manufacture and assemble products that are and have been offered for sale, sold, purchased and used within the state of Delaware. In addition, Defendants regularly place their products within the stream of commerce, with the knowledge and/or understanding that such products will be sold in Delaware. Accordingly, Defendants have purposefully availed themselves of the benefits of the state of Delaware and the exercise of jurisdiction over Defendants does not offend traditional notions of fair play and substantial justice.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. §§ 1400(b) inasmuch as each Defendant has committed acts within this judicial district giving rise to this action and does business in this district, including offering for sale, making sales and providing service and support to their respective customers with respect to

certain of Defendants' respective products which infringe one or more claims of United States Patent No. 6,335,678.

**FACTS COMMON TO ALL COUNTS**

11.     MONEC is a leading innovator for mobile, globally usable communication solutions.

12.     MONEC is the innovator of a unitary, flat, and frame-shaped electronic mobile network computing device with virtual keyboard capability, which allows for multiple uses including internet access, email retrieval, videoconferencing, navigation, and book procurement, named the Voyager, which sold in Europe circa 2000.

13.     MONEC invests in the development and marketing of technology utilized for the transmission of data to mobile electronic communication systems.

14.     On January 1, 2002, United States Patent No. 6,335,678 (the " '678 Patent"), entitled ELECTRONIC DEVICE, PREFERABLY AN ELECTRONIC BOOK, duly and legally issued to Theodor Heutschi. MONEC is the owner by assignment of the '678 Patent. A true and correct copy of the '678 Patent is attached hereto as Exhibit A.

15.     A request for Ex Parte Reexamination of the '678 Patent was filed on November 12, 2009.

16.     The United States Patent and Trademark Office issued, on May 10, 2011, an Ex Parte Reexamination Certificate to MONEC, as assignee of Theodor Heutschi. A true and correct copy of the Ex Parte Reexamination Certificate is attached hereto as Exhibit B.

17.     Reexamined '678 Patent embodiments include a generally flat electronic device housing a processing system to communicate, store, interact with and display digital media

4

transferred from a peripheral device over a multiband radio network station incorporating a GSM/SIM chip and manipulated by various input means, including a touch-screen.

18.     By virtue of the assignment of the '678 Patent from Theodor Heutschi to MONEC, MONEC owns the entire right, title, and interest in and to the '678 Patent, as reexamined, including the right to bring this action.

19.     The Reexamined '678 Patent is valid and enforceable.

20.     Assuming the payment of all maintenance fees, the Reexamined '678 Patent will expire on February 20, 2019.

**COUNT I**
**Infringement of United States Patent No. 6,335,678**
**Against Motorola Mobility Pursuant to 35 U.S.C. §271(a), _et. seq._**

21.     MONEC repeats and realleges the allegations of paragraphs 1-20 as if set forth at length herein.

22.     Motorola Mobility manufactures, markets and/or sells smartphones and tablet computers in this judicial district and throughout the United States.

23.     The smartphones made, used, sold, and/or offered for sale by Motorola Mobility include, among others, the 4G Atrix.

24.     The 4G Atrix infringes one or more claims, including claim 1, of the Reexamined '678 Patent.

25.     Motorola Mobility also imports, makes, uses, sells, and/or offers for sale tablet computers, including the Motorola Xoom.

26.     Upon information and belief, Motorola Mobility presently offers and advertises upgrades to its existing Motorola Xoom tablet computers which upgrades result in the Motorola Xoom infringing one or more claims, including claim 1, of the Reexamined '678 Patent.

27.     Upon information and belief, in addition to the 4G Atrix and the Xoom, one or more other products imported into the United States, made, used, sold, and/or offered for sale by Motorola Mobility (collectively the "Motorola Infringing Products") in this judicial district and throughout United States, infringe one or more claims, including claim 1, of the Reexamined '678 Patent.

28.     Motorola Mobility is, and has been, making, using, selling, offering for sale, and/or importing the Motorola Infringing Products, alone and/or in combination with other Motorola Mobility products and services, within this judicial district and elsewhere in the United States without authority or license of the Reexamined '678 Patent.

29.     Upon information and belief, Motorola Mobility has contributed to and/or induced and will continue to contribute to and/or induce the infringement of the Reexamined '678 Patent by others in this judicial district and elsewhere in the United States.

30.     The Motorola Infringing Products are offered for sale and sold to end-users throughout the United States and within this district by both brick-and-mortar and on-line retailers, as well as by providers of mobile communication services.

31.     Motorola Mobility, either directly or through retailers and/or mobile communication service providers that sell Motorola Infringing Products, advertises the Motorola Infringing Products for sale throughout the United States and in this judicial district through various media outlets, including television, radio, and print.

32.     Motorola Mobility, either directly or indirectly, supplied, and continues to supply, Motorola Infringing Products to retailers and/or mobile communication service providers for the express purpose of selling said Motorola Infringing Products to end-users.

33.     Upon information and belief Motorola Mobility instructs customers, both retailers and end-users, on uses of the Motorola Infringing Products, including infringing uses.

34.     Motorola Mobility knew, or should have known, that the Motorola Infringing Products are especially made or especially adapted for use in an infringement of the '678 Patent, as reexamined, and that there is no substantially noninfringing use of the Motorola Infringing Products.

35.     The Motorola Infringing Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

36.     Upon information and belief Motorola Mobility had actual and constructive knowledge of the '678 Patent, and the Reexamined '678 Patent.

37.     Prior to the commencement of this litigation, MONEC commenced actions alleging infringement of the '678 Patent against both Hewlett-Packard, *Monec Holding AG v. Hewlett-Packard Co.*, 2:2008cv00153 (E.D.Va.) (the "HP Action"), and Apple Inc., *Monec Holding AG v. Apple Inc.*, 1:09-cv-00312 (E.D. Va) (the "Apple Action"). The HP Action, and even more so the Apple Action, received substantial press coverage.

38.     In the Apple Action MONEC alleged, among other things, that Apple's iPhone product infringed the '678 Patent. The Apple Action terminated in February 2010.

39.     Apple is a direct competitor of Motorola Mobility, and Motorola Mobility has been involved in on-going patent related litigation with Apple, including litigation related to Apple's iPhone, in the United States and throughout the world. *See, e.g.,* October 6, 2010 Motorola Press Release titled: Motorola Mobility Sues Apple for Patent Infringement (noting that Motorola Mobility had commenced litigation against Apple alleging infringement of

eighteen patents). *See, also, Motorola Mobility v. Apple, Inc.*, 1:10-cv-23580 (S.D. Fla); *Apple, Inc. v Motorola, Inc., et al.*, 10-cv-00661 (W.D. Wis.).

40.     Motorola Mobility, as a reasonable economic actor and competitor, likely monitors the activities of its primary competitors, such as Apple, including patent litigation in which those competitors are involved, and as a result Motorola Mobility would have obtained knowledge of the '678 Patent, as reexamined.

41.     Upon information and belief, Motorola Mobility's infringement of the Reexamined '678 Patent has been and continues to be willful, entitling MONEC to enhanced damages pursuant to 35 U.S.C. § 284.

42.     As a result of Motorola Mobility's infringement of the Reexamined '678 Patent, MONEC has suffered injury to its business and property in an amount to be determined, and will continue to suffer damages in the future.

43.     Unless an injunction is issued enjoining Motorola Mobility and its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with it, from infringing the Reexamined '678 Patent, MONEC will be irreparably harmed.

44.     MONEC has no adequate remedy at law.

45.     Upon information and belief, and, with full knowledge of the '678 Patent, as reexamined, Motorola Mobility willfully and wantonly infringed the Reexamined '678 Patent in deliberate and intentional disregard of MONEC's rights, making this an exceptional case pursuant to 35 U.S.C. § 285.

**COUNT II**
**Infringement of United States Patent No. 6,335,678**
**Against The Samsung Defendants Pursuant to 35 U.S.C. §271(a), *et. seq.***

46.     MONEC repeats and realleges the allegations of paragraphs 1-20 as if set forth at length herein.

47.     Upon information and belief Samsung Electronics is the parent of SEA. Upon further information and belief, Samsung Electronics makes, uses, sells, offers for sale and/or imports into the United States smartphones and tablet computers, which are used, sold, and offered for sale in Delaware and throughout the United States.

48.     Upon information and belief SEA is a subsidiary of Samsung Electronics. SEA makes, uses, sells, offers for sale, and/or imports smartphones and tablet computers in Delaware and throughout the United States.

49.     The smartphones made, used, sold, offered for sale, and/or imported in the United States by the Samsung Defendants include, among others, the Infuse 4G.

50.     The Samsung Defendants also make, use, sell, offer for sale, and/or import tablet computers, including the Galaxy Tab.

51.     Both the Infuse 4G smartphone and the Galaxy Tab infringe one or more claims, including claim 1, of the Reexamined '678 Patent.

52.     Upon information and belief, in addition to the Infuse 4G smartphone and Galaxy Tab, one or more other products imported into the United States, made, used, sold, offered for sale, and/or imported by the Samsung Defendants (collectively the "Samsung Infringing Products") in Delaware and throughout United States, infringe one or more claims, including claim 1, of the Reexamined '678 Patent.

53.     The Samsung Defendants are, and have been, making, using, selling, offering for sale, and/or importing the Samsung Infringing Products, alone and/or in combination with other products and services, within Delaware and elsewhere in the United States without authority or license of the Reexamined '678 Patent.

54. Upon information and belief, the Samsung Defendants have contributed to and/or induced and will continue to contribute to and/or induce the infringement of the Reexamined '678 Patent by others in this judicial district and elsewhere in the United States.

55. The Samsung Infringing Products are offered for sale and sold to end-users throughout the United States and within this judicial district by both brick-and-mortar and on-line retailers, as well as by providers of mobile communication services.

56. The Samsung Defendants, either directly or through retailers and/or mobile communication service providers that sell Samsung Infringing Products, advertise the Samsung Infringing Products for sale throughout the United States and in this judicial district through various media outlets, including television, radio, and print.

57. The Samsung Defendants, either directly or indirectly, supplied, and continue to supply, Samsung Infringing Products to retailers and/or mobile communication service providers for the express purpose of selling said Samsung Infringing Products to end-users.

58. Upon information and belief the Samsung Defendants instruct customers, both retailers and end-users, on uses of the Samsung Infringing Products, including infringing uses.

59. The Samsung Defendants knew, or should have known, that the Samsung Infringing Products are especially made or especially adapted for use in an infringement of the '678 Patent and there is no substantially noninfringing use of the Samsung Infringing Products.

60. The Samsung Infringing Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

61. Upon information and belief the Samsung Defendants had actual and constructive knowledge of the '678 Patent, and the Reexamined '678 Patent.

10

62.    Prior to the commencement of this litigation, MONEC commenced actions alleging infringement of the '678 Patent against both Hewlett-Packard, *Monec Holding AG v. Hewlett-Packard Co.*, 2:2008cv00153 (E.D.Va.) (the "HP Action"), and Apple Inc., *Monec Holding AG v. Apple Inc.*, 1:09-cv-00312 (E.D. Va) (the "Apple Action"). The HP Action, and even more so the Apple Action, received substantial press coverage.

63.    In the Apple Action MONEC alleged, among other things, that Apple's iPhone product infringed the '678 Patent. The Apple Action terminated in February 2010.

64.    Apple is a direct competitor of the Samsung Defendants, and the Samsung Defendants have been involved in what has been described as long-running patent related litigation with Apple in the United States and throughout the world related to the Galaxy Tab tablet computer. *See* Samsung Scores Rare Patent Win Versus Apple, Reuters, November 30, 2011 (referencing a rare legal victory by Samsung in a "long-running global patent war with Apple Inc.").

65.    The Samsung Defendants have also been engaged in patent related litigation with Apple related to the iPhone. *See, e.g., Apple Inc v. Samsung Electronics Co Ltd et al*, 11-1846 (N.D. Cal.).

66.    The Samsung Defendants, as reasonable economic actors and competitors, likely monitor the activities of their primary competitors, such as Apple, including patent litigation in which those competitors are involved, and as a result the Samsung Defendants would have obtained knowledge of the '678 Patent, as reexamined.

67.    Upon information and belief, the Samsung Defendant's infringement of the Reexamined '678 Patent has been and continues to be willful, entitling MONEC to enhanced damages pursuant to 35 U.S.C. § 284.

68.     As a result of the Samsung Defendants infringement of the Reexamined '678 Patent, MONEC has suffered injury to its business and property in an amount to be determined, and will continue to suffer damages in the future.

69.     Unless an injunction is issued enjoining the Samsung Defendants and their respective officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from infringing the Reexamined '678 Patent, MONEC will be irreparably harmed.

70.     MONEC has no adequate remedy at law.

71.     Upon information and belief, with full knowledge of the '678 Patent, as reexamined, the Samsung Defendants willfully and wantonly infringed the Reexamined '678 Patent in deliberate and intentional disregard of MONEC's rights, making this an exceptional case pursuant to 35 U.S.C. § 285.

## COUNT III
### Infringement of United States Patent No. 6,335,678
### Against The HTC Defendants Pursuant to 35 U.S.C. §271(a), *et. seq.*

72.     MONEC repeats and realleges the allegations of paragraphs 1-20 as if set forth at length herein.

73.     Upon information and belief HTC Corp. is the parent of HTC America and Exedea.

74.     HTC Corp. makes, uses, sells, offers for sale and/or imports into the United States smartphones and tablet computers, which are used, sold, and/or offered for sale in Delaware and throughout the United States.

75.     Upon information and belief HTC America is a subsidiary of HTC Corp.

76.     HTC America markets, sells, and/or offers for sale smartphones and tablet computers, in Delaware and throughout United States.

77.     Upon information and belief Exedea is a subsidiary of HTC.

78.     Exedea imports into the United States HTC smartphones and tablet computers and sells and/or offers sale of said smartphones and tablet computers in Delaware and throughout the United States.

79.     The smartphones made, used, sold, offered for sale, and/or imported into the United States by the HTC Defendants include, among others, the ThunderBolt smartphone.

80.     The HTC Defendants also make, use, sell, offer for sale, and/or import tablet computers, including the Jetstream.

81.     Both the ThunderBolt smartphone and the Jetstream tablet computer infringe one or more claims, including claim 1, of the Reexamined '678 Patent.

82.     Upon information and belief, in addition to the ThunderBolt smartphone and the Jetstream tablet computer, one or more other products manufactured, marketed, sold, offered for sale, and/or imported by the HTC Defendants (collectively the "HTC Infringing Products") in Delaware and throughout the United States, infringe one or more claims, including claim 1, of the Reexamined '678 Patent.

83.     The HTC Defendants are and have been making, using, selling, offering for sale, and/or importing the HTC Infringing Products, alone and/or in combination with other HTC products and services, within Delaware and elsewhere in the United States without authority or license of the Reexamined '678 Patent.

84.     Upon information and belief, the HTC Defendants have contributed to and/or induced and will continue to contribute to and/or induce the infringement of the Reexamined '678 Patent by others in Delaware and elsewhere in the United States.

85.    The HTC Infringing Products are offered for sale and sold to end-users throughout the United States and within this judicial district by both brick-and-mortar and on-line retailers, as well as by providers of mobile communication services.

86.    The HTC Defendants, either directly or through retailers and/or mobile communication service providers that sell HTC Infringing Products, advertise the HTC Infringing Products for sale throughout the United States and in this judicial district through various media outlets, including television, radio, and print.

87.    The HTC Defendants, either directly or indirectly, supplied and continue to supply, HTC Infringing Products to retailers and/or mobile communication service providers for the express purpose of selling said HTC Infringing Products to end-users.

88.    Upon information and belief the HTC Defendants instruct customers, both retailers and end-users, on uses of the HTC Infringing Products, including infringing uses.

89.    The HTC Defendants knew, or should have known, that the HTC Infringing Products are especially made or especially adapted for use in an infringement of the '678 Patent, as reexamined, and there is no substantially noninfringing use of the HTC Infringing Products.

90.    The HTC Infringing Products are not staple articles or commodities of commerce suitable for substantial non-infringing use.

91.    Upon information and belief the HTC Defendants had actual and constructive knowledge of the '678 Patent, as reexamined.

92.    Prior to the commencement of this litigation, MONEC commenced actions alleging infringement of the '678 Patent against both Hewlett-Packard, *Monec Holding AG v. Hewlett-Packard Co.*, 2:2008cv00153 (E.D.Va.) (the "HP Action"), and Apple Inc., *Monec*

14

*Holding AG v. Apple Inc.*, 1:09-cv-00312 (E.D. Va) (the "Apple Action"). The HP Action, and even more so the Apple Action, received substantial press coverage.

93.     In the Apple Action MONEC alleged, among other things, that Apple's iPhone product infringed the '678 Patent. The Apple Action terminated in February, 2010.

94.     Apple is a direct competitor of the HTC Defendants, and the HTC Defendants have been involved in patent related litigation with Apple in the United States and throughout the world, including in on-going litigation in this district, related to, among other things, Apple's iPhone. *See, e.g., HTC Corp. v. Apple Inc.*, No.1:99-mc-09999 (D. Del.).

95.     The HTC Defendants, as reasonable economic actors and competitors, likely monitor the activities of their primary competitors, such as Apple, including patent litigation in which those competitors are involved, and as a result the HTC Defendants would have obtained knowledge of the '678 Patent, as reexamined.

96.     Upon information and belief, the HTC Defendants' infringement of the Reexamined '678 Patent has been and continues to be willful, entitling MONEC to enhanced damages pursuant to 35 U.S.C. § 284.

97.     As a result of the HTC Defendants' infringement of the '678 Patent, as reexamined, MONEC has suffered injury to its business and property in an amount to be determined, and will continue to suffer damages in the future.

98.     Unless an injunction is issued enjoining the HTC Defendants and their respective officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from infringing the Reexamined '678 Patent, MONEC will be irreparably harmed.

99.     MONEC has no adequate remedy at law.

100.    Upon information and belief, with full knowledge of the '678 Patent, as reexamined, the HTC Defendants willfully and wantonly infringed the Reexamined '678 Patent in deliberate and intentional disregard of MONEC's rights, making this an exceptional case pursuant to 35 U.S.C. § 285.

## JURY DEMAND

MONEC demands a jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, MONEC prays for judgment and relief as follows:

A.    A declaration that Motorola Mobility, Inc. has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of Reexamined U.S. Patent No. 6,335,678 (the "Patent-in-Suit");

B.    A declaration that Samsung Electronics, Co., Ltd. has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of the Patent-in-Suit;

C.    A declaration that Samsung Electronics America, Inc. has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of the Patent-in-Suit;

D.    A declaration that HTC Corp. has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of the Patent-in-Suit;

E.     A declaration that HTC America has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of the Patent-in-Suit;

F.     A declaration that Exedea, Inc. has infringed, is infringing, has induced and is inducing, and has contributed and is contributing to the infringement of one or more valid and enforceable claims of the Patent-in-Suit;

G.     A preliminary and permanent injunction enjoining Motorola Mobility, Inc., its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

H.     A preliminary and permanent injunction enjoining Samsung Electronics, Co., Ltd., its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

I.     A preliminary and permanent injunction enjoining Samsung Electronics America, Inc., its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

J.     A preliminary and permanent injunction enjoining HTC Corp., its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

K.    A preliminary and permanent injunction enjoining HTC Corp. America, its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

L.    A preliminary and permanent injunction enjoining Exedea, Inc, its officers, agents, servants, employees and attorneys, and all those persons in active concert or participation with them, from further infringement, inducing infringement, and contributing to infringement of the Patent-in-Suit;

M.    An award of damages in favor of MONEC and against Motorola Mobility, Inc. sufficient to fully compensate MONEC for Motorola Mobility, Inc.'s infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

N.    An award of damages in favor of MONEC and against Samsung Electronics, Co., Ltd. sufficient to fully compensate MONEC for Samsung Electronic, Co., Ltd.'s infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

O.    An award of damages in favor of MONEC and against Samsung Electronics America, Inc. sufficient to fully compensate MONEC for Samsung Electronic America, Inc.'s infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

P.    An award of damages in favor of MONEC and against HTC Corp. sufficient to fully compensate MONEC for HTC Corp.'s infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

Q.      An award of damages in favor of MONEC and against HTC America sufficient to fully compensate MONEC for HTC America's infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

R.      An award of damages in favor of MONEC and against Exedea, Inc. sufficient to fully compensate MONEC for Exedea, Inc.'s infringement of the Patent-in-Suit, and an assessment of prejudgment interest and post-judgment interest;

S.      A finding by the Court that Motorola Mobility, Inc.'s infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

T.      A finding by the Court that Samsung Electronic, Co. Ltd.'s infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

U.      A finding by the Court that Samsung Electronics America, Inc.'s infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

V.      A finding by the Court that HTC Corp.'s infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

W.      A finding by the Court that HTC America's infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

X.      A finding by the Court that Exedea's infringement of the Patent-in-Suit is and has been willful, justifying an award of enhanced damages pursuant to 35 U.S.C. § 284;

Y.      Trebling the compensatory damages due MONEC;

Z.    A finding by the Court that this is an exceptional case under 35 U.S.C. § 285 and an award to MONEC of its attorneys' fees, costs and expenses in this action;

AA.    An order:  (1) directing each of Motorola Mobility, Inc., Samsung Electronics, Co., Ltd., Samsung Electronics America, Inc, HTC Corp., HTC America, and Exedea, Inc. to file with this Court and serve upon MONEC within 30 days of service of the injunction, a report, in writing and under oath, setting forth in detail the manner in which each of  Motorola Mobility, Inc., Samsung Electronics, Co., Ltd., Samsung Electronics America, Inc, HTC Corp., HTC America, and Exedea, Inc. has complied with the injunction and any further orders of the Court; (2) directing each of Motorola Mobility, Inc., Samsung Electronics, Co., Inc., Samsung Electronics America, Inc, HTC Corp., HTC America, and Exedea, Inc. account for all benefits and monies realized as a result of their respectful wrongful conduct; and (3) upon production of such accounting, rendering judgment against each of Motorola Mobility, Inc., Samsung Electronics, Co., Ltd., Samsung Electronics America, Inc, HTC Corp., HTC America, and Exedea, Inc. for the amount shown due and the cost of accounting;

BB.    A constructive trust be imposed on all proceeds, assets, and benefits accruing to each of Motorola Mobility, Inc., Samsung Electronics, Co., Ltd., Samsung Electronics America, Inc, HTC Corp., HTC America, and Exedea, Inc. as a result of their respective wrongful conduct.

CC.    Such other and further relief as the Court deems just and equitable.

PROCTOR HEYMAN LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (# 3630)
E-mail:  dgattuso@proctorheyman.com
300 Delaware Ave., Suite 200
Wilmington, DE 19801
(302) 472-7300

Attorneys for Monec Holding AG

20

OF COUNSEL:

KELLEY DRYE & WARREN LLP
Steven J. Moore
smoore@kelleydrye.com
James M. Moriarty
jmoriarty@kelleydrye.com
Elizabeth W. Swedock
eswedock@kelleydrye.com
400 Atlantic Street
Stamford, CT 06901
(203) 324-1400

Dated: December 19, 2011

# Exhibit "C"

## To

# DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS INDIRECT INFRINGEMENT CLAIMS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CLOUDING IP, LLC,

            Plaintiff,

        v.

AMAZON.COM, INC. AND
AMAZON WEB SERVICES, LLC,

            Defendants.

C.A. No. 12-641-LPS

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United

States of America, 35 U.S.C. § 1 *et seq.* in which Plaintiff Clouding IP, LLC ("Clouding") makes

the following allegations against Defendants Amazon.com, Inc. and Amazon Web Services, LLC

(collectively, "Amazon"):

## PARTIES

1.      Plaintiff Clouding IP, LLC is a Delaware limited liability company having a

principal place of business at 2 Terrace Way, Suite C, Greensboro, North Carolina 27403.

2.      Defendant Amazon.com, Inc. is a Delaware corporation with its principal place

of business at 410 Terry Avenue North, Seattle, Washington 98109.  Amazon.com, Inc. may be

served via its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400,

Wilmington, Delaware 19808.

3.      Defendant Amazon Web Services, LLC is a Delaware limited liability company

with its principal place of business at 410 Terry Avenue North, Seattle, Washington 98109.

Amazon Web Services, LLC may be served via its registered agent, Corporation Service

Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.  Defendant Amazon

Web Services, LLC is a wholly owned subsidiary of Defendant Amazon.com, Inc.

## JURISDICTION AND VENUE

4.      This action arises under the patent laws of the United States, Title 35 of the

United States Code.  This Court has original subject matter jurisdiction pursuant to 28 U.S.C.

§§ 1331 and 1338(a).

5.      Amazon is subject to this Court's specific and general personal jurisdiction

pursuant to due process and/or the Delaware Long Arm Statute, due to having availed itself of

the rights and benefits of Delaware by incorporating under Delaware law and due to its

substantial business in this forum, including: (i) at least a portion of the infringements alleged

herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of

conduct, and/or deriving substantial revenue from goods and services provided to individuals in

Delaware and in this Judicial District.

6.      Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c) and

1400(b).  Amazon is incorporated in this district, and on information and belief, Amazon has

transacted business in this district and has committed and/or induced acts of patent infringement

in this district.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 7,596,784

7.      Plaintiff Clouding realleges and incorporates by reference paragraphs 1-6

above, as if fully set forth herein.

8.      Plaintiff Clouding is the owner by assignment of United States Patent

No. 7,596,784 ("the '784 patent") titled "Method System and Apparatus for Providing Pay-Per-

Use Distributed Computing Resources."  The '784 patent was duly and legally issued by the

United States Patent and Trademark Office on September 29, 2009.  Clouding is the owner by assignment from Symantec Corporation of the '784 patent.  A true and correct copy of the '784 patent is included as Exhibit A.

9.      Amazon makes, uses, sells, and offers for sale in the United States products and/or services for cloud computing.  On information and belief, at least some of Amazon's cloud computing products and/or services provide or support pay-per-use cloud computing.

10.      On information and belief, Amazon has directly infringed and continues to infringe the '784 patent by, among other things, making, using, offering for sale, and/or selling pay-per-use cloud computing products and/or services patented under the '784 patent.  Such pay-per-use cloud computing products and/or services include, by way of example and without limitation, use of Amazon's Elastic Compute Cloud, which is covered by one or more claims of the '784 patent, including but not limited to claim 1.  By making, using, offering for sale, and/or selling pay-per-use cloud computing products and/or services patented under the '784 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '784 patent pursuant to 35 U.S.C. § 271(a).

11.      Amazon has had actual knowledge of the '784 patent since at least the filing of the original complaint in this action.

12.      On information and belief, Amazon has and continues to indirectly infringe one or more claims of the '784 patent by inducing others (e.g., its customers and end-users) to infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

13.      On information and belief, Amazon has induced others and continues to induce others, including but not limited to Amazon's customers and end-users, to infringe the '784

patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by importing, making, offering for sale, and/or selling products and/or services that when used as intended infringe the '784 patent. Such products and/or services include, by way of example and without limitation, Amazon's Elastic Compute Cloud, the use of which is covered by one or more claims of the '784 patent, including but not limited to claim 19. Amazon's customers and end-users who use such products and/or services directly infringe the claims of the '784 patent. Since at least the filing of the original complaint in this action, Amazon has had actual knowledge of the '784 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '784 patent. Despite Amazon's actual knowledge of the '784 patent and the knowledge that its customers and end-users infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Amazon's pay-per-use cloud computing products and/or services that are covered by one or more claims of the '784 patent.

14.    In particular, Amazon's customers' and end-users' use of Amazon's pay-per-use cloud computing products and services is facilitated by the use of pay-per-use systems and methods patented under the '784 patent. Thus, Amazon's customers and end-users are billed or charged on a pay-per-use basis when using such pay-per-use cloud computing products and services.

15.    On information and belief, in order to generate profits and revenues, Amazon markets and promotes, e.g., through its website and sales personnel, the use of its pay-per-use products and services that infringe the '784 patent when used as intended by Amazon's

customers and end-users. Amazon further sells (or licenses the use of) such products and/services to customers and end-users. Amazon's customers and end-users use such products and services (including, e.g., Amazon's software and hardware). Amazon further instructs its customers and end-users how to use such products and services in a manner that infringes the '784 patent (e.g., through technical documentation, manuals, instructions, and technical support). Amazon further instructs its customers and end-user to infringe the '784 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts. Amazon still further makes such products and services accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such products and services, including supporting hardware and software systems, to infringe the '784 patent.

16. On information and belief, even though Amazon has been aware of the '784 patent and that its customers and end-users infringe the '784 patent for over a year, to date Amazon has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '784 patent, nor has Amazon informed its customers or end-users how to avoid infringing the '784 patent. To date, Amazon has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '784 patent. On information and belief, Amazon itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '784 patent. To date, Amazon has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation

5

relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '784 patent in response to Clouding's requests for production of documents and things. Nor has Amazon to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '784 patent in response to Clouding's interrogatories.

17.     As such, on information and belief, despite the information Amazon gleaned from the original complaint in this action, Amazon <u>continues to specifically intend for and encourage</u> its customers and end-users to use its products and/or services in a manner that infringe the claims of the '784 patent. In addition, since at least the filing of the original complaint in this action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner that infringe the claims of the '784 patent.

18.     Amazon's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services constitute an objectively high likelihood of infringement of the '784 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '784 patent and that the '784 patent is valid. Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement the '784 patent. Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell

6

products and/or services patented under the '784 patent. As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '784 patent in disregard of Clouding's rights.

19.      As a result of Amazon's infringement of the '784 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## COUNT II
## INFRINGEMENT OF U.S. PATENT NO. 7,065,637

20.      Plaintiff Clouding realleges and incorporates by reference paragraphs 1-19 above, as if fully set forth herein.

21.      Plaintiff Clouding is the owner by assignment of United States Patent No. 7,065,637 ("the '637 patent") titled "System for Configuration of Dynamic Computing Environments Using a Visual Interface." The '637 patent was duly and legally issued by the United States Patent and Trademark Office on June 20, 2006. Clouding is the owner by assignment from Symantec Corporation of the '637 patent. A true and correct copy of the '637 patent is included as Exhibit B.

22.      Amazon makes, uses, sells, and offers for sale in the United States products and/or services for cloud computing. On information and belief, at least some of Amazon's cloud computing products and/or services provide or support use of a visual interface to configure cloud computing resources.

23.      On information and belief, Amazon has directly infringed and continues to infringe the '637 patent by, among other things, making, using, offering for sale, and/or selling cloud computing products and/or services covered by one or more claims of the '637 patent. Such cloud computing products and/or services include, by way of example and without

limitation, cloud computing products and/or services configurable through Amazon Elastic Compute Cloud, which are covered by one or more claims of the '637 patent, including but not limited to claim 1. By making, using, offering for sale, and/or selling such products and services covered by one or more claims of the '637 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '637 patent pursuant to 35 U.S.C. § 271(a).

24. Amazon has had actual knowledge of the '637 patent since at least the filing of the original complaint in this action.

25. On information and belief, Amazon has and continues to indirectly infringe one or more claims of the '637 patent by inducing others (e.g., its customers and end-users) to infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

26. On information and belief, Amazon has induced others and continues to induce others, including but not limited to Amazon's customers and end-users, to infringe the '637 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by importing, making, offering for sale, and/or selling products and/or services that when used as intended infringe the '637 patent. Such products and/or services include, by way of example and without limitation, Amazon's Elastic Compute Cloud, the use of which is covered by one or more claims of the '637 patent, including but not limited to claim 1. Amazon's customers and end-users who use such products and/or services directly infringe the claims of the '637 patent. Since at least the filing of the original complaint in this action, Amazon has had actual knowledge of the '637 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '637 patent. Despite

8

Amazon's actual knowledge of the '637 patent and the knowledge that its customers and end-users infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Amazon's visual interface tools to configure cloud computing products and services that are covered by one or more claims of the '637 patent.

27. On information and belief, in order to generate profits and revenues, Amazon markets and promotes, e.g., through its website and sales personnel, the use of its visual construction tools to configure its cloud computing products and services that infringe the '637 patent when used as intended by Amazon's customers and end-users. Amazon further sells (or licenses the use of) such products and/services to customers and end-users. Amazon's customers and end-users use such products and services (including, e.g., Amazon's software and hardware). Amazon further instructs its customers and end-users how to use such products and services in a manner that infringes the '637 patent (e.g., through technical documentation, manuals, instructions, and technical support). Amazon further instructs its customers and end-user to infringe the '637 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts. Amazon still further makes such visual construction tools accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such visual construction tools, including supporting hardware and software systems, to infringe the '637 patent.

28. On information and belief, even though Amazon has been aware of the '637 patent and that its customers and end-users infringe the '637 patent for over a year, to date Amazon has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '637 patent, nor has

Amazon informed its customers or end-users how to avoid infringing the '637 patent. To date,

Amazon has not identified, in response to Clouding's interrogatories, a single action that it has

taken to avoid infringement (e.g., by designing around or notifying its customers or end-users

how to avoid infringement) by itself or its customers or end-users since it became aware of the

'637 patent. On information and belief, Amazon itself is unaware of any legal or factual basis

that its actions solely, or in combination with the actions of its customers and end-users, do not

constitute direct or indirect infringement of the '637 patent. To date, Amazon has not produced

any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation

relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the

infringement or potential infringement of any claim of the '637 patent in response to Clouding's

requests for production of documents and things. Nor has Amazon to date identified any legal or

factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity)

relating to any claim of the '637 patent in response to Clouding's interrogatories.

29.     As such, on information and belief, despite the information Amazon gleaned from

the original complaint in this action, Amazon continues to specifically intend for and encourage

its customers and end-users to use its products and/or services in a manner that infringe the

claims of the '637 patent. In addition, since at least the filing of the original complaint in this

action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel,

designing around, or providing notice to its customer) to avoid confirming that its actions

continue to specifically encourage its customers and end-users to use its products and/or service

in a manner that infringe the claims of the '637 patent.

30.     Amazon's actions of, *inter alia*, making, importing, using, offering for sale,

and/or selling such products and/or services constitute an objectively high likelihood of

infringement of the '637 patent, which was duly issued by the United States Patent and

Trademark Office and is presumed valid. Since at least the filing of the original complaint,

Amazon is aware that there is an objectively high likelihood that its actions constituted, and

continue to constitute, infringement of the '637 patent and that the '637 patent is valid. Despite

Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes

to the relevant operation of such products and/or services and has not provided its users and/or

customers with instructions on how to avoid infringement the '637 patent. Instead, Amazon has

continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell

such products and/or services patented under the '637 patent. As such, Amazon willfully,

wantonly and deliberately infringed and is infringing the '637 patent in disregard of Clouding's

rights.

31.     As a result of Amazon's infringement of the '637 patent, Plaintiff Clouding has

suffered monetary damages in an amount adequate to compensate for Amazon's infringement,

but in no event less than a reasonable royalty for the use made of the invention by Amazon,

together with interest and costs as fixed by the Court.

## COUNT III
### INFRINGEMENT OF U.S. PATENT NO. 6,738,799

32.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-31

above, as if fully set forth herein.

33.     Plaintiff Clouding is the owner by assignment of United States Patent

No. 6,738,799 ("the '799 patent") titled "Methods and Apparatuses for File Synchronization and

Updating Using a Signature List." The '799 patent was duly and legally issued by the United

States Patent and Trademark Office on May 18, 2004. Clouding is the owner by assignment

11

from Symantec Corporation of the '799 patent. A true and correct copy of the '799 patent is included as Exhibit C.

34.     Amazon makes, uses, sells, offers for sale, and/or imports into the United States products and/or services that provide or support synchronization of files. On information and belief, at least some of such products and/or services perform synchronization of files between networked computers by providing updates.

35.     On information and belief, Amazon has directly infringed and continues to infringe the '799 patent by, among other things, making, using, offering for sale, selling and/or importing products and/or services into the United States that are covered by one or more claims of the '799 patent. Such products and/or services include, by way of example and without limitation, Amazon's Whispersync, the use of which is covered by one or more claims of the '799 patent, including but not limited to claim 37. By making, using, offering for sale, selling and/or importing into the United States such products and/or service that are covered by one or more claims of the '799 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '799 patent pursuant to 35 U.S.C. § 271(a).

36.     Amazon has had actual knowledge of the '799 patent since at least the filing of the original complaint in this action.

37.     On information and belief, Amazon has and continues to indirectly infringe one or more claims of the '799 patent by inducing others (e.g., its customers and end-users) to infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

38.     On information and belief, Amazon has induced others and continues to induce others, including but not limited to Amazon's customers and end-users, to infringe the '799

patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by importing, making, offering for sale, and/or selling products and/or services that when used as intended infringe the '799 patent. Such products and/or services include, by way of example and without limitation, Amazon's WhisperSync, the use of which is covered by one or more claims of the '799 patent, including but not limited to claim 42. Amazon's customers and end-users who use such products and/or services directly infringe the claims of the '799 patent. Since at least the filing of the original complaint in this action, Amazon has had actual knowledge of the '799 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '799 patent. Despite Amazon's actual knowledge of the '799 patent and the knowledge that its customers and end-users infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Amazon's file-synchronization products and services that are covered by one or more claims of the '799 patent.

39. On information and belief, in order to generate profits and revenues, Amazon markets and promotes, e.g., through its website and sales personnel, the use of its file-synchronization products and services that infringe the '799 patent when used as intended by Amazon's customers and end-users. Amazon further sells (or licenses the use of) such products and/services to customers and end-users. Amazon's customers and end-users use such products and services (including, e.g., Amazon's software and hardware). Amazon further instructs its customers and end-users how to use such products and services in a manner that infringes the '799 patent (e.g., through technical documentation, manuals, instructions, and technical support). Amazon further instructs its customers and end-user to infringe the '799 patent through the

13

products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

40.     On information and belief, even though Amazon has been aware of the '799 patent and that its customers and end-users infringe the '799 patent for over a year, to date Amazon has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '799 patent, nor has Amazon informed its customers or end-users how to avoid infringing the '799 patent. To date, Amazon has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '799 patent. On information and belief, Amazon itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '799 patent. To date, Amazon has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '799 patent in response to Clouding's requests for production of documents and things. Nor has Amazon to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '799 patent in response to Clouding's interrogatories.

41.     As such, on information and belief, despite the information Amazon gleaned from the original complaint in this action, Amazon continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '799 patent. In addition, since at least the filing of the original

complaint in this action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner that infringe the claims of the '799 patent.

42.　　Amazon's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services constitute an objectively high likelihood of infringement of the '799 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '799 patent and that the '799 patent is valid.  Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement the '799 patent.  Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell products and/or services patented under the '799 patent.  As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '799 patent in disregard of Clouding's rights.

43.　　As a result of Amazon's infringement of the '799 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 5,944,839

44.    Plaintiff Clouding realleges and incorporates by reference paragraphs 1-43 above, as if fully set forth herein.

45.    Plaintiff Clouding is the owner by assignment of United States Patent No. 5,944,839 ("the '839 patent") titled "System and Method for Automatically Maintaining A Computer System."  The '839 patent was duly and legally issued by the United States Patent and Trademark Office on August 31, 1999.  Clouding is the owner by assignment from Symantec Corporation of the '839 patent.  A true and correct copy of the '839 patent is included as Exhibit D.

46.     Amazon makes, uses, sells, offers for sale, and/or imports in the United States products and/or services for cloud computing.  On information and belief, at least some of Amazon's products and/or services that provide or support performing health checks and elastic load balancing.

47.    On information and belief, Amazon has directly infringed and continues to infringe the '839 patent by, among other things, making, importing, using, offering for sale, and/or selling products and/or services covered by one or more claims of the '839 patent.  Such products and/or services include, by way of example and without limitation, Amazon Electronic Cloud Compute, the use of which is covered by one or more claims of the '839 patent, including but not limited to claim 6.  By making, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '839 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '839 patent pursuant to 35 U.S.C. § 271(a).

48.     Amazon has had actual knowledge of the '839 patent since at least the filing of the original complaint in this action.

49.     On information and belief, Amazon has and continues to indirectly infringe one or more claims of the '839 patent by inducing others (e.g., its customers and end-users) to infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

50.     On information and belief, Amazon has induced others and continues to induce others, including but not limited to Amazon's customers and end-users, to infringe the '839 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by importing, making, offering for sale, and/or selling products and/or services that when used as intended infringe the '839 patent.  Such products and/or services include, by way of example and without limitation, use of Amazon's Elastic Compute Cloud including CloudWatch and Elastic Load Balancing, which is covered by one or more claims of the '839 patent, including but not limited to claim 15.  Amazon's customers and end-users who use such products and/or services directly infringe the claims of the '839 patent.  Since at least the filing of the original complaint in this action, Amazon has had actual knowledge of the '839 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '839 patent.  Despite Amazon's actual knowledge of the '839 patent and the knowledge that its customers and end-users infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Amazon's self-diagnostics products and services that are covered by one or more claims of the '839 patent.

51.     On information and belief, in order to generate profits and revenues, Amazon markets and promotes, e.g., through its website and sales personnel, the use of its self-diagnostics products and services that infringe the '839 patent when used as intended by Amazon's customers and end-users.  Amazon further sells (or licenses the use of) such products and/services to customers and end-users.  Amazon's customers and end-users use such products and services (including, e.g., Amazon's software and hardware).  Amazon further instructs its customers and end-users how to use such products and services in a manner that infringes the '839 patent (e.g., through technical documentation, manuals, instructions, and technical support).  Amazon further instructs its customers and end-user to infringe the '839 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.  Amazon still further makes such self-diagnostics products and services accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such self-diagnostics products and services, including supporting hardware and software systems, to infringe the '637 patent.

52.     On information and belief, even though Amazon has been aware of the '839 patent and that its customers and end-users infringe the '839 patent for over a year, to date Amazon has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '839 patent, nor has Amazon informed its customers or end-users how to avoid infringing the '839 patent.  To date, Amazon has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '839 patent.  On information and belief, Amazon itself is unaware of any legal or factual basis

18

that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '839 patent. To date, Amazon has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '839 patent in response to Clouding's requests for production of documents and things. Nor has Amazon to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '839 patent in response to Clouding's interrogatories.

53.      As such, on information and belief, despite the information Amazon gleaned from the original complaint in this action, Amazon <u>continues to specifically intend for and encourage</u> its customers and end-users to use its products and/or services in a manner that infringe the claims of the '839 patent. In addition, since at least the filing of the original complaint in this action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner that infringe the claims of the '839 patent.

54.      Amazon's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services constitute an objectively high likelihood of infringement of the '839 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '839 patent and that the '839 patent is valid. Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes

to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement the '839 patent. Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell products and/or services patented under the '839 patent. As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '839 patent in disregard of Clouding's rights.

55.     As a result of Amazon's infringement of the '839 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

**COUNT V**
**INFRINGEMENT OF U.S. PATENT NO. 5,825,891**

56.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-55 above, as if fully set forth herein.

57.     Plaintiff Clouding is the owner by assignment of United States Patent No. 5,825,891 ("the '891 patent") titled "Key Management for Network Communication." The '891 patent was duly and legally issued by the United States Patent and Trademark Office on October 20, 1998. Clouding is the owner by assignment from Symantec Corporation of the '891 patent. A true and correct copy of the '891 patent is included as Exhibit E.

58.     Amazon makes, uses, sells and/or offers for sale in the United States products and/or services that provide for or support establishing virtual private network ("VPN") tunnels.

59.     On information and belief, Amazon has directly infringed and continues to infringe the '891 patent by, among other things, using methods covered by one or more claims of the '891 patent. Such methods include, by way of example and without limitation, use of Amazon Virtual Private Cloud, which is covered by one or more claims of the '891 patent,

including but not limited to claim 1.  By using such methods covered by one or more claims of the '891 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '891 patent pursuant to 35 U.S.C. § 271(a).

60.    Amazon has had actual knowledge of the '891 patent since at least the filing of the original complaint in this action.

61.    Amazon's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or sezrvices constitute an objectively high likelihood of infringement of the '891 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '891 patent and that the '891 patent is valid.   Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its products and/or services covered by one or more claims of the '891 patent and has not provided its users and/or customers with instructions on how to avoid infringement the '891 patent.  Instead, Amazon has continued to, and still is continuing to, among other things, use methods patented under the '891 patent.  As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '891 patent in disregard of Clouding's rights.

62.    As a result of Amazon's infringement of the '891 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## COUNT VI
## INFRINGEMENT OF U.S. PATENT NO. 5,495,607

63.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-62 above, as if fully set forth herein.

64.     Plaintiff Clouding is the owner by assignment of United States Patent No. 5,495,607 ("the '607 patent") titled "Network Management System Having Virtual Catalog Overview of Files Distributively Stored Across Network Domain." The '607 patent was duly and legally issued by the United States Patent and Trademark Office on February 27, 1996. Clouding is the owner by assignment from Symantec Corporation of the '607 patent. A true and correct copy of the '607 patent is included as Exhibit F.

65.     Amazon operates one or more server farms (comprising, *inter alia*, servers and computers on a network) that are located in data centers in the United States. On information and belief, Amazon's one or more server farms provide and support cloud computing services, including at least Amazon Elastic Compute Cloud service. On information and belief, Amazon makes and/or uses a system for monitoring the health of at least some of Amazon's servers and computers over a network in its data centers.

66.     On information and belief, Amazon has directly infringed and continues to infringe the '607 patent by, among other things, making, using, offering for sale, and/or selling systems, and products and/or services related thereto, covered by one or more claims of the '607 patent. Such systems include, by way of example and without limitation, a system made and/or used by Amazon to monitor the health of servers and computers running Amazon Elastic Compute Cloud service, which is covered by one or more claims of the '607 patent, including but not limited to claim 9. By making, using, offering for sale, and/or selling such systems, and products and/or services related thereto, covered by one or more claims of the '607 patent,

22

Amazon has injured Clouding and is liable to Clouding for direct infringement of the '607 patent pursuant to 35 U.S.C. § 271(a).

67.     Amazon has had actual knowledge of the '607 patent since at least the filing of the original complaint in this action.

68.     Amazon's actions of, *inter alia*, making and using a system for monitoring the health of at least some of Amazon's servers and computers over a network in its data centers constitute an objectively high likelihood of infringement of the '607 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '607 patent and that the '607 patent is valid.   Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its system.  Instead, Amazon has continued to, and still is continuing to, among other things, make and use a system for monitoring the health of at least some of Amazon's servers and computers over a network in its data centers patented under the '607 patent.  As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '607 patent in disregard of Clouding's rights.

69.     As a result of Amazon's infringement of the '607 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## COUNT VII
## INFRINGEMENT OF U.S. PATENT NO. 6,925,481

70.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-69 above, as if fully set forth herein.

71.     Plaintiff Clouding is the owner by assignment of United States Patent
No. 6,925,481 ("the '481 patent") titled "Technique for Enabling Remote Data Access And
Manipulation From A Pervasive Device."  The '481 patent was duly and legally issued by the
United States Patent and Trademark Office on August 2, 2005  Clouding is the owner by
assignment from Symantec Corporation of the '481 patent.  A true and correct copy of the '481
patent is included as Exhibit G.

72.     Amazon makes, uses, sells, offers for sale, and/or imports products and/or
services in the United States that provide or support remote data access by a mobile device, such
as Amazon Cloud Drive and Kindle Store.

73.     On information and belief, Amazon has directly infringed and continues to
infringe the '481 patent by, among other things, making, using, offering for sale, selling and/or
importing products and/or services that are covered by one or more claims of the '481 patent.
Such products and/or services include, by way of example and without limitation, Amazon
Cloud Drive and Kindle Store, which are covered by one or more claims of the '481 patent,
including but not limited to claim 1.  By making, using, offering for sale, and/or selling such
products and/or services covered by one or more claims of the '481 patent, Amazon has injured
Clouding and is liable to Clouding for direct infringement of the '481 patent pursuant to 35
U.S.C. § 271(a).

74.     Amazon has had actual knowledge of the '481 patent since at least the filing of
the original complaint in this action.

75.     On information and belief, Amazon has and continues to indirectly infringe one
or more claims of the '481 patent by inducing others (e.g., its customers and end-users) to

infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

76.     On information and belief, Amazon has induced others and continues to induce others, including but not limited to Amazon's customers and end-users, to infringe the '481 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, selling and/or importing products and/or services that when used as intended infringe the '481 patent. Such products and/or services include, by way of example and without limitation, Amazon Kindle Fire and/or other devices for accessing Amazon Cloud Drive or Kindle Store, the use of which are covered by one or more claims of the '481 patent, including but not limited to claim 55. Amazon's customers and end-users who use such products and/or services directly infringe the claims of the '481 patent. Since at least the filing of the original complaint in this action, Amazon has had actual knowledge of the '481 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '481 patent. Despite Amazon's actual knowledge of the '481 patent and the knowledge that its customers and end-users infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Amazon's products and services that are covered by one or more claims of the '481 patent.

77.     On information and belief, in order to generate profits and revenues, Amazon markets and promotes, e.g., through its website and sales personnel, the use of its products and services supporting data manipulation by mobile devices that infringe the '481 patent when used as intended by Amazon's customers and end-users. Amazon further sells (or licenses the use of)

such products and/or services to customers and end-users. Amazon's customers and end-users use

such products and services (including, e.g., Amazon's software and hardware). Amazon further

instructs its customers and end-users how to use such products and services in a manner that

infringes the '481 patent (e.g., through technical documentation, manuals, instructions, and

technical support). Amazon further instructs its customers and end-user to infringe the '481

patent through the products and services themselves, e.g., through on-screen instructions,

intuitive user interfaces, and command prompts. Amazon still further makes such products and

services accessible to its customers and end-users via the Internet, thus enabling and encouraging

its customers and end-users to use such products and services, including supporting hardware

and software systems, to infringe the '481 patent.

78.     On information and belief, even though Amazon has been aware of the '481

patent and that its customers and end-users infringe the '481 patent for over a year, to date

Amazon has neither made any changes to the functionality, operations, marketing, sales,

technical support, etc. of such products and services to avoid infringing the '481 patent, nor has

Amazon informed its customers or end-users how to avoid infringing the '481 patent. To date,

Amazon has not identified, in response to Clouding's interrogatories, a single action that it has

taken to avoid infringement (e.g., by designing around or notifying its customers or end-users

how to avoid infringement) by itself or its customers or end-users since it became aware of the

'481 patent. On information and belief, Amazon itself is unaware of any legal or factual basis

that its actions solely, or in combination with the actions of its customers and end-users, do not

constitute direct or indirect infringement of the '481 patent. To date, Amazon has not produced

any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation

relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the

infringement or potential infringement of any claim of the '481 patent in response to Clouding's

requests for production of documents and things.  Nor has Amazon to date identified any legal or

factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity)

relating to any claim of the '481 patent in response to Clouding's interrogatories.

79.     As such, on information and belief, despite the information Amazon gleaned from

the original complaint in this action, Amazon <u>continues to specifically intend for and encourage</u>

its customers and end-users to use its products and/or services in a manner that infringe the

claims of the '481 patent.  In addition, since at least the filing of the original complaint in this

action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel,

designing around, or providing notice to its customer) to avoid confirming that its actions

continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service

in a manner that infringe the claims of the '481 patent.

80.     Amazon's actions of, *inter alia*, making, using, offering for sale, selling and/or

importing such products and/or services constitute an objectively high likelihood of infringement

of the '481 patent, which was duly issued by the United States Patent and Trademark Office and

is presumed valid.  Since at least the filing of the original complaint, Amazon is aware that there

is an objectively high likelihood that its actions constituted, and continue to constitute,

infringement of the '481 patent and that the '481 patent is valid.   Despite Amazon's knowledge

of that risk, on information and belief, Amazon has not made any changes to the relevant

operation of its products and/or services and has not provided its users and/or customers with

instructions on how to avoid infringement the '481 patent.  Instead, Amazon has continued to,

and still is continuing to, among other things, make, use, offer for sale, sell and/or import

products and/or services patented under the '481 patent.  As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '481 patent in disregard of Clouding's rights.

81.     As a result of Amazon's infringement of the '481 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

**COUNT VIII**
**INFRINGEMENT OF U.S. PATENT NO. 7,254,621**

82.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-81 above, as if fully set forth herein.

83.     Plaintiff Clouding is the owner by assignment of United States Patent No. 7,254,621 ("the '621 patent") titled "Technique for Enabling Remote Data Access And Manipulation From A Pervasive Device."  The '621 patent was duly and legally issued by the United States Patent and Trademark Office on August 7, 2007  Clouding is the owner by assignment from Symantec Corporation of the '621 patent.  A true and correct copy of the '621 patent is included as Exhibit H.

84.     Amazon makes, uses, sells, offers for sale, and/or imports products and/or services in the United States that provide or support remote data access by a mobile device, such as Amazon Cloud Drive and Kindle Store.

85.     On information and belief, Amazon has directly infringed and continues to infringe the '621 patent by, among other things, making, using, offering for sale, selling and/or importing products and/or services that are covered by one or more claims of the '621 patent. Such products and/or services include, by way of example and without limitation,  Amazon Cloud Drive and Amazon Kindle Store, which are covered by one or more claims of the '621

patent, including but not limited to claim 1. By making, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '621 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '621 patent pursuant to 35 U.S.C. § 271(a).

86.     Amazon has had actual knowledge of the '621 patent since at least the filing of the original complaint in this action.

87.     Amazon's actions of, *inter alia*, making, using, offering for sale, selling and/or importing such products and/or services that are covered by one or more claims of the '621 patent constitute an objectively high likelihood of infringement of the '621 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '621 patent and that the '621 patent is valid. Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of products and/or services to avoid infringement the '621 patent. Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, sell and/or import products and/or services patented under the '621 patent. As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '621 patent in disregard of Clouding's rights.

88.     As a result of Amazon's infringement of the '621 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## COUNT IX
## INFRINGEMENT OF U.S. PATENT NO. 6,631,449

89.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-88

above, as if fully set forth herein.

90.     Plaintiff Clouding is the owner by assignment of United States Patent

No. 6,631,449 ("the '449 patent") titled "Dynamic Distributed Data System and Method."  The

'449 patent was duly and legally issued by the United States Patent and Trademark Office on

October 7, 2003.  Clouding is the owner by assignment from Symantec Corporation of the '449

patent.  A true and correct copy of the '449 patent is included as Exhibit I.

91.     Amazon makes, uses, sells, and offers for sale in the United States products

and/or services for cloud computing.  On information and belief, at least some of Amazon's

cloud computing products and/or services, including but not limited to Amazon Elastic Compute

Cloud, are provided by servers using server-to-server communication and/or a gossip protocol.

92.     On information and belief, Amazon has directly infringed and continues to

infringe the '449 patent by, among other things, making, using, offering for sale, and/or selling

cloud computing products and/or services patented under the '449 patent.  Such cloud computing

products and/or services include, by way of example and without limitation, Amazon's Elastic

Compute Cloud, the use of which is covered by one or more claims of the '449 patent, including

but not limited to claim 1.  By making, using, offering for sale, and/or selling cloud computing

products and/or services patented under the '449 patent, Amazon has injured Clouding and is

liable to Clouding for direct infringement of the '449 patent pursuant to 35 U.S.C. § 271(a).

93.     Amazon has had actual knowledge of the '449 patent since at least the filing of

the original complaint in this action.

30

94.     On information and belief, Amazon has and continues to indirectly infringe one

or more claims of the '449 patent by inducing others (e.g., its customers and end-users) to

infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in

this action.

95.     On information and belief, Amazon has induced others and continues to induce

others, including but not limited to Amazon's customers and end-users, to infringe the '449

patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct

infringement by others with knowledge of that infringement, such as, upon information and

belief, by making, using, offering for sale, and/or selling products and/or services that when used

as intended infringe the '449 patent.  Such products and/or services include, by way of example

and without limitation, Amazon's Elastic Compute Cloud, the use of which is covered by one or

more claims of the '449 patent, including but not limited to claim 1.  Amazon's customers and

end-users who use such products and/or services directly infringe the claims of the '449 patent.

Since at least the filing of the original complaint in this action, Amazon has had actual

knowledge of the '449 patent and has known that the use of such products and/or services by its

customers and end-users constituted direct infringement of the '449 patent.  Despite Amazon's

actual knowledge of the '449 patent and the knowledge that its customers and end-users

infringed, Amazon continued to, and still continues to, actively encourage, assist, induce, aid,

and abet its customers and end-users to directly infringe by using Amazon's cloud computing

products and/or services that are covered by one or more claims of the '449 patent.

96.     In particular, Amazon's customers' and end-users' use of Amazon's cloud

computer products and services is facilitated by the use of Amazon's systems employing server-

to-server communications and/or a gossip protocol that are patented under the '449 patent.  Thus,

when Amazon's customers and end-users use its cloud computing products and services,

Amazon's customers and end-users use systems patented under the '449 patent employing

server-to-server communications and/or a gossip protocol.

97.     On information and belief, in order to generate profits and revenues, Amazon

markets and promotes, e.g., through its website and sales personnel, the use of its products and

services employing server-to-server communications and/or a gossip protocol that infringe the

'449 patent when used as intended by Amazon's customers and end-users.  Amazon further sells

(or licenses the use of) such products and/services to customers and end-users.  Amazon's

customers and end-users use such products and services (including, e.g., Amazon's software and

hardware).  Amazon further instructs its customers and end-users how to use such products and

services in a manner that infringes the '449 patent (e.g., through technical documentation,

manuals, instructions, and technical support).  Amazon further instructs its customers and end-

user to infringe the '449 patent through the products and services themselves, e.g., through on-

screen instructions, intuitive user interfaces, and command prompts.  Amazon still further makes

such products and services accessible to its customers and end-users via the Internet, thus

enabling and encouraging its customers and end-users to use such products and services,

including supporting hardware and software systems, to infringe the '449 patent.

98.     On information and belief, even though Amazon has been aware of the '449

patent and that its customers and end-users infringe the '449 patent for over a year, to date

Amazon has neither made any changes to the functionality, operations, marketing, sales,

technical support, etc. of such products and services to avoid infringing the '449 patent, nor has

Amazon informed its customers or end-users how to avoid infringing the '449 patent.  To date,

Amazon has not identified, in response to Clouding's interrogatories, a single action that it has

32

taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '449 patent. On information and belief, Amazon itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '449 patent. To date, Amazon has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '449 patent in response to Clouding's requests for production of documents and things. Nor has Amazon to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '449 patent in response to Clouding's interrogatories.

99. As such, on information and belief, despite the information Amazon gleaned from the original complaint in this action, Amazon continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '449 patent. In addition, since at least the filing of the original complaint in this action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to specifically encourage its customers and end-users to use its products and/or service in a manner that infringe the claims of the '449 patent.

100. Amazon's actions of, *inter alia*, making, using, offering for sale, and/or selling such products and/or services constitute an objectively high likelihood of infringement of the '449 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Amazon is aware that there is

an objectively high likelihood that its actions constituted, and continue to constitute,

infringement of the '449 patent and that the '449 patent is valid.   Despite Amazon's knowledge

of that risk, on information and belief, Amazon has not made any changes to the relevant

operation of its cloud computer products and/or services and has not provided its users and/or

customers with instructions on how to avoid infringement the '449 patent.  Instead, Amazon has

continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell

products and/or services patented under the '449 patent.  As such, Amazon willfully, wantonly

and deliberately infringed and is infringing the '449 patent in disregard of Clouding's rights.

101.    As a result of Amazon's infringement of the '449 patent, Plaintiff Clouding has

suffered monetary damages in an amount adequate to compensate for Amazon's infringement,

but in no event less than a reasonable royalty for the use made of the invention by Amazon,

together with interest and costs as fixed by the Court.

## COUNT X
## INFRINGEMENT OF U.S. PATENT NO. 6,918,014

102.    Plaintiff Clouding realleges and incorporates by reference paragraphs 1-101

above, as if fully set forth herein.

103.    Plaintiff Clouding is the owner by assignment of United States Patent

No. 6,918,014 ("the '014 patent") titled "Dynamic Distributed Data System and Method."  The

'014 patent was duly and legally issued by the United States Patent and Trademark Office on

July 12, 2005.  Clouding is the owner by assignment from Symantec Corporation of the '014

patent.  A true and correct copy of the '014 patent is included as Exhibit J.

104.    Amazon makes, uses, sells, and offers for sale in the United States products

and/or services for cloud computing.  On information and belief, at least some of Amazon's

cloud computing products and/or services, including but not limited to Amazon Elastic Compute
Cloud, are provided by servers using server-to-server communication and/or a gossip protocol.

105.    On information and belief, Amazon has directly infringed and continues to
infringe the '014 patent by, among other things, making, using, offering for sale, and/or selling
cloud computing products and/or services patented under the '014 patent.  Such cloud computing
products and/or services include, by way of example and without limitation, Amazon's Elastic
Compute Cloud, the use of which is covered by one or more claims of the '014 patent, including
but not limited to claim 1.  By making, using, offering for sale, and/or selling cloud computing
products and/or services patented under the '014 patent, Amazon has injured Clouding and is
liable to Clouding for direct infringement of the '014 patent pursuant to 35 U.S.C. § 271(a).

106.    Amazon has had actual knowledge of the '014 patent since at least the filing of
the original complaint in this action.

107.    On information and belief, Amazon has and continues to indirectly infringe one
or more claims of the '014 patent by inducing others (e.g., its customers and end-users) to
infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in
this action.

108.    On information and belief, Amazon has induced others and continues to induce
others, including but not limited to Amazon's customers and end-users, to infringe the '014
patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct
infringement by others with knowledge of that infringement, such as, upon information and
belief, by making, using, offering for sale, and/or selling products and/or services that when used
as intended infringe the '014 patent.  Such products and/or services include, by way of example
and without limitation, use of Amazon's Elastic Compute Cloud, which is covered by one or

35

more claims of the '014 patent, including but not limited to claim 5. Amazon's customers and

end-users who use such products and/or services directly infringe the claims of the '014 patent.

Since at least the filing of the original complaint in this action, Amazon has had actual

knowledge of the '014 patent and has known that the use of such products and/or services by its

customers and end-users constituted direct infringement of the '014 patent. Despite Amazon's

actual knowledge of the '014 patent and the knowledge that its customers infringed, Amazon

continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers

and end-users to directly infringe by using Amazon's cloud computing products and/or services

that are covered by one or more claims of the '014 patent.

109.    In particular, Amazon's customers' and end-users' use of Amazon's cloud

computer products and services is facilitated by the use of Amazon's systems employing server-

to-server communications and/or a gossip protocol that are patented under the '014 patent. Thus,

when Amazon's customers and end-users use its cloud computing products and services,

Amazon's customers and end-users use systems patented under the '014 patent that employ

server-to-server communications and/or a gossip protocol.

110.    On information and belief, in order to generate profits and revenues, Amazon

markets and promotes, e.g., through its website and sales personnel, the use of its products and

services employing server-to-server communications and/or a gossip protocol that infringe the

'014 patent when used as intended by Amazon's customers and end-users. Amazon further sells

(or licenses the use of) such products and/services to customers and end-users. Amazon's

customers and end-users use such products and services (including, e.g., Amazon's software and

hardware). Amazon further instructs its customers and end-users how to use such products and

services in a manner that infringes the '014 patent (e.g., through technical documentation,

36

manuals, instructions, and technical support). Amazon further instructs its customers and end-user to infringe the '014 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts. Amazon still further makes such products and services accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such products and services, including supporting hardware and software systems, to infringe the '014 patent.

111. On information and belief, even though Amazon has been aware of the '014 patent and that its customers and end-users infringe the '014 patent for over a year, to date Amazon has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '014 patent, nor has Amazon informed its customers or end-users how to avoid infringing the '014 patent. To date, Amazon has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '014 patent. On information and belief, Amazon itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '014 patent. To date, Amazon has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '014 patent in response to Clouding's requests for production of documents and things. Nor has Amazon to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '014 patent in response to Clouding's interrogatories.

37

112.     As such, on information and belief, despite the information Amazon gleaned from the original complaint in this action, Amazon <u>continues to specifically intend for and encourage</u> its customers and end-users to use its products and/or services in a manner that infringe the claims of the '014 patent.  In addition, since at least the filing of the original complaint in this action, Amazon has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner that infringe the claims of the '014 patent.

113.     Amazon's actions of, *inter alia*, making, using, offering for sale, and/or selling such products and/or services constitute an objectively high likelihood of infringement of the '014 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '014 patent and that the '014 patent is valid.   Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement the '014 patent.  Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell products and/or services patented under the '014 patent.  As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '014 patent in disregard of Clouding's rights.

114.     As a result of Amazon's infringement of the '014 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement,

but in no event less than a reasonable royalty for the use made of the invention by Amazon,

together with interest and costs as fixed by the Court.

## COUNT XI
## INFRINGEMENT OF U.S. PATENT NO. 6,963,908

115.    Plaintiff Clouding realleges and incorporates by reference paragraphs 1-114

above, as if fully set forth herein.

116.    Plaintiff Clouding is the owner by assignment of United States Patent

No. 6,963,908 ("the '908 patent") titled "System for Transferring Customized Hardware and

Software Settings from One Computer to Another Computer to Provide Personalized Operating

Environments."  The '908 patent was duly and legally issued by the United States Patent and

Trademark Office on November 8, 2005  Clouding is the owner by assignment from Symantec

Corporation of the '908 patent.  A true and correct copy of the '908 patent is included as

Exhibit K.

117.    Amazon makes, uses, sells, offers for sale, and/or imports products and/or

services in the United States that provide or support remote data access by a mobile device, such

as Amazon Cloud Drive.

118.    On information and belief, Amazon has directly infringed and continues to

infringe the '908 patent by, among other things, making, using, offering for sale, selling and/or

importing products and/or services that are covered by one or more claims of the '908 patent.

Such products and/or services include, by way of example and without limitation, Amazon

Cloud Drive, the use of which is covered by one or more claims of the '908 patent, including but

not limited to claim 1.  By making, using, offering for sale, and/or selling such products and/or

services covered by one or more claims of the '908 patent, Amazon has injured Clouding and is

liable to Clouding for direct infringement of the '908 patent pursuant to 35 U.S.C. § 271(a).

119.     Amazon has had actual knowledge of the '908 patent since at least the filing of the original complaint in this action.

120.     Amazon's actions of, *inter alia*, making, using, offering for sale, selling, and/or importing such products and/or services that are covered by one or more claims of the '908 patent constitute an objectively high likelihood of infringement of the '908 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Amazon is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '908 patent and that the '908 patent is valid. Despite Amazon's knowledge of that risk, on information and belief, Amazon has not made any changes to the relevant operation of its products and/or services to avoid infringement the '908 patent. Instead, Amazon has continued to, and still is continuing to, among other things, make, use, offer for sale, sell, and/or import products and/or services patented under the '908 patent. As such, Amazon willfully, wantonly and deliberately infringed and is infringing the '908 patent in disregard of Clouding's rights.

121.     As a result of Amazon's infringement of the '908 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

**COUNT XII**
**INFRINGEMENT OF U.S. PATENT NO. 7,032,089**

122.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-121 above, as if fully set forth herein.

123.     Plaintiff Clouding is the owner by assignment of United States Patent No. 7,032,089 ("the '089 patent") titled "Replica Synchronization Using Copy-On-Read

40

Technique." The '089 patent was duly and legally issued by the United States Patent and Trademark Office on April 18, 2006. Clouding is the owner by assignment from Symantec Corporation of the '089 patent. A true and correct copy of the '089 patent is included as Exhibit L.

124.    Amazon makes, uses, sells, offers for sale, and/or imports into the United States products and/or services that provide for data synchronization. On information and belief, at least some of data synchronization products and/or services provide synchronization using copy-on-read techniques.

125.    On information and belief, Amazon has directly infringed and continues to infringe the '089 patent by, among other things, making, using, offering for sale, selling and/or importing into the United States products and/or services that are covered by one or more claims of the '089 patent. Such products and/or services include, by way of example and without limitation, the Amazon's Whispersync and products and/or services related thereto, which are covered by one or more claims of the '089 patent, including but not limited to claim 13. By making, using, offering for sale, selling and/or importing into the United States such products and/or services that are covered by one or more claims of the '089 patent, Amazon has injured Clouding and is liable to Clouding for direct infringement of the '089 patent pursuant to 35 U.S.C. § 271(a).

126.    As a result of Amazon's infringement of the '089 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Amazon's infringement, but in no event less than a reasonable royalty for the use made of the invention by Amazon, together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clouding respectfully requests that this Court enter:

1.  A judgment in favor of Plaintiff Clouding that Amazon has infringed, either literally and/or under the doctrine of equivalents, the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '607 patent, the '481 patent, the '621 patent, the '449 patent, the '014 patent, the '908 patent, and the '089 patent;

2.  A judgment that Amazon has induced infringement of the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '481 patent, the '449 patent, and the '014 patent;

3.  A judgment that Amazon willfully infringed the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '607 patent, the '481 patent, the '621 patent, the '449 patent, the '014 patent, the '908 patent, and the '089 patent;

4.  A judgment and order for treble damages pursuant to 35 U.S.C. § 284;

5.  A judgment and order requiring Amazon to pay Plaintiff its damages, costs, expenses, and pre-judgment and post-judgment interest as provided under 35 U.S.C. § 284 for Amazon's infringement of the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '607 patent, the '481 patent, the '621 patent, the '449 patent, the '014 patent, the '908 patent, and the '089 patent;

6.  A judgment and order that this case is exceptional and requiring Amazon to pay Plaintiff Clouding reasonable experts' fees and attorneys' fees pursuant to 35 U.S.C. § 285; and

7.  Any and all other relief as the Court may deem appropriate and just under the circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of

any issues so triable by right.

June 21, 2013                                  BAYARD, P.A.

OF COUNSEL:                                    <u>/s/ *Stephen B. Brauerman*</u>
                                               Richard D. Kirk (rk0922)
Marc A. Fenster                                Stephen B. Brauerman (sb4952)
Jaspal S. Hare                                 Vanessa R. Tiradentes (vt5398)
Dorian S. Berger                               222 Delaware Avenue, Suite 900
RUSS, AUGUST & KABAT                           P.O. Box 25130
12424 Wilshire Boulevard, Twelfth Floor        Wilmington, DE  19899
Los Angeles, California 90025                  (302) 655-5000
(310) 826-7474                                 rkirk@bayardlaw.com
mfenster@raklaw.com                            sbrauerman@bayardlaw.com
jhare@raklaw.com                               vtiradentes@bayardlaw.com

                                               *Attorneys for Plaintiff Clouding IP, LLC*

# Exhibit "D"

## To

# DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS INDIRECT INFRINGEMENT CLAIMS FROM PLAINTIFF'S SECOND AMENDED COMPLAINT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CLOUDING IP, LLC,

    Plaintiff,

           v.

ORACLE CORPORATION,

    Defendant.

C.A. No. 12-642-LPS

**JURY TRIAL DEMANDED**

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.* in which Plaintiff Clouding IP, LLC makes the following allegations against Defendant Oracle Corporation:

## PARTIES

1.      Plaintiff Clouding IP, LLC ("Clouding") is a Delaware limited liability company having a principal place of business at 2 Terrace Way, Suite C, Greensboro, North Carolina 27403.

2.      On information and belief, Defendant Oracle Corporation ("Oracle") is a Delaware corporation with its principal executive offices at 500 Oracle Parkway, Redwood City, California, 94065. On information and belief, Defendant may be served via its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      On information and belief, Oracle is subject to this Court's specific and general personal jurisdiction pursuant to due process and/or the Delaware Long Arm Statute, due to having availed itself of the rights and benefits of Delaware by incorporating under Delaware law and due to its substantial business in this forum, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Delaware and in this Judicial District.

5.      Venue is proper in this district under 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b).  Oracle is incorporated in this District, and on information and belief, has transacted business in this district and has committed and/or induced acts of patent infringement in this district.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 6,631,449

6.      Plaintiff Clouding realleges and incorporates by reference paragraphs 1-5 above, as if fully set forth herein.

7.      Plaintiff Clouding is the owner by assignment of United States Patent No. 6,631,449 ("the '449 patent") titled "Dynamic Distributed Data System and Method."  The '449 patent was duly and legally issued by the United States Patent and Trademark Office on October 7, 2003.  Clouding is the owner by assignment from Symantec Corporation of the '449 patent.  A true and correct copy of the '449 patent is included as Exhibit A.

8.      Oracle makes, uses, sells, and offers for sale in the United States products and/or services for distributed computing.  On information and belief, at least some of Oracle's distributed computing products and/or services, including without limitation Oracle Database 11g Release 2, provide or support the use of server-to-server or peer-to-peer communication.  On

information and belief, one such distributed computing product and/or service that provides or supports the use of server-to-server or peer-to-peer communication is Oracle Database 11*g* Release 2, which includes the ADVM (ASM Dynamic Volume Manager) feature.

9.      On information and belief, Oracle has directly infringed and continues to infringe the '449 patent by, among other things, making, using, offering for sale, and/or selling distributed computing products and/or services patented under the '449 patent.  Such distributed computing products and/or services include, by way of example and without limitation, use of Oracle Database 11*g* Release 2, which is covered by one or more claims of the '449 patent, including but not limited to claim 1.  By making, using, offering for sale, and/or selling distributed computing products and/or services patented under the '449 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '449 patent pursuant to 35 U.S.C. § 271(a).

10.      As a result of Oracle's infringement of the '449 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

**COUNT II**
**INFRINGEMENT OF U.S. PATENT NO. 6,918,014**

11.      Plaintiff Clouding realleges and incorporates by reference paragraphs 1-10 above, as if fully set forth herein.

12.      Plaintiff Clouding is the owner by assignment of United States Patent No. 6,918,014 ("the '014 patent") titled "Dynamic Distributed Data System and Method."  The '014 patent was duly and legally issued by the United States Patent and Trademark Office on

July 12, 2005. Clouding is the owner by assignment from Symantec Corporation of the '014 patent. A true and correct copy of the '014 patent is included as Exhibit B.

13. Oracle makes, uses, sells, and offers for sale in the United States products and/or services for distributed computing. On information and belief, at least some of Oracle's distributed computing products and/or services, including without limitation Oracle Database 11*g* Release 2, provide or support the use of server-to-server or peer-to-peer communication. On information and belief, one such distributed computing product and/or service that provides or supports the use of server-to-server or peer-to-peer communication is Oracle Database 11*g* Release 2, which includes the ADVM (ASM Dynamic Volume Manager) feature.

14. On information and belief, Oracle has directly infringed and continues to infringe the '014 patent by, among other things, making, using, offering for sale, and/or selling distributed computing products and/or services patented under the '014 patent. Such distributed computing products and/or services include, by way of example and without limitation, use of Oracle Database 11*g* Release 2, which is covered by one or more claims of the '014 patent, including but not limited to claim 1. By making, using, offering for sale, and/or selling distributed computing products and/or services patented under the '014 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '014 patent pursuant to 35 U.S.C. § 271(a).

15. As a result of Oracle's infringement of the '014 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT III
## INFRINGEMENT OF U.S. PATENT NO. 7,596,784

16.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-5 above, as if fully set forth herein.

17.     Plaintiff Clouding is the owner by assignment of United States Patent No. 7,596,784 ("the '784 patent") titled "Method System and Apparatus for Providing Pay-Per-Use Distributed Computing Resources."  The '784 patent was duly and legally issued by the United States Patent and Trademark Office on September 29, 2009.  Clouding is the owner by assignment from Symantec Corporation of the '784 patent.  A true and correct copy of the '784 patent is included as Exhibit C.

18.     Oracle makes, uses, sells, and offers for sale in the United States products and/or services for cloud computing.  On information and belief, at least some of Oracle's cloud computing products and/or services provide or support pay-per-use cloud computing.

19.     On information and belief, Oracle has directly infringed and continues to infringe the '784 patent by, among other things, making, using, offering for sale, and/or selling pay-per-use cloud computing products and/or services patented under the '784 patent.  Such pay-per-use cloud computing products and/or services include, by way of example and without limitation, Oracle Enterprise Manager 12$^c$, which is covered by one or more claims of the '784 patent, including but not limited to claim 1.  By making, using, offering for sale, and/or selling pay-per-use cloud computing products and/or services patented under the '784 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '784 patent pursuant to 35 U.S.C. § 271(a).

20.     Oracle has had actual knowledge of the '784 patent since at least the filing of the original complaint in this action.

21.     On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '784 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

22.     On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '784 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, and/or selling pay-per-use cloud computing products and/or services that when used as intended infringe the '784 patent.  Such products and/or services include, by way of example and without limitation, Oracle Enterprise Manager 12$^c$, the use of which is covered by one or more claims of the '784 patent, including but not limited to claim 19.  Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '784 patent.  Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '784 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '784 patent.  Despite Oracle's actual knowledge of the '784 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's pay-per-use cloud computing products and/or services that are covered by one or more claims of the '784 patent.

23.     In particular, Oracle's customers' and end-users' use of Oracle's pay-per-use cloud computing products and services is facilitated by the use of pay-per-use systems and

methods patented under the '784 patent. Thus, Oracle's customers and end-users are billed or charged on a pay-per-use basis when using such pay-per-use cloud computing products and services.

24.     On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its pay-per-use products and services that infringe the '784 patent when used as intended by Oracle's customers and end-users. Oracle further sells (or licenses the use of) such products and/services to customers and end-users. Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware). Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '784 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '784 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts. Oracle still further makes such products and services accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such products and services, including supporting hardware and software systems, to infringe the '784 patent.

25.     On information and belief, even though Oracle has been aware of the '784 patent and that its customers and end-users infringe the '784 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '784 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '784 patent. To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid

infringement) by itself or its customers or end-users since it became aware of the '784 patent.

On information and belief, Oracle itself is unaware of any legal or factual basis that its actions

solely, or in combination with the actions of its customers and end-users, do not constitute direct

or indirect infringement of the '784 patent.  To date, Oracle has not produced any opinion of

counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the

validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement

or potential infringement of any claim of the '784 patent in response to Clouding's requests for

production of documents and things.  Nor has Oracle to date identified any legal or factual basis

for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to

any claim of the '784 patent in response to Clouding's interrogatories.

26.     As such, on information and belief, despite the information Oracle gleaned from

the original complaint in this action, Oracle continues to specifically intend for and encourage its

customers and end-users to use its products and/or services in a manner that infringe the claims

of the '784 patent.  In addition, since at least the filing of the original complaint in this action,

Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing

around, or providing notice to its customer) to avoid confirming that its actions continue to

specifically encourage its customers and end-users to use its products and/or service in a manner

that infringe the claims of the '784 patent.

27.     Oracle's actions of, *inter alia*, making, using, offering for sale, and/or selling such

pay-per-use cloud computing products and/or services patented under the '784 patent constitute

an objectively high likelihood of infringement of the '784 patent, which was duly issued by the

United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the

original complaint, Oracle is aware that there is an objectively high likelihood that its actions

constituted, and continue to constitute, infringement of the '784 patent and that the '784 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '784 patent. Instead, Oracle has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell pay-per-use cloud computing products and/or services patented under the '784 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '784 patent in disregard of Clouding's rights.

28.     As a result of Oracle's infringement of the '784 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT IV
## INFRINGEMENT OF U.S. PATENT NO. 7,065,637

29.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-28 above, as if fully set forth herein.

30.     Plaintiff Clouding is the owner by assignment of United States Patent No. 7,065,637 ("the '637 patent") titled "System for Configuration of Dynamic Computing Environments Using a Visual Interface." The '637 patent was duly and legally issued by the United States Patent and Trademark Office on June 20, 2006. Clouding is the owner by assignment from Symantec Corporation of the '637 patent. A true and correct copy of the '637 patent is included as Exhibit D.

31.     Oracle makes, uses, sells, and offers for sale in the United States products and/or services for cloud computing. On information and belief, at least some of Oracle's cloud

computing products and/or services provide or support use of a visual interface to configure cloud computing resources.

32.     On information and belief, Oracle has directly infringed and continues to infringe the '637 patent by, among other things, making, using, offering for sale, and/or selling cloud computing products and/or services covered by one or more claims of the '637 patent.  Such cloud computing products and/or services include, by way of example and without limitation, cloud computing products and/or services configurable through Oracle VM Manager, which are covered by one or more claims of the '637 patent, including but not limited to claim 1.  By making, using, offering for sale, and/or selling such products and services covered by one or more claims of the '637 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '637 patent pursuant to 35 U.S.C. § 271(a).

33.     Oracle has had actual knowledge of the '637 patent since at least the filing of the original complaint in this action.

34.     On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '637 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

35.     On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '637 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, and/or selling a visual interface tool to configure cloud computing products and/or services that when used as intended infringe the '637 patent.

Such products and/or services include, by way of example and without limitation, Oracle VM Manager, the use of which is covered by one or more claims of the '637 patent, including but not limited to claim 1. Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '637 patent. Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '637 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '637 patent. Despite Oracle's actual knowledge of the '637 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's visual interface tools to configure cloud computing products and services that are covered by one or more claims of the '637 patent.

36.     On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its visual construction tools to configure its products and services that infringe the '637 patent when used as intended by Oracle's customers and end-users. Oracle further sells (or licenses the use of) such products and/services to customers and end-users. Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware). Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '637 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '637 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

37.     On information and belief, even though Oracle has been aware of the '637 patent and that its customers and end-users infringe the '637 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '637 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '637 patent. To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '637 patent. On information and belief, Oracle itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '637 patent. To date, Oracle has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '637 patent in response to Clouding's requests for production of documents and things. Nor has Oracle to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '637 patent in response to Clouding's interrogatories.

38.     As such, on information and belief, despite the information Oracle gleaned from the original complaint in this action, Oracle continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '637 patent. In addition, since at least the filing of the original complaint in this action, Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to

specifically encourage its customers and end-users to use its products and/or service in a manner that infringe the claims of the '637 patent.

39.     Oracle's actions of, *inter alia*, making, using, offering for sale, and/or selling such cloud computing products and/or services covered by one or more claims of the '637 patent constitute an objectively high likelihood of infringement of the '637 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '637 patent and that the '637 patent is valid.   Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '637 patent.  Instead, Oracle has continued to, and still is continuing to, among other things, make, use, offer for sale, and/or sell cloud computing products and/or services covered by one or more claims of the '637 patent.  As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '637 patent in disregard of Clouding's rights.

40.     As a result of Oracle's infringement of the '637 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT V
## INFRINGEMENT OF U.S. PATENT NO. 6,738,799

41.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-40 above, as if fully set forth herein.

42.     Plaintiff Clouding is the owner by assignment of United States Patent No. 6,738,799 ("the '799 patent") titled "Methods and Apparatuses for File Synchronization and Updating Using a Signature List."  The '799 patent was duly and legally issued by the United States Patent and Trademark Office on May 18, 2004.  Clouding is the owner by assignment from Symantec Corporation of the '799 patent.  A true and correct copy of the '799 patent is included as Exhibit E.

43.     Oracle makes, uses, sells, offers for sale, and/or imports into the United States products and/or services that provide or support synchronization of files.  On information and belief, at least some of such products and/or services perform synchronization of files between networked computers by providing updates.

44.     On information and belief, Oracle has directly infringed and continues to infringe the '799 patent by, among other things, making, using, offering for sale, selling and/or importing products and/or services into the United States that are covered by one or more claims of the '799 patent.  Such products and/or services include, by way of example and without limitation, Oracle Cloud File System, the use of which is covered by one or more claims of the '799 patent, including but not limited to claim 37.  By making, using, offering for sale, selling and/or importing into the United States such products and/or service that are covered by one or more claims of the '799 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '799 patent pursuant to 35 U.S.C. § 271(a).

45.     Oracle has had actual knowledge of the '799 patent since at least the filing of the original complaint in this action.

46.     On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '799 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

47.     On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '799 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, selling and/or importing products and/or services that when used as intended infringe the '799 patent.  Such products and/or services include, by way of example and without limitation, Oracle Cloud File System including Automatic Storage Management, the use of which is covered by one or more claims of the '799 patent, including but not limited to claim 42.  Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '799 patent.  Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '799 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '799 patent.  Despite Oracle's actual knowledge of the '799 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's file-synchronization products and services that are covered by one or more claims of the '799 patent.

48.     On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its file-synchronization products and services that infringe the '799 patent when used as intended by Oracle's customers and end-users.  Oracle further sells (or licenses the use of) such products and/services to customers and end-users.  Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware).  Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '799 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '799 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

49.     On information and belief, even though Oracle has been aware of the '799 patent and that its customers and end-users infringe the '799 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '799 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '799 patent.  To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '799 patent. On information and belief, Oracle itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '799 patent.  To date, Oracle has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the

16

validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '799 patent in response to Clouding's requests for production of documents and things. Nor has Oracle to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '799 patent in response to Clouding's interrogatories.

50. As such, on information and belief, despite the information Oracle gleaned from the original complaint in this action, Oracle continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '799 patent. In addition, since at least the filing of the original complaint in this action, Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to specifically encourage its customers and end-users to use its products and/or service in a manner that infringe the claims of the '799 patent.

51. Oracle's actions of, *inter alia*, making, using, offering for sale, selling and/or importing such products and/or services that are covered by one or more claims of the '799 patent constitute an objectively high likelihood of infringement of the '799 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '799 patent and that the '799 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '799 patent. Instead, Oracle has continued to, and still is continuing to, among other

things, make, use, offer for sale, sell and/or import products and/or services that are covered by

one or more claims of the '799 patent.  As such, Oracle willfully, wantonly and deliberately

infringed and is infringing the '799 patent in disregard of Clouding's rights.

52.     As a result of Oracle's infringement of the '799 patent, Plaintiff Clouding has

suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but

in no event less than a reasonable royalty for the use made of the invention by Oracle, together

with interest and costs as fixed by the Court.

**COUNT VI**
**INFRINGEMENT OF U.S. PATENT NO. 5,944,839**

53.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-52 above,

as if fully set forth herein.

54.     Plaintiff Clouding is the owner by assignment of United States Patent

No. 5,944,839 ("the '839 patent") titled "System and Method for Automatically Maintaining A

Computer System."  The '839 patent was duly and legally issued by the United States Patent and

Trademark Office on August 31, 1999.  Clouding is the owner by assignment from Symantec

Corporation of the '839 patent.  A true and correct copy of the '839 patent is included as

Exhibit F.

55.     Oracle makes, uses, sells, offers for sale, and/or imports in the United States

products and/or services for cloud computing.  On information and belief, at least some of

Oracle's products and/or services provide or support automatic detection, diagnosis, and

isolation of system and software faults.

56.     On information and belief, Oracle has directly infringed and continues to infringe

the '839 patent by, among other things, making, importing, using, offering for sale, and/or selling

products and/or services covered by one or more claims of the '839 patent.  Such products and/or

services include, by way of example and without limitation, Oracle Solaris 10 Operating System, the use of which is covered by one or more claims of the '839 patent, including but not limited to claim 6. By making, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '839 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '839 patent pursuant to 35 U.S.C. § 271(a).

57.   Oracle has had actual knowledge of the '839 patent since at least the filing of the original complaint in this action.

58.   On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '839 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

59.   On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '839 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, importing, using, offering for sale, and/or selling self-healing products and/or services that when used as intended infringe the '839 patent. Such products and/or services include, by way of example and without limitation, Oracle Solaris 10 Operating System including Predictive Self Healing, the use of which is covered by one or more claims of the '839 patent, including but not limited to claim 1. Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '839 patent. Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '839 patent and has known that the use of such products and/or services by its customers and end-users

constituted direct infringement of the '839 patent. Despite Oracle's actual knowledge of the '839 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's self-healing products and services that are covered by one or more claims of the '839 patent.

60.     On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its self-healing products and services that infringe the '839 patent when used as intended by Oracle's customers and end-users. Oracle further sells (or licenses the use of) such products and/services to customers and end-users. Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware). Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '839 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '839 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

61.     On information and belief, even though Oracle has been aware of the '839 patent and that its customers and end-users infringe the '839 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '839 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '839 patent. To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '839 patent.

On information and belief, Oracle itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '839 patent. To date, Oracle has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '839 patent in response to Clouding's requests for production of documents and things. Nor has Oracle to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '839 patent in response to Clouding's interrogatories.

62. As such, on information and belief, despite the information Oracle gleaned from the original complaint in this action, Oracle continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '839 patent. In addition, since at least the filing of the original complaint in this action, Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to specifically encourage its customers and end-users to use its products and/or service in a manner that infringe the claims of the '839 patent.

63. Oracle's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '839 patent constitute an objectively high likelihood of infringement of the '839 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '839 patent and that the '839 patent is

valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '839 patent. Instead, Oracle has continued to, and still is continuing to, among other things, make, import, use, offer for sale, and/or sell products and/or services covered by one or more claims of the '839 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '839 patent in disregard of Clouding's rights.

64. As a result of Oracle's infringement of the '839 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

**COUNT VII**
**INFRINGEMENT OF U.S. PATENT NO. 5,825,891**

65. Plaintiff Clouding realleges and incorporates by reference paragraphs 1-64 above, as if fully set forth herein.

66. Plaintiff Clouding is the owner by assignment of United States Patent No. 5,825,891 ("the '891 patent") titled "Key Management for Network Communication." The '891 patent was duly and legally issued by the United States Patent and Trademark Office on October 20, 1998. Clouding is the owner by assignment from Symantec Corporation of the '891 patent. A true and correct copy of the '891 patent is included as Exhibit G.

67. Oracle makes, uses, sells and/or offers for sale in the United States products and/or services that provide for or support establishing Internet Protocol Security ("IP Sec")/Internet Key Exchange-based Virtual Private Network tunnels.

68.     On information and belief, Oracle has directly infringed and continues to infringe the '891 patent by, among other things, using methods covered by one or more claims of the '891 patent. Such methods include, by way of example and without limitation, use of SunScreen 3.2, which is covered by one or more claims of the '891 patent, including but not limited to claim 1. By using such methods covered by one or more claims of the '891 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '891 patent pursuant to 35 U.S.C. § 271(a).

69.     Oracle has had actual knowledge of the '891 patent since at least the filing of the original complaint in this action.

70.     On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '891 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

71.     On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '891 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, selling and/or importing products and/or services supporting IP Sec that when used as intended infringe the '891 patent. Such products and/or services include, by way of example and without limitation, SunScreen 3.2, Oracle Solaris 10, and Oracle servers including Solaris 10, the use of which is covered by one or more claims of the '891 patent, including but not limited to claim 1. Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '891 patent. Since at least the

filing of the original complaint in this action, Oracle has had actual knowledge of the '891 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '891 patent. Despite Oracle's actual knowledge of the '891 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's IPSec products and services that are covered by one or more claims of the '891 patent.

72.     On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its products and services supporting IP Sec that infringe the '891 patent when used as intended by Oracle's customers and end-users. Oracle further sells (or licenses the use of) such products and/services to customers and end-users. Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware). Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '891 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '891 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

73.     On information and belief, even though Oracle has been aware of the '891 patent and that its customers and end-users infringe the '891 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '891 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '891 patent. To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid

infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '891 patent. On information and belief, Oracle itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '891 patent. To date, Oracle has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '891 patent in response to Clouding's requests for production of documents and things. Nor has Oracle to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '891 patent in response to Clouding's interrogatories.

74.     As such, on information and belief, despite the information Oracle gleaned from the original complaint in this action, Oracle <u>continues to specifically intend for and encourage</u> its customers and end-users to use its products and/or services in a manner that infringe the claims of the '891 patent. In addition, since at least the filing of the original complaint in this action, Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to <u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner that infringe the claims of the '891 patent.

75.     Oracle's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '891 patent constitute an objectively high likelihood of infringement of the '891 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the

original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '891 patent and that the '891 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '891 patent. Instead, Oracle has continued to, and still is continuing to, among other things, use methods covered by one or more claims of the '891 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '891 patent in disregard of Clouding's rights.

76.     As a result of Oracle's infringement of the '891 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT VIII
## INFRINGEMENT OF U.S. PATENT NO. 5,678,042

77.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-76 above, as if fully set forth herein.

78.     Plaintiff Clouding is the owner by assignment of United States Patent No. 5,678,042 ("the '042 patent") titled "Network Management System Having Historical Virtual Catalog Snapshots for Overview of Historical Changes to Files Distributively Stored Across Network Domain." The '042 patent was duly and legally issued by the United States Patent and Trademark Office on October 14, 1997. Clouding is the owner by assignment from Symantec Corporation of the '042 patent. A true and correct copy of the '042 patent is included as Exhibit H.

26

79.     Oracle makes, uses, sells, and/or offers for sale in the United States products and/or services that provide or support data storage deployment and management.

80.     On information and belief, Oracle has directly infringed and continues to infringe the '042 patent by, among other things, using methods covered by one or more claims of the '042 patent.  Such methods include, by way of example and without limitation, use of DTrace Storage Analytics in conjunction with Oracle Sun ZFS Storage Appliance, which is covered by one or more claims of the '042 patent, including but not limited to claim 1.  By using such methods covered by one or more claims of the '042 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '042 patent pursuant to 35 U.S.C. § 271(a).

81.     Oracle has had actual knowledge of the '042 patent since at least the filing of the original complaint in this action.

82.     On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '042 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

83.     On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '042 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by using methods that when used as intended infringe the '042 patent.  Such methods include, by way of example and without limitation, DTrace Storage Analytics in conjunction with Oracle Sun ZFS Storage Appliance, the use of which is covered by one or more claims of the '042 patent, including but not limited to claim 1.  Oracle's customers and end-users who use

27

such methods directly infringe the claims of the '042 patent. Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '042 patent and has known that the use of such methods by its customers and end-users constituted direct infringement of the '042 patent. Despite Oracle's actual knowledge of the '042 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist, induce, aid, and abet its customers and end-users to directly infringe by using Oracle's storage-management products and services that are covered by one or more claims of the '042 patent.

84.  On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its storage-management products and services that infringe the '042 patent when used as intended by Oracle's customers and end-users. Oracle further sells (or licenses the use of) such products and/services to customers and end-users. Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware). Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '042 patent (e.g., through technical documentation, manuals, instructions, and technical support). Oracle further instructs its customers and end-user to infringe the '042 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.

85.  On information and belief, even though Oracle has been aware of the '042 patent and that its customers and end-users infringe the '042 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '042 patent, nor has Oracle informed its

customers or end-users how to avoid infringing the '042 patent. To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid infringement) by itself or its customers or end-users since it became aware of the '042 patent. On information and belief, Oracle itself is unaware of any legal or factual basis that its actions solely, or in combination with the actions of its customers and end-users, do not constitute direct or indirect infringement of the '042 patent. To date, Oracle has not produced any opinion of counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement or potential infringement of any claim of the '042 patent in response to Clouding's requests for production of documents and things. Nor has Oracle to date identified any legal or factual basis for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to any claim of the '042 patent in response to Clouding's interrogatories.

86.     As such, on information and belief, despite the information Oracle gleaned from the original complaint in this action, Oracle continues to specifically intend for and encourage its customers and end-users to use its products and/or services in a manner that infringe the claims of the '042 patent. In addition, since at least the filing of the original complaint in this action, Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing around, or providing notice to its customer) to avoid confirming that its actions continue to specifically encourage its customers and end-users to use its products and/or service in a manner that infringe the claims of the '042 patent.

87.     Oracle's actions of, *inter alia*, making, importing, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '042 patent constitute

an objectively high likelihood of infringement of the '042 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '042 patent and that the '042 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '042 patent. Instead, Oracle has continued to, and still is continuing to, among other things, use methods covered by one or more claims of the '042 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '042 patent in disregard of Clouding's rights.

88.     As a result of Oracle's infringement of the '042 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT IX
## INFRINGEMENT OF U.S. PATENT NO. 5,495,607

89.     Plaintiff Clouding realleges and incorporates by reference paragraphs 1-88 above, as if fully set forth herein.

90.     Plaintiff Clouding is the owner by assignment of United States Patent No. 5,495,607 ("the '607 patent") titled "Network Management System Having Virtual Catalog Overview of Files Distributively Stored Across Network Domain." The '607 patent was duly and legally issued by the United States Patent and Trademark Office on February 27, 1996. Clouding is the owner by assignment from Symantec Corporation of the '607 patent. A true and correct copy of the '607 patent is included as Exhibit I.

91.     Oracle operates one or more server farms (comprising, *inter alia*, servers and computers on a network) that are located in data centers in the United States.  Oracle's server farms provide and support cloud computing services, including at least Oracle Cloud Computing Services.  On information and belief, Oracle makes and/or uses a system for monitoring the health of at least some of Oracle's servers and computers over a network in its data centers.

92.     On information and belief, Oracle has directly infringed and continues to infringe the '607 patent by, among other things, making, using, offering for sale, and/or selling systems, and products and/or services related thereto, covered by one or more claims of the '607 patent.  Such systems include, by way of example and without limitation, a system made and/or used by Oracle to monitor the health of servers and computers running Oracle Cloud Computing service, which is covered by one or more claims of the '607 patent, including but not limited to claim 9.  By making, using, offering for sale, and/or selling such systems, and products and/or services related thereto, covered by one or more claims of the '607 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '607 patent pursuant to 35 U.S.C. § 271(a).

93.     Oracle has had actual knowledge of the '607 patent since at least the filing of the original complaint in this action.

94.     Oracle's actions of, *inter alia*, making and using such a system covered by one or more claims of the '607 patent constitute an objectively high likelihood of infringement of the '607 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid.  Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '607 patent and that the '607 patent is valid.   Despite Oracle's knowledge of

that risk, on information and belief, Oracle has not made any changes to the relevant operation to avoid infringement of the '607 patent. Instead, Oracle has continued to, and still is continuing to, among other things, make and, use a system covered by one or more claims of the '607 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '607 patent in disregard of Clouding's rights.

95.    As a result of Oracle's infringement of the '607 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## COUNT X
## INFRINGEMENT OF U.S. PATENT NO. 7,254,621

96.    Plaintiff Clouding realleges and incorporates by reference paragraphs 1-95 above, as if fully set forth herein.

97.    Plaintiff Clouding is the owner by assignment of United States Patent No. 7,254,621 ("the '621 patent") titled "Technique for Enabling Remote Data Access And Manipulation From A Pervasive Device." The '621 patent was duly and legally issued by the United States Patent and Trademark Office on August 7, 2007. Clouding is the owner by assignment from Symantec Corporation of the '621 patent. A true and correct copy of the '621 patent is included as Exhibit J.

98.    Oracle makes, uses, sells, offers for sale, and/or imports products and/or services in the United States that provide or support remote data access by a mobile device, such as Oracle Business Intelligence Foundation Suite.

99.    On information and belief, Oracle has directly infringed and continues to infringe the '621 patent by, among other things, making, using, offering for sale, selling and/or importing

products and/or services that are covered by one or more claims of the '621 patent. Such products and/or services include, by way of example and without limitation, Oracle Business Intelligence Foundation Suite, which is covered by one or more claims of the '621 patent, including but not limited to claim 1. By making, using, offering for sale, and/or selling such products and/or services covered by one or more claims of the '621 patent, Oracle has injured Clouding and is liable to Clouding for direct infringement of the '621 patent pursuant to 35 U.S.C. § 271(a).

100.    Oracle has had actual knowledge of the '621 patent since at least the filing of the original complaint in this action.

101.    Oracle's actions of, *inter alia*, making, using, offering for sale, selling and/or importing such products and/or services that are covered by one or more claims of the '621 patent constitute an objectively high likelihood of infringement of the '621 patent, which was duly issued by the United States Patent and Trademark Office and is presumed valid. Since at least the filing of the original complaint, Oracle is aware that there is an objectively high likelihood that its actions constituted, and continue to constitute, infringement of the '621 patent and that the '621 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '621 patent. Instead, Oracle has continued to, and still is continuing to, among other things, make, use, offer for sale, sell and/or import products and/or services that are covered by one or more claims of the '621 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '621 patent in disregard of Clouding's rights.

102.    As a result of Oracle's infringement of the '621 patent, Plaintiff Clouding has

suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but

in no event less than a reasonable royalty for the use made of the invention by Oracle, together

with interest and costs as fixed by the Court.

## COUNT XI
## INFRINGEMENT OF U.S. PATENT NO. 6,925,481

103.    Plaintiff Clouding realleges and incorporates by reference paragraphs 1-102

above, as if fully set forth herein.

104.    Plaintiff Clouding is the owner by assignment of United States Patent

No. 6,925,481 ("the '481 patent") titled "Technique for Enabling Remote Data Access And

Manipulation From A Pervasive Device."  The '481 patent was duly and legally issued by the

United States Patent and Trademark Office on August 2, 2005.  Clouding is the owner by

assignment from Symantec Corporation of the '481 patent.  A true and correct copy of the '481

patent is included as Exhibit K.

105.    Oracle makes, uses, sells, offers for sale, and/or imports products and/or services

in the United States that provide or support remote data access by a mobile device, such as

Oracle Business Intelligence Foundation Suite.

106.    On information and belief, Oracle has directly infringed and continues to infringe

the '481 patent by, among other things, making, using, offering for sale, selling and/or importing

products and/or services that are covered by one or more claims of the '481 patent.  Such

products and/or services include, by way of example and without limitation,  Oracle Business

Intelligence Foundation Suite, which is covered by one or more claims of the '481 patent,

including but not limited to claim 1.  By making, using, offering for sale, and/or selling such

products and/or services covered by one or more claims of the '481 patent, Oracle has injured

Clouding and is liable to Clouding for direct infringement of the '481 patent pursuant to 35 U.S.C. § 271(a).

107. Oracle has had actual knowledge of the '481 patent since at least the filing of the original complaint in this action.

108. On information and belief, Oracle has and continues to indirectly infringe one or more claims of the '481 patent by inducing others (e.g., its customers and end-users) to directly infringe in violation of 35 U.S.C. § 271(b) since at least the filing of the original complaint in this action.

109. On information and belief, Oracle has induced others and continues to induce others, including but not limited to Oracle's customers and end-users, to infringe the '481 patent in violation of 35 U.S.C. § 271(b) by taking active steps to encourage and facilitate direct infringement by others with knowledge of that infringement, such as, upon information and belief, by making, using, offering for sale, selling and/or importing products and/or services that when used as intended infringe the '481 patent. Such products and/or services include, by way of example and without limitation, Oracle Business Intelligence Foundation Suite, the use of which is covered by one or more claims of the '481 patent, including but not limited to claim 55. Oracle's customers and end-users who use such products and/or services directly infringe the claims of the '481 patent. Since at least the filing of the original complaint in this action, Oracle has had actual knowledge of the '481 patent and has known that the use of such products and/or services by its customers and end-users constituted direct infringement of the '481 patent. Despite Oracle's actual knowledge of the '481 patent and the knowledge that its customers and end-users infringed, Oracle continued to, and still continues to, actively encourage, assist,

induce, aid, and abet its customers and end-users to directly infringe by using Oracle's products and services that are covered by one or more claims of the '481 patent.

110.    On information and belief, in order to generate profits and revenues, Oracle markets and promotes, e.g., through its website and sales personnel, the use of its products and services supporting data manipulation by mobile devices that infringe the '481 patent when used as intended by Oracle's customers and end-users.  Oracle further sells (or licenses the use of) such products and/services to customers and end-users.  Oracle's customers and end-users use such products and services (including, e.g., Oracle's software and hardware).  Oracle further instructs its customers and end-users how to use such products and services in a manner that infringes the '481 patent (e.g., through technical documentation, manuals, instructions, and technical support).  Oracle further instructs its customers and end-user to infringe the '481 patent through the products and services themselves, e.g., through on-screen instructions, intuitive user interfaces, and command prompts.  Oracle still further makes such products and services accessible to its customers and end-users via the Internet, thus enabling and encouraging its customers and end-users to use such products and services, including supporting hardware and software systems, to infringe the '481 patent.

111.    On information and belief, even though Oracle has been aware of the '481 patent and that its customers and end-users infringe the '481 patent for over a year, to date Oracle has neither made any changes to the functionality, operations, marketing, sales, technical support, etc. of such products and services to avoid infringing the '481 patent, nor has Oracle informed its customers or end-users how to avoid infringing the '481 patent.  To date, Oracle has not identified, in response to Clouding's interrogatories, a single action that it has taken to avoid infringement (e.g., by designing around or notifying its customers or end-users how to avoid

infringement) by itself or its customers or end-users since it became aware of the '481 patent.

On information and belief, Oracle itself is unaware of any legal or factual basis that its actions

solely, or in combination with the actions of its customers and end-users, do not constitute direct

or indirect infringement of the '481 patent. To date, Oracle has not produced any opinion of

counsel, request for opinion of counsel, evaluation, analysis, or investigation relating to the

validity, scope, interpretation, construction, enforceability, unenforceability, or the infringement

or potential infringement of any claim of the '481 patent in response to Clouding's requests for

production of documents and things. Nor has Oracle to date identified any legal or factual basis

for any of affirmative defense or counterclaim (e.g., noninfringement or invalidity) relating to

any claim of the '481 patent in response to Clouding's interrogatories.

112.    As such, on information and belief, despite the information Oracle gleaned from

the original complaint in this action, Oracle <u>continues to specifically intend for and encourage</u> its

customers and end-users to use its products and/or services in a manner that infringe the claims

of the '481 patent. In addition, since at least the filing of the original complaint in this action,

Oracle has deliberately avoided taking any actions (e.g., obtaining opinion of counsel, designing

around, or providing notice to its customer) to avoid confirming that its actions continue to

<u>specifically encourage</u> its customers and end-users to use its products and/or service in a manner

that infringe the claims of the '481 patent.

113.    Oracle's actions of, *inter alia*, making, making, using, offering for sale, selling

and/or importing such products and/or services that are covered by one or more claims of the

'481 patent constitute an objectively high likelihood of infringement of the '481 patent, which

was duly issued by the United States Patent and Trademark Office and is presumed valid. Since

at least the filing of the original complaint, Oracle is aware that there is an objectively high

likelihood that its actions constituted, and continue to constitute, infringement of the '481 patent and that the '481 patent is valid. Despite Oracle's knowledge of that risk, on information and belief, Oracle has not made any changes to the relevant operation of its products and/or services and has not provided its users and/or customers with instructions on how to avoid infringement of the '481 patent. Instead, Oracle has continued to, and still is continuing to, among other things, make, use, offer for sale, sell and/or import products and/or services that are covered by one or more claims of the '481 patent. As such, Oracle willfully, wantonly and deliberately infringed and is infringing the '481 patent in disregard of Clouding's rights.

114. As a result of Oracle's infringement of the '481 patent, Plaintiff Clouding has suffered monetary damages in an amount adequate to compensate for Oracle's infringement, but in no event less than a reasonable royalty for the use made of the invention by Oracle, together with interest and costs as fixed by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Clouding respectfully requests that this Court enter:

1. A judgment in favor of Plaintiff that Oracle has infringed, either literally and/or under the doctrine of equivalents, the '449 patent, the '014 patent, the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '042 patent, the '607 patent, the '621 patent, and the '481 patent;

2. A judgment that Oracle has induced infringement of the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '042 patent, and the '481 patent;

3. A judgment that Oracle willfully infringed the '784 patent, the '637 patent, the '799 patent, the '839 patent, the '891 patent, the '042 patent, the '607 patent, the '621 patent, and the '481 patent;

4.      A judgment and order for treble damages pursuant to 35 U.S.C. § 284

5.      A judgment and order requiring Oracle to pay Plaintiff its damages, costs,

expenses, and pre-judgment and post-judgment interest as provided under 35 U.S.C. § 284 for

Oracle's infringement of the '449 patent, the '014 patent, the '784 patent, the '637 patent, the

'799 patent, the '839 patent, the '891 patent, the '042 patent, the '607 patent, the '621 patent, and

the '481 patent;

6.      A judgment and order that this case is exceptional and requiring Oracle to pay

Plaintiff Clouding reasonable experts' fees and attorneys' fees pursuant to 35 U.S.C. § 285; and

7.      Any and all other relief as the Court may deem appropriate and just under the

circumstances.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of

any issues so triable by right.

June 21, 2013

OF COUNSEL:

Marc A. Fenster
Jaspal S. Hare
Dorian S. Berger
RUSS AUGUST & KABAT
12424 Wilshire Boulevard, 12th Floor
Los Angeles, CA 90025
(310) 826-7474
mfenster@raklaw.com
jhare@raklaw.com
dberger@raklaw.com

BAYARD, P.A.

 /s/ Stephen B. Brauerman
Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
Vanessa R. Tiradentes (vt5398)
222 Delaware Avenue, Suite 900
Wilmington, DE 19899
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
vtiradentes@bayardlaw.com

*Attorneys for Plaintiff Clouding IP, LLC*